NO. 13-212

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
09/11/15 11:24:40 AM
KEITH E. HOTTLE
Clerk

ROBERTSON ELECTRIC, INC. ) IN THE DISTRICT COURT
 )
 )
VS. ) 216TH JUDICIAL DISTRICT
 )
 )
SELECT BUILDING SYSTEMS, )
INC., TRI-BAR RANCH, LTD. )
AND G&R LAND COMPANY, INC. ) KENDALL COUNTY, TEXAS

------------------------------------------------------

REPORTER'S RECORD
VOLUME 2 OF 5

------------------------------------------------------

On the 16th day of March 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Bill Palmer, Judge presiding, held in Boerne, Kendall County, Texas.

Proceedings reported by machine stenographic method.

                    A P P E A R A N C E S:


MR. JIMMIE L.J. BROWN, JR.
Attorney at Law
3102 Cherry Creek Drive
Missouri City, Texas   77459
Phone: (713) 419-1021
ATTORNEY FOR ROBERTSON ELECTRIC


        - AND -


MR. TOM C. CLARK
DEALEY, ZIMMERMANN, CLARK, MALOUF & BLEND
Attorneys at Law
3131 Turtle Creek Blvd., Suite 1201
Dallas, Texas   75219
Phone: (214) 559-4400
ATTORNEY FOR SELECT BUILDING SYSTEMS


        - AND -


MR. JOHN W. SLATES
MS. COLBIE BRAZELL
SLATES HARWELL
Attorneys at Law
1700 Pacific, Suite 3800
Dallas, Texas   75201
Phone: (469) 317-1000
ATTORNEYS FOR THE TRI-BAR RANCH COMPANY


        - AND -


MR. FRED R. JONES
GOODE, CASSEB, JONES, RIKLIN, CHOATE & WATSON
Attorneys at Law
2122 N. Main Avenue
San Antonio, Texas   78212
Phone:  (210) 733-6030
ATTORNEY FOR TRI-BAR RANCH COMPANY

INDEX

VOLUME 1 OF 3
(MARCH 16, 2015)

PAGE

OPENING STATEMENTS:
MR. BROWN ......................... 5
MR. JONES ......................... 12
MR. SLATES ......................... 14

PLAINTIFF'S WITNESSES:

THOMAS PITTMAN
Direct Examination ............... 25
Cross-Examination by Mr. Clark .... 99
Cross-Examination by Mr. Slates ... 199
Redirect Examination .............. 262

COURT REPORTER'S CERTIFICATE ............... 275

P R O C E E D I N G S

THE COURT: Y'all have a seat, please. Cause number 13-212, Robertson Electric v. Select Buildings, et al. Y'all make announcements for the record, please.

MR. BROWN: Thank you, Your Honor. My name is Jimmie Brown. I represent Robertson Electric. We're present and ready to go.

THE COURT: Yes, sir.

MR. CLARK: Your Honor, Tom Clark and Jonathan Cluck for Select Building Systems, and we're ready to go.

MR. SLATES: John Slates, Fred Jones, and Colbie Brazell for Tri-Bar; ready to go.

THE COURT: Okay. Anybody else? What happened to Tom Valega? No more Tom? He signed some pleadings in there for somebody. We don't know him?

MR. CLARK: He was an intervenor, Your Honor. He just dropped out.

THE COURT: Okay. Let me tell you mode of presentation. On your questioning, just direct, cross, and redirect, and that's it. If something is brought up on redirect that was not subject to cross, object on those grounds, so we don't go back and

forth, back and forth. Everybody got that?

MR. BROWN: Yes, sir.

THE COURT: Okay. Plaintiff want to make an opening statement? I remember basically, it's the building of a hangar in Uvalde area and somebody didn't pay a subcontractor.

MR. BROWN: Yes.

THE COURT: Everything from the podium, too.

MR. BROWN: Not a problem.

THE COURT: As I told you in the past, it makes you look smarter.

MR. BROWN: Not a problem, Your Honor. We'd like to invoke the Rule.

THE COURT: Okay.

MR. BROWN: And --

THE COURT: What about an opening statement?

MR. BROWN: Yes. Basically, Your Honor, the Plaintiff's case is really very, very simple. And the evidence, for the most part, is pretty much uncontroverted. My client had entered into a contract with SBS. He's an electrical installer and basically did that type of work. In the course of the endeavor, he gets terminated on or about January 23rd of 2013.

The evidence will be uncontroverted that on or about November 2nd, Tri-Bar, who is the -- basically the owner and the main party on the SBS/Tri-Bar contract, decided that they wanted to go with another electrician. That decision is ultimately made on January 14th when they, in fact, do so. On January 23rd is when they terminate my client.

It's uncontroverted, there's not one documented complaint against my client ever to this date. They did not have grounds to terminate my client for convenience or for cause. My client's contract does not permit a for-convenience termination. And so, they just had no basis to terminate.

Since that time, the evidence will be clear that there have been a myriad of reasons that Tri-Bar has articulated for why they have done this, and each reason has been debunked. So, I -- when the Court hears from Mr. Pittman, which will be the first witness to testify, we will get an opportunity to find out ultimately what their real reason is. But the termination of my client was without cause. My client incurred significant damages as a result thereby. He has suffered losses well in excess of the contract value.

So, when the evidence fleshes out, this is what the Court will see. From the onset until now, there's never been a complaint against my client. From the onset until now, the reasons that Tri-Bar has offered for doing the actions that it undertook are unsubstantiated. From there until now, their case has been a farce. So, we'll be asking the Court basically to find against Tri-Bar because they tortiously interfered with the contract and they had no basis to do so. The costs that they alleged to -- to avoid when they, in fact, take on C&S, which was the replacement for my client, they incurred well in excess of a hundred thousand dollars more in costs. Nothing of what they have said makes sense.

And so, we'll be asking for damages. We'll be asking for damages of the contract value. We'll be asking for damages for the loss that my client has sustained. These damages are well in excess of $800,000.00. That there are attorney's fees that have been incurred, and we'll be asking for those. And we believe that when the Court hears the totality of the evidence, that it will be uncontroverted that the conduct of Tri-Bar pretty much has been unconscionable.

And you'll find that the request is quite

reasonable under the facts of this case. And we thank the Court for its indulgence to this point. And hopefully in the next three days we will be as brief as I'm going to be right now. Thank you.

THE COURT: Select Building?

MR. CLARK: Your Honor, Tom Clark. Pleasure to be here. Your Honor, eight months ago we were here on a motion for summary judgment. And the issue at the time under the AIA contract was whether the owner had terminated for convenience or terminated for cause. It only becomes a termination for cause if there is a written notice under one of four conditions that are in paragraph -- section 14 of the general conditions of the standard AIA contract.

And at the time we argued that there was no such notice. The Court made a very pointed inquiry and said, "Was there a notice provided prior to the termination?" Mr. Slates, who is back there behind us, said, "We are still looking, Your Honor." Here we are eight months later; they haven't found it. It didn't exist then. It doesn't exist now. There was no notice of any defects or any of the four reasons why an owner can terminate for cause.

So, it's going to be undisputed at the beginning of the day and at the end of the day that

this was a termination for convenience. The owner, Tri-Bar, terminated SBS for convenience. Is that a breach? No. The owner has every right to do so. It's in the contract. It's 14.2 of the general conditions. 14.2.2 of the general conditions says, if there's a termination for convenience, the owner shall pay the contractor any amount due for the work performed to date, profit on the work not yet performed, and that's it. That's the entirety of that section. That's what we're here to prove today, Your Honor. That's the section that's in play. The amount that we're due is $304,926.88 plus $24,649.70 in the profit on the work not yet performed. Plus attorney's fees of -- I believe our attorney's fees testimony by the end of this -- by the end of Wednesday will be somewhere around $95,000.00, which I'll put on the stand in appropriate testimony.

That's what we're telling you at the beginning. That's what the issue is going to be at the very end of the day. What you're going to hear in the meantime from Tri-Bar is -- in other words, our case is as simple as Mr. Robertson's is. There was a termination. We got kicked out. It was for convenience. We're done. Part of our 304,000 is the money that Select Building Systems owes to Robertson.

At the time that we were instructed to terminate Robertson by the owner, we owed Robertson $54,000.00 for material, work, everything that was done. We never got paid by the owner. We didn't pay Mr. Robertson.

That much is also going to be completely undisputed throughout the entire case. We have the pay with pay clause. And that's kind of why we're sitting together over here, is we're both suing Tri-Bar to get our money. The workmen have not been paid. What you're going to hear over here is, it should have, could have, would have. We could have sent a notice. We would have sent a notice. And if we'd done -- if we followed what we were going to be doing, we should have sent a notice. But we didn't send a notice. And what Mr. Brown was referring to is, in November, you'll see it laid out flat out that Mr. Pittman and others -- you'll see the evidence -- talk about a plan to get rid of us. They just didn't follow through with it. So, we end up with a termination for convenience.

You're going to find that they want to try to claim after the fact -- Tri-Bar wants to claim after the fact that there were a bunch of defects and problems with the project that they discovered after

the fact. These are all made up. And we'll go through -- that's what Mr. Brown was talking about with the -- the debunked part. They walk in and they say, oh, we need to change the roof; a hundred thousand dollars. There's nothing wrong with the roof. And you'll hear testimony that -- from disinterested witnesses to tell you that the stuff that they -- that Tri-Bar ended up doing after the fact did not need to be done. But more to the point legally, there's no basis for an offset. In that termination for convenience clause, there's nothing that says, oh, and by the way, if you find out something later on where you should have terminated for convenience, you get to go back and do a do-over. You'd have to add words to the contract to get there.

So, we have all these issues that were added after the fact. They call them repairing defects. Our clients are going to call them finishing work; doing punch list items; doing that which a person would ordinarily do to finish off a project. What you're going to see, there are pictures of an unfinished project without finished trim put on it to make it look good. And that's all. And at the end of the day, Select Building Systems was never given an appropriate list of things that needed to be fixed and

an opportunity to go out and cure it. You can't fault a man for not fixing something if he was never given a chance to come in and cure it. That's again part of the termination for convenience -- you can have termination for cause if they wanted to try to get there after the fact, but they still had to give us the chance to come out and cure, fix, or finish. They chose not to do that.

So, at the beginning of the day and at the end of the day, we're going to end up with a termination for convenience that Tri-Bar owes Select Building Systems $304,926.00, of which we owe Robertson $54,999.00. And the artisans need to be paid. Thank you.

THE COURT: Okay. Mr. Slates, Mr. Jones?

MR. JONES: Your Honor, I'm going to make a few brief remarks -- good morning, Your Honor -- a few brief remarks and introduce John Slates, as lead counsel, and Colbie Brazell, and also we have with us Wes Sharples, who's in-house counsel for Tri-Bar.

We obviously disagree. We agree with very little of what has been said so far. I believe you can understand that. We at least agree this is an airplane hangar project that went way bad. We chose SBS because we thought they were nimble. They told us

that they were nimble. They told us they had expertise in these type of pre-engineered metal buildings for an airplane hangar. And the evidence will show that both the Plaintiff and SBS just have the facts wrong. And the evidence will show that.

They busted all the schedules; all the time schedules. They knew from the beginning this was a 173-day contract. You don't pick 173 days just out of your hat. There was a reason for the urgency of having this done on time. They promised it would be done on time. So, we had less than six months to construct this project. They said they could do it. They tried to explain the delays based upon change orders. Anybody who's been through a construction project knows that there are going to be changes. They did know -- have actual knowledge -- that there were going to be changes from the plans and specs. Our architect lost trust in the contractor. Our -- this was just a loss of trust on the entire Tri-Bar team based upon these lengthy delays and the misrepresentations about when the product would be finished; when it would be delivered.

So, that's what we're going to show. There were a lot of defects that we discovered only after termination and after our consultants and

experts got in there and found out what was going on; found out that -- all the problems with what had been done. And so, we're here to defend these claims. We had no alternative but to terminate the contract. Did we want to? No. Did we need to? Did we have to? Yes. John, I'll turn it over to you if you have any other.

MR. SLATES: Your Honor, just a couple points on the nature of the termination as related by Mr. Clark, and then I'll address some issues raised by Mr. Brown. It was represented, I believe, during the opening that it was undisputed that this was a termination for convenience. That's not the case. I told you that at the motion for summary judgment hearing and I believe that's the reason you denied the motion. It is clearly disputed, it is firmly disputed, and it is disputed based on the facts of this case.

When you terminate someone for cause, you don't have to pay them until the project is finished. When you terminate someone for convenience, you're supposed to pay them at the time of termination. During the meeting at which Tom Pittman, who is sitting back here, terminated SBS, he made the direct representation, we don't have to pay you right now

under the terms of the contract. That's a termination for cause. He told them he was going to try to get them paid because he wanted to part ways amicably and try to get on down the road. So, he treated it as a termination for cause and he considered it a termination for cause. And the circumstances are consistent with a termination for cause. There was justification for a termination for cause. You will hear the evidence that they busted the schedule again and again and again. They made representations about when the metal building would be delivered that were not true. They even said that the metal building would be delivered on dates before it had even been put into production by the metal building manufacturer. And the architect only found that out after the fact.

This notice issue is a red herring. When we look at the contract provision, the notice that's required is not a notice and an opportunity to cure. There's nothing that the contractor can do after receiving that notice to avoid a termination. It's just a notice that this is what we intend to do. So, the fact that a notice wasn't sent has no substantive impact on what happened on this project.

As I mentioned, the -- or as Fred

mentioned, there were defects discovered after the termination. The metal building was 2 inches out of plumb. It's -- it's leaning. The brick lug that holds up 20 feet of masonry, which weighs I don't know how much, was poured as just a lip on the edge of the foundation. It wasn't on the grade beam. It wasn't supported below grade. And there were countless defects with the metal building itself. And you'll see the evidence of those defects as we get into this case.

The total cost that Tri-Bar incurred to fix those defects was $317,000.00. So, whereas SBS contends it's owed $304,000, we contend that we're entitled to an offset of $317,000.00. There is a difference, as we discussed at the motion for summary judgment hearing, between a breach of warranty claim and a breach of contract claim. They are myopically focused on the breach of warranty issues. Yes, if you want someone to come out and make a warranty repair, you have to send them a notice and ask them to do that. If you want to hold someone liable for breach of contract, there is no such obligation. And we'll see that in the language of the contract.

With respect to Mr. Robertson, I believe Mr. Brown said it. There's two claims here, first of

all; a breach of contract claim and the tortious interference claim, which he spent most of his time talking about. He said the contract is with SBS. That's undisputed. That is the one thing in this case that I think everyone will have to agree is undisputed. There is not a shred of evidence that there was any contract between Robertson and Tri-Bar. So, that claim goes away from the get-go.

And then we start talking about tortious interference. And there was records to the real reason that Robertson made a change. What you're going to hear from Mr. Pittman is the real reason that they made a change. And that is because there was a change in scope for the electrical work. There were some additions made to the scope of the electrical work. Robertson submitted a bid to perform that work that was $60,000.00. After the owner came back and said, that's way too high, they started ratcheting it down. I don't know how they did that. They must have had some fluff in the bid. But they eventually got it down to 32,000. But while all this is going on, Mr. Pittman has gotten a competitive bid from C&S Enterprises. That bid is $21,119.00; almost a third of the original bid from Robertson. And Robertson is still one and a half times higher than C&S even after

it backs all the fluff out of its bid.

An owner has a legitimate interest in the cost of his project. It's reasonable for an owner to want to manage the cost on the project. And their interest is superior to that of both the general contractor and the subcontractor. So, they were justified in asking SBS to make a change to C&S, given that they could -- the price that Robertson quoted was 50 percent higher than the price that C&S quoted.

Mr. Pittman will tell you that he believed that he had the right to require SBS to make a change in the contract. He'll tell you that he believed that the contractor allowed it. And he'll tell you that he did not believe that SBS doing so would in any way be a breach of its subcontract with Robertson. That's all I have at this point. And we will attempt to be expeditious in the presentation of our evidence as well.

THE COURT: Thank you. Your first witness, Mr. Brown?

MR. BROWN: Yes, sir. We will call Mr. Pittman to the stand.

MR. CLARK: Your Honor, I think we have an extra witness that may be in the courtroom.

THE COURT: Okay. And somebody asked

that --

MR. TREVINO:  I'm not.

THE COURT:  You're not?

MR. TREVINO:  No.  I'm general counsel for Tri-Bar.

THE COURT:  Okay.  Come on up, Mr. Pittman.

MR. CLARK:  He's actually on our witness list.

THE COURT:  Come on up, sir.

MR. TREVINO:  Excuse me?

MR. CLARK:  You're actually on our witness list.

THE COURT:  I think somebody asked to invoke the Rule, so any other witnesses around?  Okay. Come on up, sir, and tell me one more time your name for the record.

MR. TREVINO:  Yes.  It's Anthony Trevino. I'm general counsel for Tri-Bar.

THE COURT:  Okay.  Raise your right hand.

(At this time the witness was sworn in.)

THE COURT:  You understand the Rule has been invoked, which means you cannot be in the courtroom while other people testify, nor can you read

any written testimony while this case is going on or discuss the testimony. Do you understand that, sir?

MR. TREVINO: I do.

THE COURT: Okay. You're excused until we call you. Thank you. Mr. Pittman, raise your right hand.

(At this time the witness was sworn in.)

THE COURT: Have a seat, sir.

MR. BROWN: Your Honor --

THE COURT: Anything else, sir?

MR. SLATES: I apologize. I don't recall Mr. Trevino being on your witness list. He may be identified as a person with relevant facts, but he's not indicated that you were going to call him.

MR. CLARK: Well, we -- we may. It depends on whether -- you know, Mr. Morgan obviously had conversations with Mr. Trevino about the defects. So, that may become an issue. He may be a witness and I don't want to have the Rule violated and him be sitting there listening to everything.

MR. SLATES: He's a lawyer for the company. It seems like he would be --

THE COURT: Well, if he's a witness, then he would be disqualified as a lawyer. So, we can go

down that trail. I mean, you're going to call your client, who's going to say something that Counsel told him --

MR. CLARK: Yes.

THE COURT: Why would you want him to testify to -- controverting what your client says?

MR. CLARK: Well, I don't know that I would want to.

THE COURT: Okay.

MR. CLARK: But if Mr. Slates wants to call him later to say that Mr. -- I mean, I guess --

THE COURT: Then he's sitting here under the Rule, then he'd be excluded.

MR. SLATES: Your Honor, let me try to solve this problem.

THE COURT: Or we can --

MR. SLATES: We have no intention of calling Mr. Trevino. And Mr. Morgan can give his testimony as to what transpired in that conversation. I'll cross-examine him and --

THE COURT: Okay. You can have Mr. Trevino stay here. But then again, if for some reason you want to call him, you can't since the Rule has been invoked. We understand that?

MR. SLATES: That's understood.

THE COURT: Okay.

MR. BROWN: The exhibits have been previously agreed to. And we're asking, to the extent that they are, Plaintiff's Exhibits 1 through 34 that we've agreed to --

THE COURT: Any objections to Plaintiff's 1 through 34, Counsel?

MR. SLATES: The only one that we've raised an objection to, I believe, is Exhibit Number 10, which is the affidavit of Tom Pittman.

MR. BROWN: It's 10. And of the list, 10, which is the affidavit of Tom Pittman, and 21, the deficiencies of C&S, have been pulled.

THE COURT: Okay. 1 through 34 with the exception of 10 and 21. Any objection to those?

MR. SLATES: No objection.

THE COURT: Okay. Those are admitted.

MR. CLARK: And no objection from us either. Your Honor, do you want all the exhibits now? Because we've kind of --

THE COURT: If y'all have got a book like that, that would be nice.

MR. CLARK: We have a copy that you can write on. These are just the Select Building Systems exhibits that we've agreed on, all except Number --

THE COURT: Well, what about the first -- is there a binder for me?

MR. CLARK: All except Number 23 are agreed as admitted in ours. They're like the Defendant's Exhibits 1 through 117.

THE COURT: Okay.

MR. CLARK: That's your copy, so you can write on it. I've got a separate copy for the --

THE COURT: Okay.

MR. BROWN: You can have this one.

THE COURT: Counsel, as to Defendant's 1 through 117, any objections to Defendant, Select Building's --

MR. SLATES: Only as to 23, Your Honor.

THE COURT: 23. So, Select Building's Exhibits 1 through 117 are admitted, except for 23?

MR. SLATES: Yes, Your Honor.

THE COURT: Okay.

MR. SLATES: Ours is a bit more complicated.

THE COURT: Hold on. Okay. Go ahead, sir.

MR. SLATES: Okay. There are some objections that have been raised to some of our exhibits. I don't know if you want us to take those

up at the time of introduction, but let me just --

THE COURT: Let's go through the ones y'all agreed upon.

MR. SLATES: Certainly. Okay. So, stipulated as admitted by all parties of Defendant, Tri-Bar's exhibits are Exhibits 1 through 13.

THE COURT: Okay.

MR. SLATES: 21 -- excuse me -- not 21. Strike that. 28, 29 through 37, 39, 41, 42, 46 through 49.

THE COURT: 46 through 49?

MR. SLATES: Yes, Your Honor.

THE COURT: Okay. Thank you.

MR. SLATES: 51, 52, 54, 56, and 61.

THE COURT: Is that correct?

MR. BROWN: Yes, sir.

THE COURT: Counsel, is that correct?

MR. CLARK: Yes, Your Honor.

THE COURT: Okay. Defendant Tri-Bar's 1 through 13, 28, 29 through 37, 39, 41, 42, 46 through 49, 51, 52, 54, 56, and 61 are admitted.

MR. SLATES: I apologize, Your Honor. I omitted -- 15 through 18, I believe, were also stipulated to.

THE COURT: Is that correct, Counsel for

Plaintiff -- Counsel for Robertson?  15 through 18, he's saying.

MR. BROWN:  Yeah, that's correct.

MR. CLARK:  Yes, Your Honor.

THE COURT:  Okay.  15 through 18 are also admitted for Defendant Tri-Bar.  Go ahead, Mr. Brown.

MR. BROWN:  Thank you.

**THOMAS PITTMAN,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. BROWN:**

Q.  Would you please state your name?

A.  Thomas Pittman.

Q.  And what is your relationship to Tri-Bar?

A.  I used to work for Lewis Energy.

Q.  And so --

MR. SLATES:  Mr. Brown, I apologize for interrupting you.  I was just going to let the Court know, Mr. Pittman is a type I diabetic.  He may need to take a break and get a piece of candy or something if he gets a little low.

THE COURT:  Okay.  So am I, so that's okay.  We can go together to the candy machine.  Okay.  Go ahead, Mr. Brown.

MR. BROWN:  All right.

Q.   (BY MR. BROWN)   Were you still working with Tri-Bar on or about June 19th, 2012?

A.   I believe so.

Q.   Okay.  And briefly, what are your qualifications?

A.   How far do you want to go back?

Q.   Well, this century would be nice, but --

A.   Okay.  Well, I started in the construction industry probably around 1977.  While I was going to college, I worked for Ray Ellison.  I was an apprentice for Ray Ellison.  I got a degree from Trinity in building construction.  I've been in the construction business ever since; residential, commercial, multifamily; probably close to $500 million worth of work.

Q.   And do you hold any licenses?

A.   No.  You don't have to hold a license to be a general contractor.  I was certified as an FHA inspector when I was going to college, but I never used that.

Q.   And you continued working with Tri-Bar or your employer until when?

A.   I don't remember.  I want to say it was probably March or April.

Q.   Of what year?

A.   '13.

Q.   2013?

A.   Yeah, 2013.

Q.   And did you quit or were you terminated?

A.   No.  I resigned.

Q.   Under what basis?  Why did you resign?

A.   Well, at the time I was looking at starting another business with an entrepreneur and investor.

Q.   Now, there's a contract, I believe, that you entered into with -- or for Tri-Bar with SBS Select Building Systems; is that correct?

A.   I didn't enter into a contract with them.  I mean, Lewis -- Rod Lewis personally did under Tri-Bar. I mean, I don't know the specifics of it, but --

Q.   And you're identified in the contract as the representative; is that correct?

A.   Yes.  I was the construction manager for Lewis Energy.

Q.   And in your capacity in this contract, what is it that you would do?

A.   Well, I was an owner's rep.

Q.   So, what would you do?

A.   Well, I would oversee construction projects. I acted as the owner's rep with my eyes and ears on the project in all aspects.

Q. So, does that mean that you're reviewing the subcontracts that come in, meet with --

A. No. I didn't review subcontracts. Our contract was with SBS.

Q. So, you had nothing to do with any of the subcontracts that came in? You didn't look at them, didn't know anything about them?

A. No.

Q. And you're aware that my client entered into his contract with SBS on or about June 9th, 2012; is that correct?

A. I'm not sure when your client entered into a contract with SBS.

Q. During your time with the contract -- because you would have been there from June 9th of 2012 up until the point when my client was terminated; correct?

A. Correct.

Q. So, during that time, did you ever meet with any representative of Robertson Electric?

A. I talked to people that were doing the work out there periodically.

Q. Who?

A. I don't remember. You know, they had -- they were electricians. I don't know if they were subs --

subcontractors or direct employees of Robertson Electric.

Q. Did you ever meet Mr. Robertson?

A. No.

Q. Never sent him any correspondence?

A. No.

Q. Ever call him on the phone?

A. No.

Q. So, it would be reasonable, then, for me to state that during the time period from Mr. Robertson's time on the contract until he was terminated -- or his business terminated, that you never spoke to him?

A. Correct.

Q. Never wrote to him?

A. Correct.

Q. So, during that time span, then, it would be reasonable for me to say that there was never a complaint that you register with him?

A. I never registered a complaint with Robertson.

Q. At all?

A. At all.

Q. Okay. Now, with regard to -- I want to go to Plaintiff's Exhibit Number 5. Now, on January 2nd of 2012, my client made some inquiry about the status of

a change order.  There was a change order that takes place in December; isn't that correct?

A.  I'm assuming.  Yes, that's correct.  There was -- let me rephrase that.  We didn't issue a change order.

Q.  No, you didn't.

A.  No.

Q.  In fact, as I understand it, there were changes that were made to the underlying contract that Mr. Robertson for REI indicated that weren't in the original draft; isn't that correct?

A.  I don't know that.

Q.  And isn't it also correct that, based upon those changes which were not in the original draft, he then sends out a request for a change order based upon those changes that are in the -- in the contract -- I mean, in a draft he's now in possession of?

A.  Well, that -- let me digress.  I know that there was a -- there was a proposed change.  Okay.  There was a proposed change issued by the architect to add some additional circuitry and add some additional electrical work.  I'm not sure I follow what you're talking about as far as changes that were made.  Those -- that's the only specific change that was made and at issue.

Q.   But what I really want to make certain of is that you were dealing with the representative for SBS; isn't that correct?

A.   Yes.

Q.   And it indicates that on January 2nd, you're out there at the site -- it indicates that you go to the site on January 2nd; isn't that correct?

A.   I don't see where it says that I'm on site.

Q.   Go to the top.

A.   Again, I don't see where it says that I'm on -- on the site.

Q.   Read up here, please.

A.   (Witness complying.)  "Jerrod, we're scheduled to have a meeting with the client this Friday to review all outstanding issues/change orders. Hopefully we'll get something finalized during this meeting because your change order will be discussed at that time.  At this time client rep was out late this afternoon and, generally speaking, he's satisfied with the conduit installation thus far.  It doesn't mention my name.

Q.   Okay.  You're the client's rep, aren't you?

A.   I am one of them.

Q.   Okay.  The contract that you have with SBS, you are the designated client rep?

A.   Am I?

Q.   Are you aware of that?

A.   No.

Q.   Okay.  Let's go to that contract so that we can remove any ambiguity.  That should be Exhibit 15. On Exhibit 15, subparagraph section 15.3, page 11, see at the very bottom where it says, "owner's representative"?

A.   Yes.

Q.   Who does it say it is?

A.   That's me; Thomas Pittman.

Q.   So, it would appear you're the rep that he's talking about; right?

A.   Yes.

Q.   And you do recall having conversations with -- is it Kieke?

A.   Kyle.

Q.   Kyle?

A.   Yeah.

Q.   Is it Kieke?

A.   I don't know.

Q.   Okay.  And as a matter of fact, if you go to Plaintiff's Exhibit 19-D, which are the SBS daily fuel reports, where it indicates inspections and testing visitors that date at the site.

A. Uh-huh.

Q. It shows you're there, doesn't it?

A. Yes.

Q. So, does that help refresh your memory as to --

A. Yeah. I see there's one electrician on the site, too.

Q. So, that helps refresh your memory as to --

A. Yeah.

Q. -- that you were there; correct?

A. Yeah. I was there.

Q. All right. And he accurately represents that you had no problem with the conduit installation; correct?

A. Well, I didn't go and physically, I mean, examine the conduit. I mean, I saw them installing conduit with one electrician.

Q. Now, on Exhibit 19-D, it indicates the work that Robertson Electric was doing that day; correct?

A. Yes.

Q. It says pulling wires, conduit, those type of things; correct?

A. "Pull wire for overhead lighting conduit. Install conduit drops for emergency wall lighting, continue CMU wall construction."

Q.   That's what you saw going on; right?

A.   I believe so.

Q.   You didn't go up there and tell them to stop?

A.   No.

Q.   You're doing it wrong?

A.   No.

Q.   All right.  On Exhibit 19-N, this is a weekly report for SBS.  Now, it indicates that there were no project issues this week; right?  Mr. Pittman?

A.   I'm reading.

Q.   Oh, okay.

A.   Okay.  I'm sorry.  What was the question?

Q.   There are no project issues indicated for this week; correct?

A.   On this report.

Q.   That's correct.  None indicated for my client; correct?

A.   Again, this is a weekly report submitted by SBS.

Q.   I understand.  So, the purpose of these reports is to communicate a history of what is going on at the site; correct?

A.   I would assume.

Q.   Okay.  And you're looking at this, and I guess I'm trying to figure out, did you talk to

anybody at SBS saying that there was a problem that week with my client?

A. I don't remember. I know that I did speak to SBS about Robertson Electric.

Q. We'll talk about that in a few moments. Let's go to week-ending -- let's go to 19-O. You would agree with me again for this week, there are no problems identified; correct?

A. Well, there's a paragraph here that says "project issues." It says, "We'll address all outstanding issues during the scheduled meeting of 7 of January." And outstanding issues -- we'll address all outstanding issues. I don't know what those outstanding issues could be. That's kind of an open-ended question.

Q. And that is for January 6th of 2013; correct?

A. This -- yes.

Q. Okay. You know who John Grable is; correct?

A. Correct.

Q. And who was he?

A. Project architect.

Q. And in that capacity as a project architect, it would be his responsibility to oversee -- if there were problems, start with those problems; correct?

A. No, that's not correct.

Q.   Okay.  What would he do?

A.   Well, it depends on what his contract is.

Q.   Okay.  Well, you're the one dealing with him.
What did he do for you?

A.   What did he do for me?  He's a project
architect.  He also had -- at the time he was going to
act as the -- or assisting in construction management.

Q.   Okay.  So, he's assisting in project
management, so he's overseeing and making certain that
things are happening the way they're supposed to
happen; right?

A.   I don't know that.

Q.   Okay.  Let's go to Exhibit 24-B.

A.   Is there a tab that says "B" or just --

Q.   Go here.

A.   Okay.

Q.   That's Mr. Grable approving a draw
application; correct?

A.   I believe so.  I can't really see -- is that
for draw application number 6?

Q.   That's correct.  What he expressed and writes
is that the electrical rough-in is underway and real
progress is underway.  Isn't that what he writes?

A.   Yeah.  He's referencing that because there
had been no progress prior to that time.

Q.   And I want you to -- to note the exact daily weekly report he addresses.  It's 19-O; isn't that correct?

A.   I'm trying to read this.  It -- the copy is very blurred and smudged.

Q.   Do you want me to help you?

A.   No.  I'm getting through it.

Q.   All right.

A.   Okay.  What was the question?

Q.   The exact report -- weekly report he's referring to is Exhibit 19-O; isn't that correct?

A.   Yes.

Q.   And based off that, what he's saying is, everything is underway.  Everything appears to be good; right?

A.   Yeah.

Q.   And if you look at the very bottom of that, you get a CC?

A.   Uh-huh.

Q.   So, that would have been your time then to say, well, that's not what I think is correct; right?

A.   That -- yeah, I would assume.

Q.   But you don't do that, do you?

A.   No.

Q.   Okay.

A.   I mean, I don't know that I don't do that.  A lot of my communication and -- as the construction manager for Rod Lewis would be ultimately to review all the pay applications regardless of what the architect said.

Q.   Okay.  A lot of your communication is oral; right?

A.   Some of it is.

Q.   Well, a few moments ago you indicated that you had a conversation with SBS; correct, about my client?

A.   I did.

Q.   You didn't put it in writing, did you?

A.   I don't believe to.

Q.   Okay.  So, you didn't write to them saying whatever concern you allegedly had with Robertson Electric; correct?

A.   You know, that was a long time ago.  I don't remember.  I'm sure I -- I had some correspondence via e-mail.

Q.   Well, you would agree with me that if you had correspondence via e-mail; right --

A.   Right.

Q.   -- it would exist; right?

A.   Yes.

Q. And certainly your lawyers would have it; right?

A. I assume.

Q. And if I represent to you that no such communication has been turned over, then it would tend to suggest that it doesn't exist; right?

A. Okay.

Q. So, if there is no e-mail from you at all to SBS concerning Robertson Electric, then your earlier representation that it could have been in -- via e-mail would be incorrect, wouldn't it?

A. Well, like I said, I -- I haven't gone through all this documentation. If you're saying that there is no e-mails that exist between myself and SBS regarding Robertson Electric, then I'm assuming that's correct.

Q. Now, when I reviewed Mr. Grable's letters, Exhibit 24-A and Exhibit 24-B concerning my client, he expressly states electrical rough-in is underway and real progress is underway. That's what he writes in both instances; correct?

A. Correct.

Q. Now, on Exhibit 24-B, it has the date of January 21st -- I mean, of December 21st, but that's obviously incorrect, because it references the weekly

report of January 6th. So, it couldn't reference a report on the 21st that didn't exist until after that document was drafted; correct?

A. Assuming that it was issued on the 4th of January.

Q. Now, Exhibits 19-A through 19-L include the following dates: December 18th, 2012; December 19th, 2012, December 20th, 2012; January 2nd, 2013; January 3rd, 2013; January 4th, 2013; January 7th, 2013; January 8th, 2013; January 15th, 2013; January 21st, 2013; January 22nd, 2013; and January 23rd of 2013. Those are the daily reports from SBS. And in each and every one of those daily reports, there is not one indicated problem with Robertson Electric. Were you aware of that?

A. No, I wasn't. But after looking at these daily reports, it's telling me that there's one electrician on the site.

Q. Okay.

A. There's two electricians, at best. That's problematic on a job this size.

Q. It's funny you should say that. Because as I understand it, during this time frame, there is trench work that's supposed to be done and --

A. What kind of trench work?

Q.   -- curbing that's supposed to be done.

A.   What's that?  Trench work?  What kind of trench work?

Q.   We're going to get to that.  We're going to get to that.  But those documents don't show any complaint; correct?

A.   I don't see anything.

Q.   Okay.  Now, Exhibits 19-M through 19-Q are the weekly reports.  And these are December 23rd, December 30th, January 6th, January 13th, and January 30th of 2013.  And those likewise show absolutely no complaint or problem?

A.   Well, I find it highly unusual if a -- if a general contractor is going to write all his complaints on a weekly report.

Q.   Maybe.

A.   Yeah.  I mean, I doubt if a general contractor is going to put, I'm really having a problem with the electrician or, I'm really having a problem with my stone guy.  You know, so, to say that these project issues aren't identifying a problem with Robertson Electric is kind of -- I don't know how that's relevant.

Q.   So, what you're saying is, they should have been like you; right?  Not have documentation, but say

there was a problem.  Is that what you're saying?

A.  No, that's not what I'm saying.

Q.  Okay.  Because I want to be certain.  You're contesting documentation and you're saying, well, they're not going to document --

A.  I'm not consisting it.  I'm just reading what's here.

Q.  Okay.

A.  And there's very little here.  There is -- when you have project issues and you've got one sentence that says, we'll address all outstanding issues, what does that mean?

Q.  Well, I believe when your architect goes back and says everything is fine, then -- and you indicated --

A.  And as an architect, he's not going to go, boy, I'm really having a problem with the general contractor.

Q.  So, what you're saying, then, is that the general architect --

A.  A general architect?  What is that?

Q.  I mean -- excuse me.  The architect who was on this site with Mr. Grable, he didn't indicate to you that he had any problems with my client; correct?

A.  Not that I remember.

Q.   And so -- and he didn't put anything in writing to you about any problems he was having; is that correct?

A.   That's correct.

Q.   Okay.  Now, did you take any pictures?

A.   Did I take picture?

Q.   Yes.

A.   I don't believe so.

Q.   Okay.  So, the pictures that my client does take would indicate what the site was like when he was there; correct?

A.   I don't know.  I've never seen any pictures that your client took.

Q.   Okay.  Have you seen Exhibit 27?

A.   Okay.

Q.   Did you examine them?

A.   I've looked at the first page.  I didn't know there was more.  Some of these are reproductions of the same picture over and over again.

Q.   Okay.  These are pictures of the site; the work, equipment, and supplies that are at that site.  Did you ever go to the site and see the wall?

A.   See the wall?

Q.   See the wall, where the electrical work was being done.

A. Yeah.

Q. That's what it looked like, didn't it?

A. Yeah.

Q. Okay.

A. There was a whole bunch of walls. Are you referring to one of the walls or all of the walls?

Q. Those pictures accurately represent what my client did up until the 23rd of January --

A. No.

Q. -- of 2013?

A. No, they don't.

Q. So, you're saying the camera is lying, too?

A. No. I'm saying you're taking one picture -- two pictures -- a lot of these are duplicates of the same thing.

Q. Okay.

A. But they don't accurately depict all of the electrical work.

Q. And you --

A. If that's what you're asking me. You're asking me if one wall is indicative of all of the work, and I'm saying, no, it's not.

Q. As a matter of fact, that's not what I said.

A. Okay.

Q. What I said was --

A.  You did say the wall --

THE COURT:  Wait.  Y'all don't overtalk each other.  She can't type it down.

THE WITNESS:  I'm sorry.

MR. BROWN:  I'll stop.

Q.  *(BY MR. BROWN)*  What those -- I represented those pictures were of the site that Mr. Robertson did, and they were indicative of what Robertson Electric did.  Isn't that what I said?

A.  I believe so.

Q.  And that's what those pictures represent; correct?

A.  Yes.

Q.  And you don't have any pictures of what you took; correct?

A.  No.

Q.  Okay.  So, again, your memory that you -- a few moments ago was a little hazy, you were going back and saying, well, that really wasn't it?  Is that what you're saying?

A.  I'm sorry?

Q.  A few moments ago when we were going -- you know, I was asking you some questions, you appeared to be having some problems with your memory.

A.  No.

Q.   Okay.

A.   I wasn't.

Q.   Now, Exhibit 19-Q is the weekly report from SBS.  And on the project issues, it says, the electrical subcontractor status.  That was an issue. You see that?

A.   Uh-huh.

Q.   Is that because on January 14th, you told SBS that you needed to make a change?

A.   I don't remember the date, but yeah, I told SBS we needed to make a change.

Q.   And that occurs on the 14th of January of 2013; correct?

A.   I don't recall.

Q.   When -- the process for doing bids --

A.   What kind of -- doing bids?

Q.   Electrical bids.

A.   Yeah.

Q.   Is the normal course to have somebody examine the work that needs to be done and then they bid on that work?

A.   I'm sorry.  I don't really follow you.  The standard course of action is to issue contract documents to electricians, have them vet the electrician, get a price from the electrician.

Q. Okay.

A. That's standard procedure.

Q. So, you would agree then that the providing of documents is what you would provide to --

A. I'm the owner's rep. I'm not the general contractor. I would assume the general contractor provides the electrical contractor with the necessary documents.

Q. So, then, it would be the general contractor that then does the vetting in looking for --

A. Right. We don't -- as a construction manager for the owner, I'm not managing the subcontractors.

Q. Okay. So, you're not going out there looking to find subcontractors; correct?

A. I'm not sure I really understand you.

Q. Well --

A. What do you mean, I'm not going out and looking to find subcontractors?

Q. Uh-huh.

A. That -- that can happen. If I see a problem, if I identify a certain trade as having a problem, I can -- I can go in and say, hey, I want to price this or I want to look at optional pricing. I don't have to do that through a certain electrician.

Q. Okay. And the process for doing that would

be, then, that you then submit them the documents for them to review first?

A. Who is them?

Q. Whoever you're going to consider.

A. Yeah. That's safe to say.

Q. Okay. So, you would then send out documents first to whomever you're going to consider; correct?

A. I'd assume.

Q. And then that individual would then tender a bid or a proposal based upon that; correct?

A. Correct.

Q. And then you would then act upon that?

A. Well, if I gave them notice of receipt or if I issued them a contract. He's not going to act upon it independent of giving -- without giving a notice to proceed or a contract.

Q. Did you, in fact, provide C&S Enterprises a copy of the work -- a packet, as you would say, for them to consider before you recommended them?

A. I -- absolutely I did.

Q. Where is it?

A. The packet that you're referring to is -- was a change order that was issued by the architect -- a proposed change for additional work to the contract. Not the subcontractor, Robertson Electric, but the

contract that SBS had. Okay. And most of -- the majority of that was electrical work. And the only reason I did that with C&S is because the price I got back from Robertson Electric was extremely high.

Q. Well --

A. And it was my -- it was under my prerogative that I can take that and have another electrician look at that.

Q. I want to be certain I understand what you're saying. Because the only -- the only document you got back from Robertson Electric addressed a change order; correct?

A. Proposed change.

Q. Right. And that was it. And then based upon that one little narrow area of change order, you then recommended --

A. It was almost -- it was -- it wasn't one little narrow change order. The first change order I got from Robertson Electric was $60,000.00. That was almost -- that was a quarter -- more than a quarter of the whole subcontract amount.

Q. Okay.

A. That was when I went, you know, there's a problem here.

Q. Okay. Now, when you did that, okay, that was

on that one area of the change order; correct?

A. I think that was the area of the change order.

Q. Okay.

A. Not one area.

Q. And based upon that -- based upon that section, you then recommend the termination of an entire contract?

A. No, that's not true.

Q. Let's go -- let's look at --

A. After the review of C&S's number, I did.

Q. Let's look at Exhibit 29, please.

A. (Witness complying.)

Q. Now, Exhibit 29 is an e-mail. And on January 14th at 3:54, you send Jack Green -- Jack Green is with SBS; correct?

A. Yes, sir.

Q. Okay. And you send him the following. It says, "Give me a call about the electrician." Correct?

A. Correct.

Q. He said, "I'm going into a meeting now and should be out by 4:45 p.m." Correct?

A. Correct.

Q. Okay. Now, attached to that is the proposal.

A. There's nothing -- there's no attachment on this e-mail. So, there's -- but that was not attached to this.

Q. That's what I got.

A. Okay. It's just another proposal. It's not attached -- there's no attachment. But yeah. Okay.

Q. And the entire contract for my client is being bidded out; correct?

A. No. I sent over the plans and specifications for the hangar for a comparable bid.

Q. Well, if all you sent over was a comparable bid for the change order -- that's what you're saying?

A. No. No. I sent over all of the documents for the electrical side. Because I'm getting a comparable price. Okay. Now, here is -- for the same work, $76,000.00. And then I also send over a proposal for the change order. So, what I'm trying to do is not just get the change order price. I'm trying to get a full magnitude of what the original contract is --

Q. Correct.

A. -- and what the add is.

Q. And so, the original contract and the add on the proposal that's provided was $72,000.00; correct?

A. No. This was $76,000.00.

Q.   Okay.  $76,486.75; correct?

A.   For the first order of magnitude, which was the first work.

Q.   Okay.  We're going to get back to this.  Now, going back to Exhibit Number 5, in my client's e-mail on January 8th, he's talking about the easement and underground matters; correct?

A.   Well, I'm on the fourth page.  You said the third page.  But this is January 8th?

Q.   Uh-huh.

A.   Okay.

Q.   And he is being told by Mr. Kieke that the owner foreman isn't going to allow the easement or underground situation to continue and it's placed on hold; right?  Do you see that?

A.   Yes.

Q.   That's true; right?

A.   I don't know.  I don't know who the owner's foreman is.

Q.   Okay.

A.   Because there's another owner's foreman out there.

Q.   There was an easement problem; correct?

A.   I don't remember.  The easement wasn't a problem.  What we were trying to do was to bring in

three-phase power.

Q. Uh-huh.

A. So, there was never a problem. I mean, the site is a ranch that we can establish easement wherever you want it. The easement -- the electrical easement was for the feed coming in off the main power. We always wanted to try to get three-phase power. We had single-phase, so what we were trying to do in this process was to get three-phase. We found out from the electrical provider that three-phase was too far down the road, so we were just going to go with the single-phase.

Q. Right. But it hadn't been done; right? The owner was withholding permission to do the work; correct?

A. It says, "The owner's foreman isn't going to start until his boss gives him the go-ahead." And was the owner's -- was the easement part of Robertson's scope of work?

Q. Sir, let's go to Exhibit 19-M.

A. "M"?

Q. "M." Look where it says on project issues. It expressly reads, "Need status of electrical easement to begin utility work."

A. Uh-huh.

Q. So, SBS is clearly indicating, in order for things to continue going forward, that has to change; right?

A. No. Let me -- let me --

Q. Sir --

A. -- qualify something. The electrical easement isn't part of an critical path.

Q. And then right below there it says, "Need status of electrical change approval." See that?

A. Yes.

Q. Both of these things are still up in the air, and that's seven days earlier -- matter of fact, almost a week earlier than the January 6th --

A. The electrical easement wasn't part of a critical path.

Q. Okay.

A. The electrical easement became an issue when we decided that we would try to bring in three-phase, which is a much more economical way to handle the motors and things that -- that were going to be on this project.

Q. Now, I want -- the date on that particular weekly report is December 23rd, 2012; correct?

A. Yes. That's what it says.

Q. And the easement problem and/or excavation

issues are ongoing and continuing on the date that my client is terminated, January 23rd of 2013; correct?

A. Yes.

Q. Okay. Now, on Exhibit 19-I, which is dated January 15th of 2013, that's the day after C&S submits its bid -- its proposal; correct?

A. I don't remember what day C&S submitted its proposal.

Q. I'll represent to you that on the top of its proposal, it's January 13th of 2013.

A. Okay. All right.

Q. The following day is when they do their walk-through.

A. Who is they?

Q. C&S.

A. Okay.

Q. You see it there?

A. Yes.

Q. So, before they do a walk-through to examine the site, they've already presented to you what they're going to do the work for?

A. Correct.

Q. Okay. And again, we understand that price to be $76,486.75; correct?

A. That was for a full scope of the work.

Q. Uh-huh.

A. Not the change order.

Q. Well, what you indicated then was that you submitted all that was before you at that time. Because at the time that you submitted your report and your requests to Robertson for Robertson Electric, their change order and their contract were before you; correct?

A. I had seen their change order. The change order was submitted to me. I never saw their contract -- their contract with SBS. I may have requested it.

Q. But you don't know?

A. I don't remember.

Q. Now, their proposal, again, is dated January 14th of 2013; right?

A. Yeah.

Q. And you --

A. I'm assuming you're correct.

Q. Okay. You had it. It was in your hands. It was in your e-mail; right?

A. Right.

Q. Do you understand why it takes almost about a year, a year plus before that document is ever produced in discovery?

A. I have no idea.

Q. Okay. Now, I want to go to Plaintiff's Exhibit 22-A. And I want to make certain, do you need any sugar or anything?

A. I'm good.

Q. All right.

A. Thanks.

Q. Now, on July 31st, 2013, the awarded contract that was given to C&S wasn't 76,000; it was $115,163.00.

A. Well, this was way after I'm gone. This was July. I'd been gone since March. What transpired after I left, I couldn't tell you. There may have been a whole bunch of change orders. Who knows.

Q. You don't know?

A. I don't know.

Q. But they're clearly getting more than what they said they'd do it for.

A. Well, we're assuming we're talking about the same scope of work.

Q. Well, that would apply then as to Robertson, too, that whatever you're submitting would be the same scope of work.

A. No, it wouldn't.

Q. Oh, okay.

A. You're talking about something that could evolve between when I left -- or when the original project started. The only thing we had to compare was the original scope of work. Okay.

Q. Which was changing.

A. Sure.

Q. Okay.

A. It's like every project. I mean, I don't remember a single project not changing.

Q. You'd agree with me that the difference between the proposed amount and the stated contract amount would be approximately $39,000.00?

A. What -- I'm sorry. I don't follow you.

Q. The proposed amount is 76 --

A. What proposed amount?

Q. The proposed --

A. C&S's proposed amount --

Q. Correct. January 14th --

A. -- for the original scope of work?

Q. Correct. And the contract amount would appear to be $39,000.00; correct?

A. Which contract amount?

Q. The contract amount that's referenced.

A. The contract amount you're referencing on July 31st?

Q. Yes.

A. That's apples and oranges.

Q. Oh, is it?

A. Yes, it is.

Q. Okay. So, if it's apples and oranges, then you would appear to be trying to hold my client, based on your testimony, to oranges?

A. No, no.

Q. Oh, okay.

A. No. We're going back to the original scope of work.

Q. Okay.

A. Months before this invoice, which has nothing to do with Robertson Electric. They've been gone for months. I've been gone for months. What -- how this contract amount evolved is academic. Who knows what changed. I want to go back to the original contract amount that Robertson had and that C&S gave us a price on.

Q. Uh-huh. Now, Mr. Pittman, you indicate that you submitted to C&S a bid. Did that bid take into consideration --

A. I didn't submit to C&S a bid. I submitted --

Q. Documents.

A. -- documents.

Q. Okay. Did those documents include the work that my client had done?

A. No.

Q. Did it include the supplies they'd left behind?

A. No.

Q. Did it include the gears and electrical matters that were left behind?

A. No.

Q. So, if it doesn't, then if they include those costs in items that were left behind and they have been paid for them, but they were already there, then somebody is --

A. No.

Q. -- pocketing money; right?

A. No. That's -- that's a wild imagination. What C&S gave us a price on prior to seeing the site was the contract documents. The same contract documents that Robertson gave us a price on -- or gave SBS a price on.

Q. Well, as I understand it, you never saw what Robertson did; right?

A. No. I saw part of what Robertson did.

Q. Well --

A. I was on the site. I never said I never saw

what Robertson did.

Q. So, what you're really saying is, well, there's some stuff I saw --

A. What do you mean I'm really saying? I -- have I changed my opinion?

Q. I don't know.

A. Have I said two things? Have I spoken out of either side of my mouth? You're trying to say what I really said. So, I'm not saying -- I've said exactly what I said.

Q. What you said was that the information that you submitted included Robertson's work.

A. No, I did not say that.

Q. So, it didn't include it at all?

A. Let me rephrase this, and hopefully you'll understand it this time.

Q. Help me.

A. What they -- what we submitted to C&S was the same contract documents that Robertson Electric had. So --

Q. That you never saw?

A. No. The plans and specifications that Robertson gave us -- gave SBS a price is the same documentation that C&S gave us a price to do. So, we had apples and apples. We had the schedule of values

from Robertson Electric.  We had a schedule of values from C&S Enterprises.  So, when I gave C&S Enterprises a change order --

Q.  Uh-huh.

A.  -- to give us a price on, they're working off the same pieces of papers.  They're working off the same documents.

Q.  Okay.

A.  That was the whole purpose of giving them the full scope of the work.

Q.  So, again, when Robertson leaves, it leaves its electrical supplies on-site; right?

A.  They left some stuff on-site.  Yeah.  A lot of it we couldn't use because it was wrong.

Q.  Oh, okay.

A.  But yeah.

Q.  And those were the same electrical supplies that had been approved by both you and Mr. Grable?

A.  No.  I did not approve any submittals.

Q.  Now, you're indicating that, well, this was wrong.  Did you ever tell anybody with SBS that the supplies were wrong?

A.  I never said that the supplies were wrong until after we reviewed them.

Q.  And my question is, did you ever tell anybody

that they were wrong?

A. No.

Q. Okay.

A. Not until after we had terminated them.

Q. Now --

A. We weren't out -- going out there checking -- I mean, that's the general contractor's responsibility, is to check that the submittals and the -- and the documentation that's submitted is correct per the contract documents. It's not my responsibility.

Q. Okay. And I want to make certain -- because I asked if you're licensed. You're not a journeyman, you're not an electrician, you don't have those type of --

A. Oh, no.

Q. Okay. So, you wouldn't be putting your training against someone who is certified and has the requisite licenses; correct?

A. What do you mean putting it against?

Q. You know, putting your knowledge in what is required on the site and what the specs require against someone who has that training.

A. Oh, I do all the time.

Q. And you think you're on par with somebody who

has the requisite skills and training?

A. I'm on par with architects, engineers, professional people from every aspect of this -- of construction.

Q. Okay. Now, on or about December 14th, Mr. Robertson is going through the plans that he has and notes that the plans that he has are different than the original plans that he was provided. Were you aware of that?

A. No.

Q. And that the change-up in those plans required a change order; correct?

A. Yes.

Q. Because if he's doing work that has -- off the original plans that hasn't been approved, then he's not going to get paid; right?

A. That's not -- that's not my responsibility. That's SBS's responsibility.

Q. So, he then --

A. What he was submitted by SBS, I don't know.

Q. Okay. Well, you just said you did know because that's the same stuff you submitted --

A. I mean, how could I say what was submitted to Robertson Electric? Okay. I'm not overseeing every piece of paper that's submitted to them. I mean, I

know that I have a certain set of documents that I'm supposed to bill the project off of. What they're issued, I don't know. How can I have control of that?

Q. So, Exhibit Number 4-A begins the movement with regard to the change order. Now, that begins December 14th of 2012; correct?

A. I'm getting there.

Q. That's the first document where you're indicating that the proposed change order is $60,276.00; correct?

A. We must be looking at a different thing. This is -- okay. We are looking at different things. This is price requests RFP number 1 for 60,000.

Q. Now, did you get that?

A. I saw a copy of this. Yeah.

Q. Did you respond to it?

A. No.

Q. So --

A. It's not my duty to respond to this. I respond to SBS.

Q. Okay. Did you respond to SBS?

A. Yes.

Q. In writing?

A. I don't know.

Q. Did you tell them -- first, did you just tell

them it's too high?

A. Oh, yeah.

Q. Did you tell them why it was too high?

A. No. I mean, I looked at the scope of work here --

Q. Sir, my question is, did you tell them why it was too high?

A. No.

Q. Okay. So, you had said it's too high, but you don't tell them why; correct?

A. I don't need to. I can look at it and tell you it's too high.

Q. Okay. Then on January 8th at 4-B, Mr. Robertson resubmits, indicating there was an error and the price quoted is 56,611.

A. Uh-huh.

Q. Did you ever see that?

A. Yes.

Q. Did you speak with SBS?

A. I'm sure I did.

Q. My question is, do you know? You think you did or you --

A. I'm pretty sure I did.

Q. Okay. But you didn't in writing?

A. I don't know.

Q. Did you ever tell them what was wrong with the alleged proposal or work that had to be done?

A. Yes, I did.

Q. Was it done in writing?

A. I don't know if it was or not. I know a lot of times I'll pick up the phone. It's a lot quicker than sending off an e-mail.

Q. And again --

A. But I think that the fact that Robertson continues to try to adjust this price down is evidence that I spoke to SBS that I felt the price was too high.

Q. Now --

A. Why did they keep working this over and over?

Q. And now, my question to you was, did you ever put your -- you say you sent an e-mail; right?

A. No, I didn't say I sent an e-mail. I said a lot of times I'll pick up the phone. It's faster than sending an e-mail.

Q. Okay. So, you didn't send an e-mail?

A. I kind of believe -- well, I don't know. Did I?

Q. Sir, I can tell you that no e-mail has been submitted to me from you.

A. Then I didn't send an e-mail.

Q.   Okay.  So, you spoke orally then?

A.   Yes.

Q.   Now, on January, I want to say, 21st, my client submits the last of what he proposed that it be done for.  Did you ever speak to him about what needed to be done and why?

A.   Him, being Robertson Electric?

Q.   Robertson.  Yes.

A.   No.

Q.   Did you ever speak to SBS as to what needed to be done and why?

A.   Yes.

Q.   You're sure?

A.   Positive.

Q.   You know that two days after this, Robertson is terminated; right?

A.   Yes.

Q.   And you know that on January 14th, you've already indicated that there's going to be a change in the electrician; right?

A.   Yes.

Q.   So, you're telling me that with the decision made that you're going to replace somebody, you have this in-depth conversation about the work they were going to do; is that right?

A.   That's correct.

Q.   Okay.

THE COURT:  Mr. Brown, let's take our morning 15-minute break; okay?

MR. BROWN:  Yes, sir.

THE COURT:  You can step down, Mr. Pittman.  Let's take 15 minutes.

(Recess taken.)

MR. SLATES:  Your Honor, if we may address an administrative issue before we resume.  We were talking during the break.  Mr. Pittman is obviously a key witness to all the parties.  He's been subpoenaed by SBS and we obviously intend to ask questions of Mr. Pittman as well.

THE COURT:  Sure.

MR. SLATES:  The question we raised is whether the Court would prefer us, in the course of his examination today, to cover everything with him or does he need to be re-called by SBS and then re-called by us?

THE COURT:  I was -- after Mr. Brown, then SBS, and then you examining.  If you can do everything.

MR. SLATES:  Can we cover -- obviously, Mr. Brown is going to have topics that are specific to

Robertson. You had instructed only to cover on cross things that are covered on direct and then redirect. But we would -- I think --

THE COURT: No. Cross is wide open. If something is brought up on redirect is what I'm trying to limit.

MR. SLATES: Okay. Okay. We just wanted to get clarification that we can go ahead and go into any topic with Mr. Pittman today.

THE COURT: Sure.

MR. SLATES: Okay. Thank you.

THE COURT: Sure. And somebody brought up something about a computer or needing IT or something like that?

MR. SLATES: We were just trying to figure out how to throw an image up onto that television.

THE COURT: I can -- well, normally you can plug into that thing under the desk, which you've tried already and it's not working?

MS. BRAZELL: Yes, Your Honor. We could not get it to come up.

THE COURT: Okay. Maybe at lunch we can bring another one over and then we can see if you can get it running. If not, I can see if I can find

somebody that can get it running.

MS. BRAZELL: Thank you.

THE COURT: Did you turn on the TV?

MS. BRAZELL: Yes.

MR. SLATES: We cycled through the different inputs, but we couldn't get it to come up.

THE COURT: Okay. And I'll get somebody that uses it and we'll see if we can get y'all going. But everybody, if they can, finish Mr. Pittman while he's on the stand. Okay. Have a seat, Mr. Pittman. Mr. Brown, you may proceed.

MR. BROWN: Thank you.

Q. *(BY MR. BROWN)* Now, Mr. Pittman, you indicated in your direct in response to my questions that the base contract would tend to flux; correct, it would change?

A. I believe so.

Q. That's what you said; right?

A. (Witness nodding head up and down.)

Q. So, on July 25th in Exhibit 22-A, the base contract represents $115,163.00; correct? In 22-B, the base contract on November 11th, 2013 also references 115,163. You see that?

A. What was that? I'm sorry. 22-B?

Q. 22-B.

A.   Yes.

Q.   What changes are the extras that occur; right?

A.   Yes.

Q.   For example, in July you had extras at $87,893.00; correct?

A.   No.

Q.   Don't you see it there?  It says extras $87,893.00.  See?

A.   I see extras to date 100,000.

Q.   No, no, no.  You're looking on 22-B.

A.   Okay.  Where am I supposed to be looking?

Q.   22-A.

A.   I'm sorry.  Okay.

Q.   And in November, the extras represent the $100,000.00 you indicated; right?

A.   Again, I'm looking at a document that's dated July 31st of '13.  I'd been gone for several months.

Q.   Sir, I can appreciate it, but you're on the stand.

A.   Okay.

Q.   Thank you.  Now, the extras --

A.   Is that 87 or 27?

Q.   It's 87,893.

A.   Okay.  All right.  I'm sorry, but this is not

clear.

Q. Now, we're at -- Exhibit 11-A an e-mail from Mr. Sharples. And it indicates that you had Mr. Robertson or Robertson Electric terminated; correct?

A. 11-A?

Q. Yes. It's an e-mail.

A. It's from Daniel Boddie.

Q. At the very top it says Daniel Boddie, then next below that is Thomas Pittman, and then below that is Weston Sharples.

A. Okay.

Q. Now, it accurately reflects that you had Mr. Robertson -- or Robertson Electric terminated; right? Sir?

A. I'm reading it. I'm assuming. It says I need to get a fixture or device -- the value of the fixtures that were left there for percentage complete from C&S.

Q. So, back in, it appears to be, June 7th of 2013, you're still with Mr. Lewis. See that?

A. Yes.

Q. So, earlier when you were saying that you were -- it was sometime in May, that obviously is not true?

A. Well, I'm trying to get my dates straight

here, because I resigned in March. I still assisted Mr. Lewis in certain things even though I was gone.

Q. Well --

A. But --

Q. -- I want you to look at where it says in that second paragraph it starts off with the 60,000 that they're claiming in their scheduled values for the entire project. It says, "Tom thinks that on the date of termination, Robertson was no more than 25 percent done with their work." Isn't that what it says?

A. Yes.

Q. It also says you're going to do an investigation; right?

A. Correct.

Q. Did you do an investigation?

A. We did.

Q. Put it in writing?

A. Yes.

Q. So, there is an investigation that you conducted in writing?

A. Yes.

Q. Where is it?

A. It's -- it's out there.

Q. Where is it?

A. You know, I don't know where it is. All I know is I did a full forensic investigation of the whole building; foundation, metal building, structural, electrical, plumbing, the full gambit. We did a full gambit and it's documented.

Q. And so, are you aware that as of this date, no such investigation from you has been provided?

A. No.

Q. But you're claiming that it exists?

A. I know it exists.

Q. You're positive?

A. Positive.

Q. Absolutely positive?

A. Absolutely positive.

Q. And so, when you left the employ of Mr. Lewis, you left them that report?

A. I did.

Q. Now, in the -- in Exhibit 29 you indicate that, "We're going to make a change with the electrician." That's on January 29th -- excuse me -- on --

A. 14th.

Q. Yes. And the e-mail consistent with that is recognizing that whatever termination is being done is being done by you at the behest of Tri-Bar. Is that

accurate?

A. Yes.

Q. And this was all oral; right?

A. I'm sorry?

Q. This was oral?

A. Yes.

Q. Okay. So, when you terminated Robertson Electric --

A. I didn't terminate them. SBS did.

Q. I understand. But you -- you told them to do it; right?

A. Yes.

Q. Okay. Now, when you had it done, you hadn't done your investigation; right?

A. Correct.

Q. So, you didn't know allegedly what reasons you had; right?

A. Well, the reason I had was for nonperformance.

Q. Well --

A. We didn't discover discrepancies until afterwards.

Q. Okay. So, what you're saying is, they were being bad, but you didn't know how they were being bad; right?

A.   Well, I'm not sure I follow you.  I -- I know that the electricians were not manning the job properly.

Q.   Well, we understand that that's at least your position; right?

A.   Well, even your daily reports substantiate that.

Q.   What the daily reports reflect, sir, is that there was work being done and we're going to address what the reports show.

A.   Okay.

Q.   But what we do know is that at the time that you made the termination suggestion/direction to SBS, that all your supposed concerns were all oral; right?

A.   Right.

Q.   And we now know that there's some alleged investigation that you did that existed sometime in 2013; right --

A.   Right.

Q.   -- that we've never seen?

A.   I don't know if you've seen it or not.  We did a report that identifies the discrepancies.

Q.   Now, did you ever look at Robertson Electric's contract with SBS?

A.   I don't believe I have.

Q.   Never?

A.   Never.  I know what their schedule of value was.  I know what the amount of contract was -- or let me say, I assume I knew the amount of the contract because it was in the scheduled values that was submitted for weekly -- or for monthly draws.

Q.   So, we're talking about from the date of incident, which was January 23rd, 2013 until today, you've never looked at it?

A.   Yes.

Q.   So, at Plaintiff's Exhibit 1, page 9 through 10, there is a subparagraph section 8.06.  And Robertson's contract expressly requires that any work that it's going to do on work that it's submitted that is not contained within the original plans has to be submitted in a change order and has to be approved. Did you know that?

A.   Well --

Q.   My first question is, did you know it?

A.   No.

Q.   Okay.  So, anything else you're going to say after that is your suspicion; right?

A.   No.

Q.   Okay.  So, at least as between SBS and Robertson Electric, they're sending you information

trying to get you to identify what it is that is relevant that needs to be done with regard to this change order, and the best you ever do is respond orally.  Isn't that correct?

A.  I have no responsibility to respond to Robertson Electric.

Q.  The best you ever do --

A.  That's not -- my contract is not with Robertson Electric.  It's with SBS.

Q.  But you could terminate them; right?

A.  Yes, I can.

Q.  Okay.  Now, have you ever looked at SBS's contract with Tri-Bar?

A.  Yes.

Q.  Have you looked at section 7.1.1?

A.  I'm not familiar with that paragraph.

Q.  Let's go to Plaintiff's Exhibit 17, page 21.

A.  (Witness complying.)

Q.  Section 7.1.1 expressly reads this.  "Changes in work may be accomplished after execution of the contract and without invalidating the contract."  You see that?

A.  Yes, sir.

Q.  It would appear to me that this section contemplates that there would be additional work, and

whatever concerns about that additional work would need to be doesn't destroy, invalidate, or give reason to terminate the underlying contract. Right? Correct?

A. No. It's not correct. I mean, termination -- this, to me, doesn't say anything about terminating anybody. This is talking about construction change and construction directly.

Q. So, invalidate, to you, means what?

A. Well, I mean --

Q. What does invalidate mean to you, sir?

A. I'm trying to answer that question. You know, that's -- that's not a yes or no answer.

Q. I agree with --

A. Invalidating a contract could be a number of things.

Q. I'm sure inquiring minds want to know.

A. Well, you could invalidate a contract by not manning the project.

Q. Uh-huh.

A. Not properly meeting the schedules.

Q. Uh-huh.

A. Those are big ones.

Q. Oh, I suppose they are. But my question to you is, when a contract is invalidated, I think this

section deals expressly with changes in work, doesn't it?

A. It's part of it.

Q. Sir, article 7, which leads that section, says "changes in work." Isn't that what it says?

A. Yes, sir.

Q. So, a change order deals with changes in work; right?

A. Correct.

Q. Okay. So, your other concerns that you allege to be concerns would be within other sections of the contract that address terminations for cause; correct?

A. Correct.

Q. So, we're not talking about right now termination for cause, are we?

A. I don't know.

Q. No. I expressly said section 7. So, let's stay a little focussed. Now, your position that you've stated a few moments ago that the additional work that you wanted someone else to do -- that being C&S -- would not serve as a basis or reason to terminate Robertson Electric for a change order; correct?

MR. SLATES: Objection, that

mischaracterizes the record.

THE COURT: Sustained. Next question.

Q. (BY MR. BROWN) Now, let's go to 14.2, which is on page 35.

A. 14 -- I'm sorry? My pages aren't marked. I'm sorry.

Q. Now, this exact -- this section deals with terminations for cause. See it?

A. Yes, sir.

Q. It says that, "The owner may terminate for cause if the contractor, one, repeatedly refuses or fails to supply enough properly skilled workers or proper materials." Right?

A. Correct.

Q. Okay. "Fails to make payment to subcontractors." Correct?

A. Correct.

Q. "Repeatedly disregards applicable laws, statutes, et cetera." Correct?

A. Correct.

Q. "And otherwise is guilty of substantial breach of provisions of contract documents." Right?

A. Correct.

Q. So, that's a for-cause termination; right?

A. Correct.

Q.   Correct?

A.   Yes, sir.

Q.   Now, that would seem to suggest that there have to be repeated statements and concerns; right?

A.   Yes.

Q.   Now, your statement is that my client supposedly didn't man it correctly; correct?

A.   Correct.

Q.   When?

A.   Throughout the job.

Q.   When?

A.   From day one.

Q.   When?

A.   From the beginning of the job.

Q.   When?

A.   They were notified several times -- SBS was notified several times -- not only -- not only did they not man the job --

MR. BROWN:  Objection, nonresponsive.

THE COURT:  He's asking if you know specific dates that you remember when they were --

THE WITNESS:  Every day.  Your Honor, every date that I went there, every date that I saw people from Robertson Electric, they never had a hardhat on --

MR. BROWN:  Mr. Pittman --

THE WITNESS:  I'm trying to answer the question.

MR. BROWN:  Nonresponsive.

THE COURT:  You're asking him when and he's telling you the dates.

MR. BROWN:  I'm asking him what date --

THE WITNESS:  I would have to look through my whole logs.  I mean, there was GPS on my truck.  You could pull up when I was at that job, which was several times every time I was there.

Q.   *(BY MR. BROWN)*  So, your testimony is this  --

A.   And again, my --

Q.   Your testimony -- I'm trying to understand your testimony -- is that there were these numerous offenses that took place that you were orally making these statements to SBS?

A.   Correct.

Q.   Correct?  That you don't independently have any recollection of; right?

A.   I don't remember the exact dates.  You're asking for dates.  I don't remember the exact dates.

Q.   Would those have been contained in your report -- your investigation?

A.   No.

Q.   So, they weren't important enough to be put in your investigation?

A.   No.

Q.   Okay.

A.   The investigation was after the fact.

Q.   Now, let's go to section 14.2.2.

A.   From 17 to 14?

Q.   It's on --

A.   Or section 14 --

Q.   It's on page 35.

A.   Okay.  I'm sorry.  Okay.

Q.   Section 14.2.2.

A.   Okay.

Q.   And it reads, "When any of the above reasons exist, the owner, upon certification by the initial decision maker that sufficient cause exists to justify such action, may, without prejudice to any other rights or remedies, after giving the contractor and the contractor surety, if any, seven days written notice terminating employment."  Right?

A.   Correct.

Q.   Now, the initial decision maker under this contract is John Grable; isn't that correct?

A.   If we're looking at the same document that we

were referring to earlier, yes, sir.

Q. Okay. So, John Grable would have been the individual who would have first been required to make a certification; correct?

A. Yes.

Q. That didn't happen, did it?

A. Not to my knowledge.

Q. Okay. Then the next thing that has to happen is there must be seven written days notice; right?

A. Yes, sir.

Q. That didn't happen either, did it?

A. No.

Q. So, section 14.2.2 that expressly governs the section you're dealing with as relates to my client, and for that matter SBS, you are telling this Court was not complied with?

A. Correct.

Q. Thank you. As a matter of fact, there is never any documented complaint against my client at all in compliance with this section. Isn't that correct?

A. That's correct.

Q. But it would have been very easy for you to do it, wouldn't it? Wouldn't it?

A. To do what?

Q.  To have gotten the certification.  It would have been very easy.

A.  Yes.

Q.  Now, so that we know, section 1.1.8 of page 9 of this document expressly designates and defines the initial decision maker; correct?

A.  Yes.

Q.  And then section 15.2.1 on page 37 expressly states the architect will serve as the initial decision maker; correct?

A.  Which section?  I'm sorry.

Q.  Section 15.2.1 on page 37.  Correct?

A.  Yes.

Q.  So, your alleged reason that would be a for-cause alleged termination of my client that you want to serve as some basis that he did whatever would have to have been contained within a letter and certification done by Mr. Grable; right?

A.  Yes.

Q.  Which does not exist; correct?

A.  To my knowledge, it does not.

Q.  So, the letters that we do have from Mr. Grable say that Robertson Electric is performing the way it's supposed to be performing; correct?

A.  No.

Q. Okay.

A. It says they're finally getting on track. If that's what you're saying performing as -- you know, that's --

Q. Now -- so, amid all your conversations, all your alleged concerns, as relates to any contractual basis that you have to have my client terminated for cause does not exist; correct?

A. No. Not correct.

Q. The contract specifically requires that it be done by the initial decision maker, seven days notice. You've already stated it doesn't exist. So, you're saying that you don't have to comply with the contract?

A. That's not what I'm saying.

Q. Well, if the contract requires you to do something, and you're saying that you don't have to do it, then you're saying that you're above the contract.

A. No.

Q. Okay. So, you agree you have to follow the contract?

A. Yes.

Q. Okay. Now, I want you to go to section -- of Exhibit 17, page 9. Because I must admit, my reading of this has always been -- has always put me in a

quandary. And it says this. And it's Bates stamped 00245. So, I want to make sure you're on that page. You there?

A. You said page 9?

Q. It is Exhibit 17, page 9.

A. I'm on Exhibit 17, page 9.

Q. Okay. You see on the bottom -- or you see the section that says, "The contract document shall not be construed to create a contractual relation of any kind"? See that?

A. No. Which section is it?

Q. That would be -- it should be section 1.1.2 of the contract.

A. Okay. I see that.

Q. You see that?

A. Yes, sir.

Q. And it says that the Tri-Bar contract will not create a contractual relationship of any kind with a subcontractor. Do you see that?

A. No. I'm trying to read it. Yes, sir.

Q. So --

A. It just says between the owner and a subcontractor or a sub-subcontractor.

Q. And my client is a subcontractor; correct?

A. Correct.

Q.   So, you asserted a right against my client that you contractually did not have; right?

A.   No.

Q.   Okay.

A.   That's not -- go ahead.

Q.   Now, you would agree with me that whatever concerns you may have had, you never voiced with my client and you only orally tell SBS.  So, assuming SBS says that didn't happen, then my client never knows of any alleged concern you have; right?

A.   Correct.

Q.   But if this was such a big problem and you have -- you're going to the site, you say, almost daily; right?

A.    I went there several times.

Q.   Oh, okay.  And if you could terminate them, certainly you could go up to them and say, what's the problem; right?

A.   Well, contractually, I'm not supposed to carry on any kind of conversation with them.  And my direct contact with them is through SBS.  And I'm not going to contact Robertson Electric.

Q.   So, you could terminate them, but you can't talk to them?

A.   Correct.

Q.   Okay.  Now, you then proceeded on behalf of Tri-Bar to obtain a substitute subcontractor to do the work; correct?

A.   Correct.

Q.   Now, let's go to section 2.4 of the owner's right to carry out work.

A.   What page is that?

Q.   I believe --

THE COURT:  11.

Q.   (BY MR. BROWN)  It would appear to me that in the very middle, it says, "If a contractor defaults and neglects to carry out work," which is what you're claiming happened; right?

A.   Which section?  I'm sorry.

Q.   2.4.  Owner's right to carry out the work.

A.   All right.

Q.   That if that is what is going to happen, and that's what you're claiming happened; right?

A.   Yes, sir.

Q.   Okay.  Then it says, "Written notice from the owner to commence and continue correction of such default or neglect has to be done."  Right?  That's what this section requires.

A.   Well, I think this section is between the owner and the contractor; not the subcontractor.

Q. So, you stepped in, had my client terminated -- you, on behalf of the owner; right, obtained a subcontractor; right?

A. Correct.

Q. That means you are carrying out the work because you're the one doing it. SBS didn't do it; right?

A. Correct.

Q. And this requires that there be written notice. Do you see that?

A. Yeah.

Q. You didn't do it, did you?

A. No.

Q. John Grable didn't do it, did he?

A. No.

Q. Mr. Lewis didn't do it, did he?

A. No.

Q. All right. But there's no question that you then assumed the control over my client's contract when you had him terminated?

A. Yes, sir.

Q. And when you do that, at paragraph 5.4.2, this is what your SBS/Tri-Bar contract says. It says, "When the owner accepts the assignment of a subcontract agreement, the owner assumes the

contractor's rights and obligations under the contract." Do you see that?

A. I'm trying to get there. Is that page 20 -- 5.4.2?

Q. Yes. Do you see that?

A. Yes, sir.

Q. So, at that point when you did what you did and you assumed control over the contract, you stepped into the shoes of SBS for my client. Did you understand that?

MR. SLATES: Objection. That assumes evidence not in the record. There's no record that Tri-Bar ever took assignment of Robertson's contract.

THE COURT: Legal objection?

MR. SLATES: Assumes facts not in evidence.

THE COURT: Okay. Overruled.

Q. *(BY MR. BROWN)* You see that, don't you?

A. Uh-huh.

Q. That's what happened, didn't it?

A. No, that's not what happened.

Q. Okay. Now, it appears to me that the proposal from C&S was written for basically 76,000; that it's written as a contract for basically 115,000. Right?

A. No.

Q. That is the proposal?

A. That was the proposal.

Q. Okay. And the contract is written for 115,000?

A. No, it's not. Where is the contract written for 115,000?

Q. Let's go back to 22-A. See where it says the total contract amount?

A. Yes. 115,163.

Q. That's the total contract amount; right?

A. That's the total contract amount on July the 31st.

Q. Okay.

A. That proposal that was submitted was for a different scope of work. Even after that, they're not even close to what Robertson's original contract amount was.

Q. Now, in the draw section -- and it includes the gear. You see that; draw number 3 on page -- on Exhibit 22-A?

A. Yes.

Q. And that gear packet, even borrowing the loose numbers that you guys provided, is approximately 10 to $15,000.00.

A.   You're -- you know, I remember this.  This gear package has nothing to do with the original scope of work.  This gear package -- their records is for a totally new section of the hangar in support -- in ancillary structure.  It has nothing to do with the original scope.  So, you can't take this draw package for gear that's done on a totally different aspect of the building.

Q.   So, then, the gear and information that you submitted to C&S upon which they based their contract and/or proposal was not exactly the same as what was submitted by Robertson; could it be?

A.   I don't know how you're getting there.  I really don't.

THE WITNESS:  I'm sorry, Your Honor.

A.   But you're -- I've directly said that this is apples and oranges.  What this references has nothing to do with what the original scope of work was.  So, why do you think that this was part of the original scope of work?

Q.   (BY MR. BROWN)  Now, did you have opportunity to review any documents for today's testimony?

A.   Yes.

Q.   What did you see?

A.   I didn't foresee anything.

Q.   What did you see?  What did you --

A.   Oh, what did I see?

Q.   Uh-huh.

A.   Basically, we didn't look at anything.  Very, very little of Robinson Electric.  Mainly what I looked at was old documentation from SBS, our reports, whatnot.

Q.   Didn't happen to see your report?

A.   Yes.  I saw part of my report.

Q.   Not the complete report?

A.   I don't know.  I saw part of my report.

Q.   Now, Exhibit 32 --

A.   I don't have 32.  I got 31.

Q.   It's 32.

A.   Okay.

Q.   On November 28th -- I want to go to Tri-Bar Exhibit TR-01833.  At the very bottom of that -- do you see it?  Let me get you there.  Right here. There's an e-mail from Mr. Lewis.  And this is what he says.  "Looks like they're making progress.  Thanks for the pics."  That is what he writes; right?

A.   Yes, sir.

Q.   Right above there, Mr. Grable -- I know he tells them thanks for the pictures; right?

A.   Uh-huh.  Yes, sir.

Q. So, he sees them. Right above it, Mr. Grable writes, "Rod, on another note, hangar is beautiful and fits well with the land. Want this project to be fun and exciting for you; not the way it has progressed thus far with the P&B building delay." You see that?

A. Yes, sir.

Q. One, nothing about my client at all; right?

A. Right.

Q. And it seems like everybody is happy about the building; right?

A. Well, yes.

Q. Okay.

A. That one sentence.

Q. But when we go to 32 -- Exhibit 32 --

A. Okay.

Q. -- it says, "I'll go visit the project myself." This is Mr. Weigand. "And I'll get with Tom and John for a thorough review. And we'll get a handle on what's going on, and I'll get back to you." That's November 25th; right?

A. I'm sorry. You referenced 32, but which --

Q. Tri-Bar Bates stamped TR-01835.

A. Okay. I'm sorry. Okay.

Q. Now, did they go into this e-mail with you?

A. No.

Q. Okay. So, on the 25th as well as on the 2nd of November, there appear to be concerns that y'all have; right? Correct?

A. Yes, sir.

Q. You never put it in writing; right?

A. To who?

Q. You don't go in writing by Mr. Grable. He never does the certification he's required to do. Right?

A. Right.

Q. Never sends anything to SBS saying, you're doing this, in writing to them, you're being bad, you're not complying with the contract. Right?

A. Right.

Q. Never put anything in writing saying my client is doing anything that he's not supposed to do; right?

A. Right.

Q. But you claim that this has been going on for no less than three months, and yet you never do anything; right?

A. In writing.

Q. At all with my client; right?

A. Correct.

MR. BROWN: I pass the witness.

THE COURT: Select Building, your witness.

### *CROSS-EXAMINATION*

*BY MR. CLARK:*

Q. Now, Mr. Pittman, I want to clear up just a few things before I get into my examination. You said that you resigned in March of 2013; is that correct?

A. I want to say it was March.

Q. Okay. You're testifying under oath. Is it March or is it not March?

A. I believe it's March. It may have been -- it may have been April. I don't remember exactly what day it was.

Q. Do you remember receiving a subpoena from my office?

A. No.

Q. Do you remember signing a -- an affidavit under oath regarding documents that you may or may not have in your possession?

A. No.

Q. Let me hand you what I've marked as Defendant's Exhibit 118. And I'll ask you to turn to the last page.

A. Well, I just can't remember. I'm looking at it.

Q.   Is that your signature on the last page?

A.   Yes, sir.  Yes, sir, it is.

Q.   Is that your signature on the last page?

A.   Yes, sir.

Q.   And you signed it before a notary?

A.   Yes.

MR. CLARK:  Your Honor, at this time we would offer Defendant's Exhibit Number 118.

THE COURT:  Any objections to 118?

MR. BROWN:  I have no objection.

MR. SLATES:  No objection, Your Honor.

THE COURT:  118 is admitted.  SBS's 118 is admitted.

Q.   (BY MR. CLARK)  Whose handwriting is on Exhibit 118?

A.   It's mine.

Q.   So, you filled this out and you just didn't remember it?

A.   Yeah.  I just didn't remember it.

Q.   Okay.  Who was your attorney at the time?

A.   Actually, Mark Luitjen assisted me with that.

Q.   Okay.  And you know that I spoke with Mr. Luitjen about this document as well; right?

A.   I'm assuming you did.

Q.   Okay.  Let's look at the answer to question

number 14.  Because I really just want to establish the timeline.  Can you tell me at that time when you said that you resigned?

A.  Oh, it was May.

Q.  May 21st?

A.  Yes, sir.

Q.  Okay.  So, your earlier testimony about March was --

A.  That was incorrect.  It was May.

Q.  Okay.

A.  I just didn't remember the exact date.

Q.  Okay.  Now, the document that Mr. Brown showed you a few minutes ago had an e-mail from you that was dated in June and it came from thomaspittman@lewisenergy.com --

A.  Correct.

Q.  -- in June.  How long did you continue to use that e-mail address?

A.  It couldn't have been very long at all.

Q.  After you -- after you resigned in May -- May 21st, how much longer was it?  Was it --

A.  I'm surprised that -- well, because when I left Lewis Energy, I left.  I turned in my badges.  I turned everything in.

Q.  In fact, you turned in your -- your laptop,

your computer, and your Blackberry?

A. Yes, sir. Well, I didn't have a Blackberry. It was an iPhone.

Q. An iPhone. And every bit of that stayed with Lewis Energy; right?

A. Yes, sir.

Q. And all the e-mails that were on Lewis Energy's server is still Lewis Energy; right?

A. Right.

Q. The report that you referenced is still at Lewis Energy; right?

A. Correct.

Q. And so, in answer to that subpoena when I asked if you had any documents related to this project, you said that you had none; right?

A. Correct.

Q. Now, a minute ago you said -- you started into an answer with Mr. Brown and you said it was -- how long -- how many times did I go out there? And you said you'd have to check your log.

A. Well, when I said I'd have to check my log is that -- because I had a GPS on my truck, Lewis could physically go back and say, okay, Pittman was at Uvalde hangar on this date. My log was maybe not the right nomenclature. But it was, you know, semantics.

What I meant was, we could physically go and see how many days I was there.

Q. Okay. We could do that a different way. If you could, turn in this volume right here to Exhibit Number 104.

A. Yes, sir.

Q. These are the weekly -- these are the daily job reports; correct?

A. Yes.

Q. Okay. If you would, look at page 2 of that document -- or that very first page. You see a list of persons that were out there on the project?

A. Yes, sir.

Q. Okay. And on this particular date, which was December 6th of 2012, I see Martin Rojas, Luis Fuentes, Fidel Montanyes, Alejandro Baldovino, and Julio Barriaga. Right?

A. Correct.

Q. What's behind Exhibit Number 104 are the daily logs for all of December. I don't see your name as being out there any day in December. Is that accurate?

A. Is this all the reports you have for December?

Q. For December, yes.

A. And it's not a full month's report. Is it supposed to be?

Q. Do you see -- do you -- do you recall being out there in December?

A. I don't recall not being there.

Q. Okay. Well, let's look at the next one, 105.

A. (Witness complying.)

Q. And I'll just save you the trouble, just for the sake of time. Do you see the little TR numbers at the bottom?

A. Yes.

Q. Just go to TR-00120.

A. (Witness complying.)

Q. Do you see your name on there?

A. Yes, sir.

Q. Along with Rod Lewis and Jack Green?

A. Right.

Q. All right. And if you'll turn the page over to 00130.

A. (Witness complying.)

Q. I'm sorry. And that date was January 16th; right?

A. Yes.

Q. The next one is going to be January 22nd.

A. Okay.

Q.   Do you see your name there?

A.   Yes, sir.

Q.   So, according to the daily job reports, you were out there twice in January; is that correct?

A.   Correct.

Q.   Do you have any recollection that it's different than that?

A.   No.

Q.   Okay.  So, in your testimony to Mr. Brown, he asked you how often were you out there representing the owner, and you said, "I went out there several times."  In December and January, it looks like you were out there twice.  Is that consistent with how often you were out there; your recollection?

A.   Well, that's assuming these reports are --

Q.   I didn't ask you if the report was accurate. I'm asking -- well, actually, I am asking you if the -- does that report --

A.   I think it is.  I think I was out there more than two times in December and January.

Q.   How many times were you out there?

A.   I don't know.

Q.   But the logs only show twice; right?

A.   These daily logs.

Q.   Twice?

A.   Twice.

Q.   Do you have any documents -- any logs that would show different?

A.   No.

Q.   Okay.  And in November, I see -- the logs show that you were out there three times.  Do you have any recollection that it's different than that?

A.   No.

Q.   In August, I show you were out there twice.  Do you have any recollection that it's different than that?

A.   No.

Q.   In fact, you went out there and inspected the pour before it happened on the foundation, didn't you?

A.   I did.

Q.   Okay.  So, when you say several times, is it more accurate to say a couple of times a month that you were out there?

A.   No.  I was in Encinal once a week.  And when I made my trip to Encinal, I went to Uvalde, then Encinal, and back.  And a lot of times I went from Encinal, Uvalde, and back.  Several of those times, there was nobody from SBS out there.

Q.   Okay.

A.   So, that's what I'm saying, that these -- I'm saying that these reports may not be accurate.

Q.   Okay.  And what you just testified to was that you went out there four times a month; correct?

A.   According to this document.

Q.   No.  What you just said.  You said you went out there once a week on your way out to Encinal.  So, that's four times a month; right?

A.   No, that's not correct.  I said a lot of times I would go to Uvalde, Encinal, Encinal, back to Uvalde, and back to San Antonio.  So, there's twice every week.  You know, I did that all the time.

Q.   It's just not reflected in any of the records that have been produced?

A.   No.

Q.   Okay.  But you're saying there are logs somewhere where that information would be?

A.   I'm saying if you went and looked at my GPS, it would show how many times I went there.  Whether or not Lewis has that GPS log, I don't know.

Q.   Okay.  Now I need to hand you a whole different volume, if I may.  If you would, turn to Exhibit 48.

A.   Yes.

Q.   Do you recall a meeting on February 5th of

2013 when you terminated Select Building Systems?

A. Yes.

Q. And did you know that there was a person there taking stenographic-type notes?

A. Yes.

Q. Who was that?

A. Jane Reeves.

Q. And who does she work for?

A. She worked for us. She worked -- actually, she's an independent contractor that worked for us.

Q. For us, being whom?

A. Lewis Energy.

Q. Okay. And have you had a chance to review these notes?

A. Yes, I have.

Q. When was the last time you reviewed these notes?

A. Last week.

Q. Okay. And when was -- when had you -- had you reviewed them prior to that?

A. Yes.

Q. When?

A. A long time ago. I don't remember the exact date.

Q. Was it at the direction of Mr. Slates, or was

it before Mr. Slates got involved?

     A.   No.  At the direction of Mr. Slates.

     Q.   Did you see them -- did you see these notes shortly after they were prepared in February of 2013?

     A.   I did.

     Q.   Did you have a chance to make any corrections that you wanted to make as to what you thought happened?

     A.   I didn't think I made any corrections.

     Q.   Is that because this Exhibit 48 fairly and accurately represents who said what during that meeting?

     A.   Yes.

     Q.   Okay.  Let's go through it then, if you don't mind.  Let's just start with the first line.  "T.P." that refers to you; correct?

     A.   Correct.

     Q.   Okay.  "Briefly met with Rod.  He wants to terminate the contract."  Did I read that correctly?

     A.   Yes.

     Q.   Did you state a reason in that sentence?

     A.   Sir?

     Q.   Did you state a reason in that sentence?

     A.   Yeah, I believe I did.

     Q.   That Rod wants to terminate the contract;

right?

A. Right. Did I state a reason? I mean, we had beat that reason up for months prior to it. It wasn't a surprise to anybody.

Q. Okay. I don't see any reference in this agreement to lack of manpower; failure to man the job anywhere in this transcript. Do you?

A. No.

Q. I don't see any reference to a lack of manpower. Do you?

A. No.

Q. I don't see the word "breach" anywhere in this entire transcript. Do you?

A. No.

Q. I don't see the word "defect" anywhere in this entire transcript. Do you?

A. No.

Q. I don't see any reference to "notices, written or oral," in here. Do you?

A. No.

Q. In fact, the only statement that's in here as to why the contract is being terminated is that very first line that says, "He wants to terminate the contract," isn't it?

A. Yes.

Q. And in this entire transcript you never attribute the termination to anything that SBS did; just what Rod Lewis wants. Correct?

A. Correct.

Q. All right. Now, let's look at the next -- well, skip a sentence. "So, he wants to find out where you're at and make it as amicable as possible." Forget that part. Let's read the next part. "I know you have additional material needed to be paid for. Will pay your fee that you are due as soon as possible." Do you see that?

A. Yes, sir.

Q. And you were committing, as the owner's representative, you knew that there was material that needed to be paid for that was unpaid for; right?

A. Correct.

Q. And you knew that the contractor, SBS, had fees that were owed at that point in time, and you agreed to pay them as soon as possible. Correct?

A. Correct.

Q. Okay. Now, let's move down -- well, skip down about two-thirds of the way where it says, "Steve, have to ask" and then it says "Tom would have asked the same thing." Do you see where I am, just a little bit below the middle of page?

A.  Yes.

Q.  Okay.  The next sentence, "No uncertain terms this morning with Rod.  If we can, let's find out where we are with anything else and all bills that you're owed, all payments that you're owed."  That's what you asked them to find out; correct?

A.  Correct.

Q.  Okay.  And then -- I'm sorry.  And then Jack -- who is Jack?

A.  Jack Green was the project manager.

Q.  He's one of SBS's employees; correct?

A.  Yes, sir.

Q.  Jack says, "Some issue with what we've done not in the contract.  Change orders."  Do you recall there being an issue with change orders not being signed?

A.  Yes.

Q.  And what did you respond?

A.  I put, "Not a problem.  Want to protect you on this."

Q.  Okay.  And, "Mr. Steve" -- that would be who?

A.  Steve Schiffman.

Q.  The owner of Select Building Systems?

A.  Yes.

Q.  An owner of Select Building Systems.  Okay.

"We want to be fair, too." And then Tony; who is Tony that's referred to there?

A. Tony Weigand.

Q. Who is he?

A. He was the global construction manager for Rod Lewis.

Q. Okay. And apparently he showed up late?

A. Yes.

Q. And in the next line, you catch him up. "Tom, just informed SBS that we're terminating and that we're going to be fair." Did I read that correctly?

A. Yes, sir.

Q. "Two outstanding draws and change orders not processed. Will get those processed and paid." Did I read that correctly?

A. Yes, sir.

Q. And if you would, turn the page.

A. (Witness complying.)

Q. Okay. And if you'll go down, there's kind of a grayish area. Right below that grayish area, it says, "Tom, we are, too." Do you see that?

A. Yes, sir.

Q. Okay. And it says, "Not a win-win scenario for anyone." Let's go down to the last sentence of

that where you state, "Will get payment done as soon as possible." Did I read that correctly?

A. Yes, sir.

Q. Okay. And then Steve says, "Can we sign releases?" You say, "Absolutely." And then you say, "Contractually, we don't have to pay until the project is finished. We aren't going to do that." Isn't that what you said?

A. Yes, sir.

Q. And then the next sentence in that section, that you want to finish it in a businesslike manner. Did I read that correctly?

A. Yes, sir, you did.

Q. Okay. Now, in point of fact, you didn't pay Select Building Systems after this, did you?

A. No.

Q. Not a dime?

A. No.

Q. Right?

A. Correct.

Q. And you didn't process the change orders, did you?

A. No.

Q. They were never processed; correct?

A. Correct.

Q. Were you making these statements on the owner's behalf?

A. Yes.

Q. Now, did you ever inform SBS in this meeting or thereafter that any of their payments were contingent upon an inspection by you?

A. No.

Q. Did you ever -- did you ever alert SBS to any deficiencies or problems with the work?

A. No.

Q. Did you ever ask SBS to come back out and explain something, finish something, correct something, or do anything with respect to any work after February 5th, 2013?

A. No.

Q. Did anybody on the owner's behalf request that Select Building Systems come out and explain why something was done, correct an error, cure a problem, change something, pour something, straighten something, anything after February 5th, 2013?

A. I don't know if they did, but I did not.

Q. Okay. Okay. If you would, I want you to go back and look at -- in that same exhibit book -- are you in Tri-Bar's exhibit book? Yes. Okay. Tri-Bar's Exhibit Number 46.

A. Yes.

Q. Okay. Now, this e-mail is dated six days before the termination meeting; correct?

A. That's correct.

Q. And it says -- it's from you to Mr. Grable; right?

A. Correct.

Q. And it's not copied to Select Building Systems or anybody else. It's just between you and Mr. Grable, right?

A. Correct.

Q. And you say, "I continue to be underwhelmed with performance with SBS. I went yesterday and they had only four masons working. After repeated requests and threats for that matter, SBS has yet to man the project properly in my opinion. Consequently, I want you to issue a 72-hour request to SBS in writing stating that we are giving you a 72-hour notice that you man the project or we will terminate the contract for cause." Did I read that correctly?

A. Yes, sir.

Q. Okay. Now, we can go back and look at it again if you want to. But I think Mr. Brown read all of that paragraph 14.2 in the AIA contract. Is there any reference to a 72-hour notice in that AIA

contract?

A. No.

Q. You've been a general contractor before; right?

A. Yes, sir.

Q. Where is that 72-hour notice found?

A. It's not in the contract.

Q. It's in subcontracts; right?

A. I don't know.

Q. You don't -- you're not familiar with subcontracts?

A. Oh, I'm real familiar with subcontracts.

Q. Isn't that a common provision to put in a subcontract?

A. It's a common provision in general contracts, too. 72 hours. I've written 72-hour letters before.

Q. Okay. It's not in the standard AIA contract?

A. It's not in the standard AIA contract.

Q. Okay.

A. And I'm not referencing any AIA contract. I'm just saying write a 72-hour notice.

Q. Pursuant to what?

A. To activity.

Q. But I mean, under what?

A. I mean, I'm not making this up. We keep

going out there, keep asking SBS to man the job. They don't do it.

Q. And did Mr. Grable ever send that letter?

A. Not to my knowledge.

Q. In fact, you know he didn't do it; right?

A. Yes.

Q. Okay. And we have an e-mail confirmation from the summer. It's Exhibit 110.

A. This one.

Q. There's an e-mail confirmation from Matt Martinez that says that that 72-hour notice was never sent; right?

A. Okay. Yeah.

Q. Were you still part of -- were you still working for Lewis Energy when that revelation was made?

A. No.

Q. That was after your time with them?

A. Yes, sir. June 27th.

Q. Now, you said that as the -- as the project manager for Mr. Lewis, you were to protect his interests; correct?

A. Correct.

Q. And how many projects did you have going on at once?

A. Well, at that time we had the hangar, we had an office project going on, we had several projects going on in Encinal.

Q. So, I want to say it's seven that were going on at that time. Does that sound right?

A. At least.

Q. Okay. And -- that you were in charge of?

A. Yes.

Q. Is that right?

A. Yes.

Q. And this one was a million dollar project; right?

A. Correct.

Q. Or at least, it started as a million dollar project. It got up to about 2, didn't it?

A. I don't know what the final cost was.

Q. But you know the costs kept increasing; right?

A. Yes, sir.

Q. And there were continual changes in the project as well; right?

A. Correct.

Q. In fact, there were almost $800,000.00 worth of changes after SBS was terminated; correct?

A. I don't know.

Q.   Well, how many changes -- there were a significant amount of changes at the time SBS was being terminated; correct?

A.   There was -- there was a few changes.  Yeah.

Q.   I mean, like the entire interior.

A.   I don't know.

Q.   Do you remember they changed the entire floor structure?

A.   I know we had to tear out all the framing, so yeah.  We had to -- all the framing was done improperly.

Q.   Okay.  I know -- I know that you're trying to get that out there.  But the -- everything in the interior was coming out anyway because they changed the entire --

A.   No.

Q.   -- interior, didn't they?

A.   No.  All they did was add floors on top of existing rooms.

Q.   Which required new plumbing, it required new electricity --

A.   Well, sure it did.  You extend the plumbing up -- it's not like we had -- I mean, it was just an extension of plumbing --

Q.   Well --

A. -- to add a second floor.

Q. Actually, they had to cut some of the floor, didn't they, to move the plumbing over to where Mr. Grable wanted it?

A. I don't -- I don't know.

Q. Okay. You weren't involved in that part?

A. I don't believe so.

Q. Okay. Now, if I understood you correctly, it was your testimony with Mr. Brown that you did not decide to replace the electrical contractor or seek bids for a new electrical contractor until you got this outrageous proposal in early January of 2013 for the change order. Is that correct?

A. Well, that was just the icing on the cake.

Q. Okay. Did you not understand my question?

A. I understood your question. But you're asking me to go back over a year and a half and tell you what I was doing in January. I can't do that.

Q. Okay. Was that the issue; the change order?

A. Part of the issue. And the other part was that they -- they didn't man the job. That was the initial part, is they never -- and you can go through their daily reports. One electrician. One electrician. Two electricians. That was lucky. One electrician. That's not manning the job properly.

Q.   In your opinion.

A.   In anybody's opinion.

Q.   Not in my opinion, but --

A.   How could an electrician pull wire with one electrician?  You can't do it.

Q.   Let's get the timeline established, though, as to when you started.  If you would, look in that same exhibit book and go to Exhibit 65.

A.   (Witness complying.)

Q.   Are you there?

A.   Yes, sir.

Q.   Okay.  Look at the second e-mail.  Do you see that one in the middle of the page?

A.   Right.

Q.   Do you see the date on that in the middle e-mail?

A.   February 12th, 2013.

Q.   In the middle e-mail.  It's a chain.

A.   Yes.

Q.   The middle one is from you and it's dated October 31st, 2012?

A.   Yeah.

Q.   Is that a yes?

A.   Yes, sir.

Q.   And who is Bob Carnwath?  Who is he employed

with?

A. C&S.

Q. And this is an e-mail from you and it says, "We may be taking over this project and finish it in-house." Did I read that correctly?

A. Yes, sir.

Q. "The foundation is poured and the PEMB" -- and what does PEMB stand for --

A. Pre-engineered metal building.

Q. -- "should be delivered in two weeks. Can you give me a price for the balance of the project? We would like the numbers as soon as possible. Thanks." And then you enclosed the MEP and structural; correct?

A. Correct.

Q. So, as early as October 31st of 2012, two and a half months before Robertson was terminated, you were already soliciting bids from C&S to finish this work; correct?

A. Yes.

Q. If you would, flip back to Exhibit 63.

A. (Witness complying.) Okay.

Q. Okay. I want to look at the e-mail starting at the bottom of the page. It's from you; is that correct? Do you see the November 2nd e-mail at the

bottom of the page?

A. Yes, sir.

Q. Okay. And it's addressed to Mr. Lewis; correct; that's who Rod is?

A. Yes, sir.

Q. "Rod, upon delivery, they need to give us erection drawings and certification that the building meets the specs. We will verify the gauge, et cetera." And then the next part, "I think we need to terminate the contract with them." You're referring to SBS; correct?

A. Correct.

Q. "I have Neena working on it. They have breached, as far as I'm concerned. We can finish this ourselves." Did I read that correctly?

A. Yes, sir.

Q. This was never sent to SBS, was it?

A. No.

Q. There's not going to be a single e-mail or document that we look at in the entirety of this trial from you to SBS where it uses the word breach, is there?

A. Not that I know of.

Q. But you used it with Mr. Lewis; right?

A. (Witness nodding head up and down.)

Q.   Who is Neena?

A.   Neena is counsel for Rod Lewis.

Q.   So, you were -- you had enough authority to go deal directly with Rod Lewis' attorneys?

A.   I did.

Q.   Okay.  And Neena was one of those attorneys?

A.   Right.

Q.   And she was the attorney that helped draft the contract; right?

A.   Correct.

Q.   The -- the first part -- the owner contract of the AIA contract; right?

A.   (Witness nodding head up and down.)

Q.   What were you having to work on?

A.   Termination.

Q.   The proper steps?

A.   (Witness nodding head up and down.)

Q.   Is that --

A.   Yes, sir.

Q.   Okay.  Did she tell you that you had to have a certification from the architect; that there was a --

A.   No, she did not.  In fact, further down the road when I discussed termination, Rod said he didn't want to terminate yet.

Q.   Okay.

A.   Give SBS --

Q.   Well, let's look and see what Rod did say. Let's look up at the top of the page.  You see where Rod Lewis is writing back to the entire group?  It says -- it's directed to Tony W; and that would be Weigand?

A.   Weigand.

Q.   "Let's take care of this ASAP.  Give me your opinion and let's make a quick decision.  Garrett" -- who is Garrett?

A.   He's the chief financial officer -- one of the financial people with the company.

Q.   What's the direction to Garrett?

A.   I'm sorry?

Q.   What's the direction that Rod Lewis gives to Garrett?  "Hold all payments to this company until further notice.  Thanks."  Did I read that correctly?

A.   Yeah.  I'm trying -- I'm sorry.  I'm trying to find out where that is to Garrett.  I'm sorry. Okay.

Q.   First page.

A.   Yes, sir.

Q.   "Garrett, hold all payments to this company." Do you know how long the owner has to make payments

after a draw request is made under the contract?

A. Well, they vary.

Q. With this contract, do you know how long it was?

A. I -- I don't.

Q. Would it --

A. I know the --

Q. -- surprise you to know it was 30 days?

A. No, that wouldn't surprise me.

Q. Is that fairly average?

A. Yes, sir.

Q. Do you know what the law is on it?

A. No.

Q. Would you be surprised to learn the law says that an owner must pay within 35 days? Would that surprise you?

A. No.

Q. 30 days is pretty standard, isn't it?

A. Yes, sir.

Q. Is it unusual for an owner to say, "Hold all payments to this company until further notice"?

A. No.

Q. How long were the payments held?

A. I don't know.

Q. The previous payment -- I'm just telling you,

the previous payment had been made in October.  Do you know when the next payment was made?

A.   No, sir.

Q.   Okay.  Now, why is it important that the contractor be paid?  Who does he pay?

A.   Subcontractors.

Q.   The -- if the contractor is not being paid, is he paying the subcontractors?

A.   No.

Q.   Does that create problems?

A.   Sure, it does.

Q.   Okay.  So, in other words, if you're telling Morrell Masonry, "I want five guys out there," and Morrell looks back at you and says, "We haven't been paid in two months; we'll put one guy out there." Isn't that what happens?

A.   Theoretically.

Q.   Okay.  In this case, would you be surprised to learn that it was 87 days before the payments were made?

A.   Yes.

Q.   That would surprise you?

A.   Yes.

Q.   Okay.  But you were being told all along, weren't you, that nonpayment was causing problems;

right?

A.   I was told that the payments were slow and we tried to speed it up.

Q.   And that it was causing problems; right?

A.   Maybe verbally.  I'm sure I was told more than once.

Q.   Let's just turn back a page to 62.  An e-mail from Jack Green to you?

A.   Yes.

Q.   About this same time, October 23rd; correct?

A.   Correct.

Q.   If you would, let's go down to -- let's just go through -- well, never mind.  Let's just go down to the bottom.  See where it says, "The delay in payment"?

A.   Yes, sir.

Q.   "The delay in payment on draw number 2 has caused problems in regards to maintaining a project schedule, mostly with pouring the remainder of the concrete.  We only have one supplier to work with, and now they have requested all payments COD."  Did I read that correctly?

A.   Yes, sir.

Q.   So, you were advised that the concrete guy was now demanding cash on delivery; correct?

A. Correct.

Q. And that's what COD stands for. "I'm still trying to negotiate this with the supplier and will keep you informed of my progress. The outcome of these negotiations will determine a pour date." Isn't it true that that payment to that particular -- for that particular concrete pour was not made until January 17th?

A. I -- I don't remember the exact date, but I'm assuming that's when it was made if you're referencing it.

Q. Well, let's do this. Let's switch over and look at Exhibit Number 4 in the same book.

A. (Witness complying.) Okay.

Q. All right. This is an e-mail from John Maywald. And who is John Maywald?

A. He's SBS financial.

Q. Okay. And it's addressed to you; correct?

A. Yes, sir.

Q. And this attaches a copy of draw number 6, and it talks about the originals being delivered. And this references, "Still have not received the executed change orders -- which, you know, we will talk about in a minute; those were change orders from July; right --

A. Yes.

Q. -- "and the following payments or draws."
And there are three draws listed there; correct?

A. Yes, sir.

Q. And the November draw is pretty substantial,
isn't it?

A. Yes, sir.

Q. So, at this point in time, Jack Green is
telling you, we're having problems; we can't get
concrete without getting payments. And as of
December 28th, you know that there's three payments
that have -- three draws that have not been paid that
are holding up the project; correct?

A. Yes, sir.

Q. And $271,00.00; that's holding up almost
every single trade, isn't it? Do you want to look
through that draw request?

A. Yeah. I'd like to look at it. (Witness
complying.) Yeah. This is -- actually, this draw is
for the metal -- pre-engineered metal building.

Q. That would be Schulte; right?

A. Correct.

Q. But the prior draws, 4 and 3, involved
concrete and electrical; right?

A. I'm surprised there would be a monthly draw

for $3500.00 or for 28,000, for that matter.  Are those the full draws?

Q.  Did I ask you -- did I ask you whether you were surprised about the draw or whether it was paid?

A.  I'm sorry.

Q.  Was it paid?

A.  I don't know.  I'd have to see.

Q.  All right.  Let's look at the next exhibit, number 5.

A.  (Witness complying.)

Q.  We've now gone from -- we've gone from October 23rd, when -- the first exhibit that we looked at where Jack Green was complaining about lack of payment, to December 23rd, where Mr. Maywald was asking you about payment.  And now, in this e-mail, if there's actually -- you'll see in the middle of the page, "Was finally able to get the Los Cerritos checks just before lunch."  Do you see that?

A.  Excuse me.  Yes.

Q.  Okay.  What's the date of that e-mail?

A.  January 17th.

Q.  Okay.  Is that when -- I'm sorry.  If you would -- I skipped ahead of where I meant to be.  If you look down at the very bottom there, do you see the bottom e-mail --

A.   Yes, sir.

Q.   -- on that same page, January 9th?  Do you see that one?

A.   Yes, sir.

Q.   Okay.  And that's from Dave Morgan.  Who is Dave Morgan?

A.   He's with SBS.

Q.   And that's directed to you.  And it says, "Appreciate the opportunity to meet on Monday." Starting about this point in time, did SBS have regular meetings with you?

A.   Yes.

Q.   They set them up; correct?

A.   Correct.

Q.   Okay.  In this particular meeting they had been asking you about those three checks for those three draws and the change orders.  Remember?

A.   Yes, sir.

Q.   And Mr. Morgan is, in essence, asking you if there's a problem, above here.  And if you read through the e-mail, it says, "Would it be beneficial for me to contact anyone in your organization to see what is holding up payment and processing of these documents?  I'm getting pressure on my end to get this stuff done."  Was there somebody above you that was

holding payments?

A. Yes.

Q. Who was that?

A. Tony Weigand.

Q. And was there somebody above you that was holding the change orders and not signing those?

A. You know, I remember that the -- well, yes.

Q. Who was that?

A. Tony.

Q. Okay. Now, if you'll turn back to the first page, we already read the middle one, but now look at the top. You got the payment, but now Mr. Morgan is asking you on the 18th," any chance we can get the change orders?"

A. Where is --

Q. At the top on page 1.

A. Yeah. "Any chance we can get change orders?" I'm sorry. At the same time.

Q. Did you ever tell anyone at SBS that the change orders had actually been signed by the owner?

A. No.

Q. Did you ever tell them that they would be forthcoming?

A. No.

Q. If you would, turn to Exhibit Number 6.

135

A.    (Witness complying.)

Q.    And you see that one is dated January 31st?

A.    Yes.

Q.    Okay.  And again, let's assume 30 days because that's what's in the contract.  It's an e-mail from David Morgan to you, and it says, "Can you update SBS on the status of payment on our December application for payment that was sent to you on December 28th, 2012?"  Did I read that correctly?

A.    Yes.

Q.    And at that point in time, it would be three days late, assuming a 30-day deadline; right?

A.    Yes.

Q.    Do you know if that draw was ever paid?

A.    I don't know.

Q.    You know it wasn't paid, because you fired SBS six days later.

A.    Okay.  Well, then --

Q.    That's why we're here, is because that draw wasn't paid.

A.    Okay.

Q.    Okay.  And then again, Mr. Morgan asks you, "Can you also update SBS on the status of the execution of change orders one and two that have been in your possession since -- July and October -- "for

several months," is what it says. "SBS has been informed in the past that these change orders have been signed, but to date we have never received a signed copy." Did you ever respond to this and say, oh, they haven't been signed?

A. No, I don't remember.

Q. Well, if you had an e-mail, it would have been on the Lewis server; correct?

A. Correct.

Q. And we didn't get it. So, if we didn't get it, --

A. Well, then I didn't respond to it.

Q. -- you didn't respond to it. You didn't correct his information that we have been told that they're signed? You knew they weren't signed; right?

A. I -- I don't remember. I don't even remember what change order 1 and 2 are.

Q. Change order number 1 is when they changed the size of the hangar. That's the big one of $44,000.00. You don't remember that one?

A. I remember that now that you mention it. What's change order number 2?

Q. Change order number 2 had to do with framing -- with the exterior siding.

A. Okay.

Q. But we can -- if you want to look at the change orders, they're actually -- as long as we're in this section of the book, they're Exhibits Number 1 and 2.

A. Okay.

Q. Do you see Defendant's Exhibit Number 1?

A. Yes, sir.

Q. And that's got John Grable's signature on it. It's got Dave Morgan's signature on it from SBS. And it's dated in July of 2012; right?

A. Correct.

Q. And this is the additional cost associated with the larger airplane; right?

A. Correct.

Q. And that's $44,600.00?

A. Yes.

Q. And what was that change; do you remember?

A. I believe we raised the -- in fact, I did -- we raised the height of the door going into the hangar to accommodate a 2000LX Falcon Dassault.

Q. Okay. And that was a change that was made after the contract was signed, but before they actually poured the foundation; right?

A. Yes.

Q. Now, when it comes to raising something like

that, is that something that SBS can just do on its own; oh, no dig deal; we'll just raise it up 6 feet?

A.   Oh, no.  No.  It's quite complicated.

Q.   Yeah.  Because the architect has to design what it's going to look like; right?

A.   Correct.

Q.   And then the engineer has to tell them whether or not it's going to stand up if he builds it at that height?

A.   Absolutely.

Q.   And then you have to worry about the other things that go into it; the electrical, and you have other issues; right?

A.   Correct.

Q.   So, SBS has to receive architectural drawings and then they have to receive structural drawings from the engineer?

A.   And they have to modify the pre-engineered metal building.

Q.   Correct.

A.   Which they told us they could do, no problem.

Q.   Right.  So -- and those things all have to happen before SBS can actually get out and pour the concrete or do whatever they need to do?

A.   Yes, sir.  Absolutely.

Q. So, SBS is at the mercy of Victor de Anda, who was the structural engineer?

A. Yes, sir.

Q. And at the mercy of John Grable and Matt Martinez, who were the --

A. Yes.

Q. -- architects; right?

A. Yes.

Q. If you would, book at Exhibit Number 3.

A. (Witness complying.)

Q. And this was from October 2012; this change order. So, this has to do with the windows and the panels and columns and whatnot; correct?

A. Correct.

Q. This is the interior -- some of the interior stuff?

A. Yes.

Q. And this is a change for $27,544.00?

A. Yes, sir.

Q. Okay. Now, when it came to that first change order, did you allow SBS to sit back and wait on the change order to be signed?

A. No.

Q. In fact, you insisted that SBS get out there and pour the foundation and begin erecting that metal

building and order all the parts before that change order was signed?

A. Yes.

Q. If you don't have a change order signed by the owner, can the owner come back and say, I didn't sign that; I'm not paying for it?

A. Theoretically.

Q. Isn't that what they're doing in this case?

A. I don't know what they're doing.

Q. Would it surprise you to learn that's the position they're taking in this case?

A. Yes.

THE COURT: Counsel, let's break for lunch; okay?

MR. CLARK: Okay. I'm stopping, Your Honor.

THE COURT: Okay. 1:40. Mr. Pittman, you can step down. 1:40, please.

(Recess taken.)

THE COURT: Mr. Pittman, come on back up, sir.

MR. SLATES: Your Honor, one admission on preadmitted exhibits. 63 through 69 of Tri-Bar's, I believe, are admitted by agreement.

THE COURT: 63 through 69?

MR. SLATES: Yes, Your Honor.

THE COURT: Okay. Tri-Bar 63 to 69 are admitted. Go ahead, sir.

Q. *(BY MR. CLARK)* Mr. Pittman, before we leave Exhibit 63 -- that's the one that says, "Garrett, hold all payments to this company until further notice. Thanks" -- did you ever tell anyone at SBS -- or you didn't tell anyone at SBS that Tri-Bar was holding payments, did you?

A. No.

Q. Did Mr. Grable know that?

A. I don't know.

Q. I see he's copied on --

A. I think -- I think he did. Yeah.

Q. Do you know if he ever told anyone at SBS that their payments were being held?

A. No, I don't know.

Q. So, in response to the e-mail inquiries from Mr. Morgan about, "Is there somebody that I should talk to or somebody over your head that I can go to to get payment facilitated," you never bothered to mention to Mr. Morgan that the payments were being held at the direction of Bob Lewis, did you?

A. No.

Q. Okay. Now, we talked about some of the

issues related to the lack of payment and what that does to the subcontractors. If you would, your book is open to Exhibit Number 14 -- it's SBS Exhibit 14. It's open to that. You're there.

A. Oh, I'm sorry.

Q. You were on the page I wanted you to be right there. That's SBS at the bottom right-hand corner. It says, "SBS-1962."

A. That's right.

Q. This -- if we can describe for the Court what we're looking at here. This is a picture from up in the top front corner of the hangar; right?

A. Oh, yes.

Q. Yes. And so, you're looking across what would be the big front doors for the airplane to pull into the hangar; right?

A. Correct.

Q. Okay. And what's this big area out here to the front that has no concrete in it?

A. That's the -- that's basically a taxi area where the planes --

Q. Can I call it an apron?

A. Yes, sir.

Q. Is that what they called it out there on --

A. Yeah, I believe so.

Q.   Okay.  And that apron sat there unpoured just like that for how long?

A.   I don't know.  Quite awhile.

Q.   Three months; right?  And that was the concrete that they were waiting to pour that Jack Green referenced in the October 23rd e-mail to you where he said, "I can't get the concrete guys to get back out there because they're now on COD."  And that's what he's waiting on; right?

A.   Right.

Q.   And that concrete supplier did not get paid until January 17th.  We saw that right before lunch; correct?

A.   Correct.

Q.   Isn't it also true that Mr. Schiffman had a direct conversation with you about getting concrete for this apron?

A.   I'm sure he did.  I don't remember it.

Q.   Didn't he offer to pay for the concrete out of his own pocket if you would personally guarantee it?

A.   I don't remember that.

Q.   Are you saying it didn't happen or are you saying you just don't remember?

A.   I don't remember it.

Q. Now, did this --

A. Actually, I do remember that.

Q. You do remember him saying that?

A. Yes.

Q. And you -- you said no; right?

A. Right.

Q. Okay. And you wouldn't put it on your own credit card, would you?

A. No.

Q. Now, how does one manufacture doors and stand them up from the outside without that concrete being there?

A. Well, this apron had nothing to do with the doors.

Q. Well, what I'm saying is that if you're the door manufacturer and you're trying to access where those doors go in those tracks, which is the only side that you can access them from --

A. Right.

Q. -- inside?

A. Well, yes and no. But I mean, there's more than one way to get those doors in there.

Q. Would the easy way be to just walk across --

A. Yes, sir.

Q. -- what should be an apron?

A. Yes, sir.

Q. Yeah. Okay. If you would, turn to Exhibit 8 of that same book.

A. (Witness complying.)

Q. If you would, turn to page 2 of that.

A. (Witness complying.)

Q. Are you on page 2 of Exhibit 8?

A. Yes, sir.

Q. Okay. Let's start at the bottom. Do you see your e-mail dated May 19th?

A. Right.

Q. And that one is to John Grable?

A. Right.

Q. And it begins, "Every project Rod has is micromanaged." Did I read that correctly?

A. No, you didn't. Is macro micromanaged.

Q. Oh, I'm sorry. You're right. Macro micromanaged. And then you said, "He needs to find someone he trusts to let him make all this" -- expletive -- "happen. That's not me and damn sure not Tiny." Who is Tiny?

A. Tony.

Q. Tony. Okay. "Hope you find someone in his future." And then Grable responds, "He always second guesses everyone. So sad." Right?

A.   Uh-huh.

Q.   And then your response is, "Ironically, crews are pulling off because I can't get them paid."  This is May 19th; right?

A.   Right.

Q.   This is -- remember SBS was terminated February 5th of 2013.  This is three months after the termination of SBS.  You're now the general contractor; right?

A.   Yes.

Q.   And you can't get people paid; right?

A.   Yes.

Q.   In fact, it was United Erectors that pulled off the project, wasn't it?

A.   I don't know.  I mean, United Erectors finished the job.

Q.   But they pulled off the project and left one guy there and then came back once they got paid.  Do you remember that?

A.   I don't.  But --

Q.   Okay.  Then you go on.  "The cheapest best guys have to be paid every other week.  Steve Mower" -- and who is he?

A.   He's in accounting.

Q.   With?

A. Lewis.

Q. Okay. "Steve Mower in accounting told me that that's not going to happen because Tiny has to approve everything and he sits on all the invoices until the cows come home." You meant that; right?

A. Yes.

Q. And that's exactly what he did, was they sat on these payments forever; right?

A. Right.

Q. And now turn back to the first page. When you had proposed -- the e-mail down at the bottom, also dated May 19th when you proposed that somebody needs to take over this stuff from -- or Grable said somebody needs to take this over. You responded, "No, he doesn't. Let's earn our keep and keep him out of the daily" -- expletive -- "we need to do. He doesn't need to know about the crap we do every day." Did I read that correctly?

A. Yeah.

Q. And then Mr. Grable responds back, "Seems like we are back in an SBS grind with us pushing the unpaid." Right?

A. Right.

Q. And that's exactly what it was in May when -- when you wrote this, you were pushing unpaid people to

do more work; right?

A.  Right.

Q.  And Mr. Grable writes back, "Not right in my mind to tool around with the working man's paycheck." Oh, I'm sorry.  I skipped a word.  "Nothing to worry about, my friend."  That is in there as well?

A.  Right.

Q.  And Mr. Grable writes back, "Not right in my mind to tool around with the working man's paycheck." Now, Mr. Pittman, it was only four days after this that you resigned from Lewis Energy.  Was -- you mentioned that one of the reasons that you resigned from Lewis Energy was because you had a potential project with some investor?

A.  Right.

Q.  There were other reasons why you left Lewis Energy; right?

A.  That was the primary reason I left.

Q.  But you also left because this project wasn't going according to plan; right?

A.  No.  That didn't have anything to do with me leaving.

Q.  Well, you -- one of the other reasons that you left was because of the other legal problems that you were having at the time; correct?

A. No.

Q. Okay. So, if your attorney told me that you -- that you left -- that you were actually terminated, then he falsely represented that to me?

A. My attorney told you that?

Q. Yeah.

A. Who said that?

Q. Luitjen.

A. Luitjen?

Q. Yes.

A. Mark Luitjen?

Q. Yes.

A. Judge Mark Luitjen? No, he didn't say that, because it's not true. I didn't -- I wasn't terminated. I resigned.

Q. He said that you resigned --

MR. SLATES: Objection, Your Honor. That's hearsay.

THE COURT: Sustained. Rephrase it.

MR. CLARK: I'll move on, Your Honor.

Q. (BY MR. CLARK) Now, were you aware that at some point in time, to keep people on the project, that -- that the people that were involved in the project were required to put stuff on their credit cards?

A. Yes. I put things on my credit card.

Q. Okay. And that was to keep the project moving; right?

A. Right.

Q. And that's because you couldn't get payments from the owner?

A. Well, it was easier for me to -- instead of setting up accounts with suppliers, that I just put it on my American Express.

Q. Okay. So, if you would, move over to Exhibit Number 9.

A. (Witness complying.)

Q. And I just don't know when in June you stopped providing services to Mr. Lewis. So, this doesn't actually copy you, but I'll ask if you're aware of it. The one down at the bottom is from June 26th. It's from Daniel Boddie. Who is Mr. Boddie?

A. He's the guy that we pulled in to finish the job.

Q. Okay. It says, "Tony" -- and that's Tony Weigand that he's talking about?

A. Yes.

Q. "Citing nonpayment, United Erectors has left this project for other jobs to make payroll for the

remainder of this week." Did I read that correctly?

A. Uh-huh.

Q. Do you remember that happening?

A. No. I wasn't there.

Q. Would this have been after you left then?

A. Yes.

Q. This was not atypical, was it?

A. It wasn't what?

Q. Atypical.

A. Well, United Erectors I've use on a lot of projects, and they tend to be problematic. You have to pay them not on 30 days, but sometimes every other week.

Q. Okay. Now, did you ever propose to Mr. Lewis that -- that you would continue to push the unpaid at his -- for his benefit?

A. I don't remember that particular --

Q. Do you recall telling him that you were going to let SBS work through the erection of the building and then look for an excuse to fire them?

A. No.

Q. Okay. If you would, turn to Exhibit Number 66.

A. (Witness complying.)

Q. Okay. First of all, let's look down at the

very bottom of Exhibit 66, where it's an e-mail from John Grable. And I'll just ask you if you -- if you agree with the statement down -- where it says, "Material selection deadlines are now, as material needs to be ordered and there are lead times on stone that require four to six weeks for delivery." Did I read that correctly?

A. Yes.

Q. This is November 4th of 2013. And at least some of the stone has not been ordered yet; is that correct?

MR. SLATES: For the record, it's November 2012.

MR. CLARK: '12. Yes. Sorry. '12.

Q. (BY MR. CLARK) Is that correct that some of the stone has not even been ordered yet?

A. Yes.

Q. And they were waiting on Mr. Lewis to make a decision on what kind of stone would be ordered; right?

A. Well, that's not entirely correct. We were waiting on a mockup to be made.

Q. Okay.

A. The stone mockup to be made that was never made.

Q. And the material deadline -- the materials needed to be ordered, and he was asking for the material selections from Mr. Lewis; right?

A. Well, yeah. But we couldn't do that until after the mockup was done. Because the mockup had, like, three or four different types of stone in it. And we wanted to see what that was going to look like before we ordered all the stone.

Q. And that caused delays, didn't it?

A. Well, it caused delays because we couldn't get the -- couldn't get the mockup done.

Q. Right. Okay. If you would, look at the e-mail right above that. And it says from Rod, "I'm ready to move forward with selections now, John. Let's proceed as we have discussed and you have identified." And the next paragraph, "What I don't understand right now, and we should hold for discussion, is how we move forward with this project. So, before ordering the material, I will have to discuss with Tony W. and Tom how we plan to proceed. This can be done in the next 48 hours." He's referring to your proposal to terminate SBS, isn't he?

A. Let me see here. I think it's referring to the mockup, but --

Q. Well, looking at your response to this, it certainly looks like it's addressing SBS, doesn't it?

A. Yes.

Q. And your response was, "Rod, best case, we get the building in full, they get it and erect it. If they "F" up the erection, we hammer them, we take over the project, we're golden."

A. Right.

Q. And so, at that point in time, this was just two weeks after the directive to hold all payments. You knew that you were holding their payments. You knew they were having problems with their trade. You knew they couldn't get the concrete out there that they needed to pour the apron so they could work on the door. You knew that they were waiting on a stone selection material that was deliberately being held back here. You weren't telling any of this to SBS and you were just going to sit back and wait and see if it was a problem with the erection and then you were going to terminate SBS; right?

MR. SLATES: Objection, compound.

THE COURT: Overruled. You can answer, sir.

THE WITNESS: Oh, okay.

A. Well, that's -- that's not a one-sentence

answer.

Q. *(BY MR. CLARK)* Well, they were set up to fail, weren't they?

A. They set themselves up to fail.

Q. When you -- when Mr. Lewis holds payment for three months and they can't pay their trade, that's setting the general contractor up to fail, isn't it?

A. Granted, it's not the best situation.

Q. Well, you were getting payments monthly, I assume, in May; right, from Mr. Lewis when you were acting as the general contractor?

A. I -- I wasn't there.

Q. In May. The e-mail we were just looking at where you were talking about people wanting to get paid and pushing the unpaid.

A. Oh, yeah. Yeah.

Q. You were having to push the unpaid and you couldn't get money out of Mr. Lewis, could you?

A. It was slow.

Q. So, February 5th comes along when you have this meeting. And then we've already established that after that meeting on February 5th, when you terminated SBS, it's my understanding that you had no more communications with SBS at all; correct?

A. I think we had one or two phone

conversations, but not -- not many.

Q. And none of them about the work; right?

A. Right.

Q. They were all about, like, administrative matters?

A. Yes, sir.

Q. All right. If you would, go back to Exhibit Number 14; the actual letter that is Exhibit 14.

A. (Witness complying.)

Q. Do you remember this letter?

A. Yes, sir.

Q. Okay. The first paragraph deals with administrative stuff; right?

A. Yes.

Q. And that -- you said you had a conversation with somebody maybe about some of that stuff. The second one really doesn't mention much except about Schulte. The third paragraph says, "Jack, you may not be aware, but we have discovered several defects in work delivered by SBS. Glacier Cap has hired an independent consultant to test and review all as-built conditions. This effort continues and is still under way to complete a detailed list that outlines these defects and how they will be resolved." Are you aware of any detailed list that was ever sent to SBS that

those -- as said in this letter?

A. No.

Q. "Today it was determined the building is a minimum of 2 inches out of plumb towards the west." What is -- did you -- were you involved in determining that?

A. Yes.

Q. Did you get out there with a level and shoot it yourself?

A. Actually, I did.

Q. And you determined that it was 2 inches out of plumb?

A. No. I didn't determine it was 2 inches out of plumb. When we had the erector come out and do the -- actually, when Speedway came out and did the initial inspection, they were the ones that said that this building is racked 2 inches out.

Q. Okay. And did Speedway -- I mean, did you contact Schulte at that point, the building's manufacturer, to find out what the tolerances were?

A. Yes, we did contact him and ask for tolerances.

Q. And 2 inches is within tolerance, isn't it?

A. Oh, no, it's not.

Q. Oh, you don't think so?

A.   No, I don't think so.

Q.   Okay.  We'll get to that one in a minute. Today -- "And the double roof lock seam roof panels are not contiguous as specified."  How many of the roof panels were not contiguous?

A.   I don't remember.

Q.   Wasn't it only two?

A.   I don't remember.  I know that -- well --

Q.   "The diaphragm function of the roof element will be compromised when the building is plumb and will have to be completely removed and replaced." What engineer provided you with that information?

A.   I didn't write this letter.

Q.   Did you have a hand in editing the letter?

A.   No.

Q.   Who in your office did?

A.   I don't know.  I might have -- I might have edited this, but I don't remember.

Q.   I'll tell you what.  Let's look at Exhibit 111.

A.   (Witness complying.)  Sorry.  I'm having a hard time.

Q.   I know -- that notebook.  I'm going to do something with that tonight.

A.   Okay.

Q.   So, that's from Jennie Briggs to you.  And it encloses that letter with revisions on there.  So, whose revisions are they?

A.   Those are Jennie Briggs'.

Q.   Okay.  But you saw the letter before it went out?

A.   Yes.

Q.   And you -- and you approved it?

A.   I didn't -- not approve it.  Yes, sir.

Q.   Okay.  At that point in time, did you know what the tolerances were for the building?

A.   I don't remember.

Q.   Why would Mr. Grable say in his letter that it was -- that it violated the quality industry standards if you can't even remember whether you had the tolerances at that point or not?

A.   Well, I know that when you physically look at a building and you've got a masonry wall that's here and a metal structure that's like this, you can -- you can look at it and see that it's out of plumb.  Regardless -- if the tolerance -- are you telling me that 2 inches out of plumb is within building industry standards?  I disagree.

Q.   How many of those columns were out of plumb?

A.   Well, the whole building was racked.

Q.   The information I've seen shows two columns out of plumb.

A.   So?

Q.   Was it more than two; do you know?

A.   I'm saying the whole building was racked.

Q.   So, it's your testimony that all the columns were out of plumb?

A.   No.  All the columns don't have to be out of plumb for the building to be racked.

Q.   Okay.  If you --

A.   That's more of the mainframe that's --

Q.   -- would, let's turn to Exhibit Number 73.

A.   (Witness complying.)

Q.   Okay.  Exhibit Number 73 is an e-mail from you to John Grable that says, "Looks like we're going to have to take the roof off before we can rack the building to plumb."  Did I read that correctly?

A.   Yes.

Q.   At that point in time, did you have the tolerances for the building?

A.   No.

Q.   If you would, turn to the next page -- turn to the next Exhibit 74.

A.   74?

Q.   74.

A.   (Witness complying.)

Q.   In fact, your prior e-mail was dated February 28th, the same day as the letter.  And here on March 4th, it's an e-mail from you to Mr. Pittman saying, "Let's check with the PEMB standard to see what the tolerances are as far as the building being plumb."  Correct?

A.   Correct.

Q.   But at the time you wrote the letter and made the conclusion that the roof needed to come off, you didn't know what the tolerances were as far as the building being plumb, did you?

A.   Correct.

Q.   And if you look at Exhibit 82 -- do you see Exhibit 82?

A.   Yes, sir.

Q.   That's an e-mail from Erick Key.  And who is Erick Key?

A.   Schulte Building representative.

Q.   Okay.  And they're the -- Schulte is the one that actually manufactured the building -- the structure?

A.   Yes.

Q.   And Exhibit 82 provides some of the tolerances for the material that they work with;

correct?

A. Correct.

Q. And then Exhibit 83 provides the rest of the tolerances -- the erection tolerances; correct?

A. Correct.

Q. So, it wasn't until March 7th that you got the erection tolerances for this building; right?

A. Right. This is dated August 10th.

Q. Which one are you looking at?

A. I'm sorry. The -- yeah, this is March 7th.

Q. Right. March 7th of 2013. Now, you've not been designated as an expert in this case, have you, by any party?

A. No.

Q. And so, you're not here to provide any expert testimony on any issues here today, are you?

A. No.

Q. Then I won't ask you about the tolerances. Do you know if SBS provided a response to Mr. Pittman's letter; the one on February 28th? Do you know if SBS gave a response to Mr. -- I'm sorry -- Mr. Grable?

A. Oh, I don't know.

Q. If you would, look at Exhibit 17.

A. (Witness complying.)

Q.   Do you see the e-mail transmittal on the first page and then you see the letter dated March 19th on the next page?

A.   Yes.

Q.   Do you see that?

A.   (Witness nodding head up and down.)

Q.   Okay.  Let's go through -- and you've seen this letter before?

A.   Yes.

Q.   Okay.  In fact, you received it from Mr. Grable on or about March 19th; right?  Then you received it again from Mr. Schiffman on the 20th?

A.   Right.

Q.   Okay.  Let's go through that -- that letter from Mr. Schiffman.  In it, the second paragraph, smack dab in the middle, it says, "Without prior verbal or written communication of any sort, SBS was summarily informed they we would no longer be associated with this project."  Did I read that correctly?

A.   Yes.

Q.   And if I understood your testimony earlier this morning, that's a fairly accurate statement, isn't it?

A.   Yes.

Q. Okay. And then if you'll look down there where the numbers are 1, 2, and 3; do you see that?

A. Uh-huh. Yes.

Q. Number 2 is the allegation in that February 28th letter that the building was out of plumb, which is contrary to measurements by SBS, the metal building erector, and the metal building supplier, Schulte." Did I read that correctly?

A. Yes.

Q. And you're saying at that point in time, somebody -- that you -- you or somebody had measurements that differed; correct?

A. Correct.

Q. Those measurements were never supplied back to SBS, were they?

A. No.

Q. There was never any -- in fact, there was never any reply to this letter from you at all, was there?

A. That's correct.

Q. Okay. And number 3, "The diaphragm function of the roof element will be compromised." That was a statement Mr. Grable made in his letter. "And that's contrary" -- this is what Mr. Schiffman wrote -- "is contrary to the improved metal building engineering

which is not dependent upon the roof diaphragm."  Were you aware of that?

A.  Oh, yeah.  Well, all roofs provide some form of diaphragm.  A diaphragm design on a metal building is -- is established by several things.

Q.  The roof is just one of those components; right?

A.  Just one of those components.

Q.  Okay.  So, the fact that the diaphragm element is compromised is -- doesn't take away any of the other diaphragm elements of the rest of the building, does it?

A.  No.

Q.  Okay.  The next sentence says, "Both Jack and I intended to communicate with you on the substance of that letter, but did not receive any phone calls." They did try to communicate with you, didn't they?

A.  Yes.

Q.  They left you numerous messages, didn't they?

A.  Yes.

Q.  Both of them; both Jack and Steve.  And you saw the messages coming in -- the calls coming in on your cell phone, didn't you?

A.  Yes.

Q.  You saw that it was -- you knew that it was

Steve Schiffman that was calling you; right?

A. Yes.

Q. And you didn't answer?

A. Correct.

Q. You knew it was Jack Green that was calling you and you didn't answer?

A. Correct.

Q. You let it go to voicemail?

A. Right.

Q. You listened to the voicemails; right?

A. Most of them.

Q. And they said, call me, what's this about; stuff like that?

A. Yeah.

Q. And you never called back?

A. I never did.

Q. You never wrote back?

A. Never.

Q. Was this at the instruction of somebody?

A. No. I just felt that at that point in the development of this thing that it wasn't beneficial.

Q. Okay. In fact, when you read Mr. Schiffman's letter, it goes through and talks about -- you know, it refutes the three things that are in Mr. Grable's letter. It says, hey, we made phone calls. On the

next page it goes through and talks about offering assistance.  It talks about receiving the package.  It talks about how we were supposed to get payment; we haven't gotten paid.  No calls have been returned.  No exchange of information has been accomplished with you.  And it goes through and raises a bunch of other issues, doesn't it?

A.   (Witness nodding head up and down.)

Q.   And none of that you saw fit to respond to; correct?

A.   Correct.

Q.   Okay.  Including the statement that, "We take Grable's letter seriously.  We continue to be willing to meet with you to achieve your initial goal of amicably settling all matters associated with your desire to close out this project."  That didn't spur you to pick up the phone and say, hey, got a -- we need you to come out and rerack this building?

A.   Yeah.  This was -- this was --

Q.   After the termination; right?

A.   Right.

Q.   No need to?

A.   No need.

Q.   Okay.  In fact, if you look at Exhibit Number 20, right there in the middle, that's where Mr. Grable

sends you this -- Mr. Grable sends you his copy of the March 19th letter because he got it first; right?

A. Right.

Q. "I wanted you to see this." And you wrote back to Mr. Grable, "Huge. Want to keep you out of the impending fight. It's going to happen and it makes my life easier taking you out of the mix. Unfortunate, but Schiffman has put me in a position. I have no other recourse. I have to crush him and I will." That's what you wrote; right?

A. That's what I wrote.

Q. You weren't going to let him come back and do anything with that project. You were just going to make sure that you changed -- you fixed everything that you could and stuck it against his bill; right?

A. Well -- but you have to understand. This is after several months of telling them to fix things -- telling them counted times to fix things.

Q. We'll get to those in a second. Because there's not a single instance that you can tell me right now where they did not agree to fix something; correct?

A. Well, I disagree with that.

Q. All right.

A. We'll get to that.

Q. I'll let you bring that up with -- let me finish this exhibit. I'm trying to move along. Mr. Grable writes back and says, "I'll stand there with you, my friend"; right?

A. Uh-huh.

Q. Two of you were going to be against SBS; right?

A. Right.

Q. Because you knew there was going to be an impending fight coming up over --

A. Right. And we're going to protect the owner, who is my client, or who I worked for.

Q. Okay. And then I think I already know the answer to this. But if you'll look very quickly at Exhibits 12 and 13.

A. Yes.

Q. 12 is a letter from Mr. Schiffman to you a week after -- no, ten days after the termination; correct?

A. Correct.

Q. Smack dab in the middle, "As Jack and I expressed, SBS will cooperate throughout the final stage of this process. We have called upon our relationship with the various subcontractors and suppliers to amicably close out their contracts on

this project with minimal additional costs. This was in no small part accomplished but for your representation everyone would be fairly compensated in a timely manner." You didn't see fit to respond to this letter at all, did you?

A. No.

Q. Okay. And Exhibit Number 13 was an e-mail that Mr. Schiffman sent to you right before that February 28th letter comes back. And it says, "Dear Tom, in the meeting you talked about getting SBS a closeout check quickly. I called yesterday to inquire about the status. I know you contacted some of the subcontractors to continue with the project, but we still need to close out SBS's subcontracts financially. Please give me an update. Steve." And you never called him back on that either; right?

A. Because I wasn't done with doing the forensic studies.

Q. Okay. And then Mr. Schiffman continued to call you during the entire month of March, didn't he?

A. I don't remember.

Q. Well, you recall it lasting for quite awhile, don't you?

A. Yeah.

Q. And eventually he became a pest and you

decided to tell him, don't call me anymore?

A. I think that's what happened.

Q. Okay. If you'll look at Defendant's Exhibit 19, this is March 26th.

A. Yeah.

Q. Do you see the e-mail right there in the middle?

A. Yes, sir.

Q. "Hello Steve and Jack. Per the advice of our in-house counsel, Tony Trevino, we are not permitted to discuss the Los Cerritos project with you or anyone from SBS Construction in any manner to include text messages, voicemail, in-person discussion, e-mail, or other written correspondence." Did I read that correctly?

A. Correct.

Q. And then you say, "Any inquiries, requests, or comments directed to us will not be answered, but will be forwarded to Tony Trevino to be answered by him. You can reach Tony Trevino at" -- and his e-mail address with Lewis Energy. Correct?

A. Correct.

Q. And after -- well, after February 5th, you had no more substantive communication about any of the defective issues that you were claiming with SBS;

right?

A.   Right.

Q.   You never shared this report with them, did you?

A.   No.

Q.   Who worked with you on this report?

A.   We had -- Speedway did the majority of the work on the erection, roof, inspection of the metal building.  Then we did a lot of it with different contractors.

Q.   Okay.  So, you -- did you actually get out there and do any of it or were you relying on others?

A.   No.  We actually -- some of it was developed as it went on.  Like when we were checking dimensions for brick lugs and noticed that there was improper brick lug poured, that's when we dug some of that dirt out to -- to make access for their -- so, it wasn't just, this guy did this, this guy did that.  So, it was an ongoing discovery.

Q.   Okay.  As long as you brought up the brick lug, the brick lug was something that was not on the structural engineered plans at the time of the pour; right?

A.   I don't know.

Q.   Well, you know it wasn't.  You know the brick

lug was added right before the pour.

A. I don't remember.

Q. You don't -- you remember going out and inspecting it; right?

A. Yeah. Well, it became apparent when we started to do the CMU that there was no brick lug for the -- the brick --

Q. But you can see --

A. -- and the stone.

Q. -- you can see on that brick lug that it was not part of the original pour; right?

A. Right. You're right.

Q. It was added. And you -- that was added at the last minute and you went out there and inspected it before it was poured; right?

A. Negative.

Q. Let's look at Exhibit 98.

A. I inspected the pour.

Q. When you say you inspected the pour, what do you mean?

A. I inspected prior to them pouring.

Q. Well, you inspected it during the pour, didn't you?

A. No. I didn't come out there until after they were done pouring.

Q. And then you saw everything that was out there?

A. Uh-huh.

Q. And you saw where the forms were, and you didn't see any problems with the way the forms were set?

A. It looked good at that point.

Q. Okay. And did the structural engineer also go out there?

A. Yes.

Q. And in fact, he provided a report, didn't he?

A. Yes, sir.

Q. And he didn't come up with any problems with --

A. No.

Q. -- the foundation, and he approved it?

A. Right.

Q. Okay. I want to switch just for a second just because I'm -- I'm trying not to overlap what Mr. Robertson went over with you -- or Mr. Brown went over with you about Robertson. But I want to talk about Robertson for just a second. Who did you tell at SBS to terminate Jerrod Robertson from this project?

A. I told Jack Green and I told Kyle.

Q. Kyle Kieke?

A.   Yeah.

Q.   Do you know which one of them actually terminated --

A.   No.

Q.   -- Mr. Robertson?

A.   They never gave me a report.

Q.   If you would, let's look at Exhibit Number 25 -- I'm sorry, not 25.  That is it.  I'm sorry.

A.   Okay.

Q.   Okay.  Let's start down at the bottom where there's actually a communication from Jerrod Robertson to Jack Green at SBS.  "Jack, please advise on payment status for payout number 2 in the amount of 16,628 for the hangar.  Late lien notices will be sent either tomorrow -- today or tomorrow by ourself and our vendors if payment hasn't been received.  I'm trying to avoid this if possible.  Please advise."  You were sent a copy of this e-mail; right?

A.   I don't see that I'm copied on there.

Q.   Look at the top.  Jack Green forwarded it to you with his comment.

A.   Yes.

Q.   Jack Green forwarded to you and says, "Tom, see below.  Please advise on how you would like me to handle this type of situation.  I'm sure other

vendor/suppliers will be sending in notices as well." Correct?

A. Correct.

Q. And at this point in time, the last payment was in early October, three months before; right?

A. I don't remember.

Q. Do you remember anything to the contrary?

A. No.

Q. Okay. And then your response is on the next page to Jack's e-mail, Number 26. From you back to Jack Green. "Give me a call to talk about the electrician. I'm going into a meeting now and should be out by 4:45. We want to make change."

A. Yes.

Q. So, you have an e-mail from --

THE WITNESS: Can I use the restroom?

THE COURT: Let's take a five-minute recess. Okay.

THE WITNESS: I'm sorry.

THE COURT: Yes, sir. That's fine.

(Recess taken.)

THE COURT: Go ahead, Mr. Clark.

Q. (BY MR. CLARK) Just to finish up on Robertson right quick. That letter that we looked at from February 28th from Mr. Grable to talk about the

177

building being out of plumb; I didn't notice any reference to any problems with electrical in there. Did you?

A. No.

Q. In the correspondence that Mr. Grable sends on March 15th, I don't -- and we'll get to that one in a little while, but there's no reference to electrical in there either, is there?

A. No.

Q. Are you aware of any communication that was sent to Jerrod Robertson before Mr. Robertson filed suit where there's a complaint made about any work with his electricity?

A. No.

Q. Was there an inventory done of Mr. Robertson's stuff?

A. Yes.

Q. Who did the inventory?

A. Electricians.

Q. What happened to the inventory?

A. Most of it we couldn't use.

Q. No, no. What happened to the list; the inventory list?

A. Oh, I don't know. I seem to remember seeing something to that effect. In the last -- in the last

bit of correspondence reviewing this, there was a --

Q. Robertson's stuff or in Tri-Bar's stuff?

A. Tri-Bar's.

Q. Okay. Do you know if -- have you ever seen a schedule of values against what was on the inventory?

A. Yes.

Q. Has that -- do you know if that's been produced in this case?

A. It was my understanding it had.

Q. Okay. All right. Now I want to talk about the door; the hangar door. And for this, I think we'll just have to kind of give a concept that the -- just correct me if I'm wrong when I get into this. The hangar front door has pockets that sit off to the side; wings, if you will?

A. Yes, sir.

Q. And the doors retract into those walls?

A. Yes.

Q. Is that a fair description of it?

A. Yes.

Q. And there was a problem that eventually manifested itself in November where it was -- somebody discovered that the foundation, as poured, was going to accommodate a 75-foot door. The structural building that Mr. Grable designed was for an 80-foot

door.  Do you recall that?

     A.  Yes.

     Q.  It was a big issue, wasn't it?

     A.  Big.

     Q.  Did you delve into how it happened?

     A.  Yes.

     Q.  Okay.  In Exhibit 30, do you see where it says in red -- or it's a red stamp, but it's, "Architect to verify dimensions."

     A.  I can see that.  Yes.

     Q.  You see this on there?  So, again, this is going to be Victor de Anda, the structural engineer; right?

     A.  Right.

     Q.  And that's his comment back to the architect to verify dimensions.  The original date was 7/20 of '12; right?

     A.  Yes.

     Q.  And these are the structural plans; right?

     A.  Can I see them, please?

     Q.  Sure.

     A.  When you said those are structural plans, those are actually shop drawings from the pre-engineered metal building manufacturer.  They're not structurals.

Q. Okay. But these are the shop drawings that Schulte was going to be working off of; right?

A. Yes.

Q. And the dimensions that they're referring to are all on this page 3; right?

A. Right.

Q. The door dimensions. Those were the ones that were in question. And they were -- they were bubbled and highlighted on the copy and they said, verify these dimensions; right?

A. Correct.

Q. Do you know if Mr. Grable -- Mr. Grable is the architect; right?

A. Yes, sir.

Q. Do you know if Mr. Grable ever went out and verified -- ever verified the dimensions?

A. I don't know if he verified those dimensions on those shop drawings.

Q. Do you know if Mr. Grable ever got back with the structural engineer, Synergy, to say, I've designed a building that's bigger; you need to go back and redo the foundation drawing so it's bigger?

A. I don't know if he did or not.

Q. I thought you investigated this issue.

A. I did, but --

Q.   Did you ever see a foundation that was different than the one that was poured?

A.   No.

Q.   No structural engineered foundation?

A.   No.

Q.   Okay.  So, SBS poured the foundation that the structural engineer designed and specced; right?

A.   I -- I believe that's correct.

Q.   Every report that I've seen says if you go out there with a tape measure and you lay it out, that you're going to find that SBS poured it exactly the way that the engineer drew it.  Correct?

A.   Correct.

Q.   The problem is, is that what Mr. Grable specced didn't fit on that slab.

A.   No.  I think it's more complicated than that.

Q.   But that is an issue is that these dimensions for the doors were off; right?

A.   It was always supposed to be an 80-foot opening.  Who had the dimension wrong, I don't know. But from the very first day that we talked with Rod and SBS, that hangar door -- Rod brought the -- the problem -- he goes, "Well, where did you -- what is the opening on this -- this hangar?"  And he said, "Oh, it's 70" -- whatever feet it is.  He goes,

"That's not big enough. We need to enlarge this building for an 80-foot door." That was before we even broke ground.

Q. Okay. But isn't it also true that the issue between -- the conflict between the one and the other didn't come up until late November, early December?

A. Actually, we never found out that there was not -- that that door wasn't going to be big enough. It wasn't until we -- that Rod and I and a few other people were out there, we said, "Open up the doors. How -- what's the opening?" And the opening turned out to be 76 feet and 5 inches.

Q. Okay. If you would, turn to Exhibit 57 for me.

A. (Witness complying.)

Q. That meeting that you're referring to would have taken place on November 28th?

A. Yes. Probably.

Q. And that's referenced in the --

A. Actually, this says December 3rd.

Q. Look in the -- see where it says "attachment" below "subject"?

A. Yes.

Q. And it says, "Attachment, Los Cerritos site visit 11/28/12 PDF?

A. Uh-huh.

Q. So, that's when the site visit was, was November 28th; right?

A. Okay.

Q. All right. So, go back to that first page. And it's from John Grable. It says, "Attached please find my report for your Uvalde hangar site visit. Please note the smaller hangar door size as originally requested by Don Wilson but reviewed and not identified as a problem by Bo Cardin" -- who is Bo Cardin?

A. Well, that should be Bob Cardin. Bob Cardin is one of the people that works for Lewis Energy that handles planes.

Q. Is he a pilot?

A. Yes.

Q. TP; that would be you?

A. Right.

Q. And JGA; that's John Grable & Associates; correct?

A. Correct.

Q. "Based on the actual aircraft dimensions." So, apparently, at some point in time, it was supposed to be a smaller door size, wasn't it?

A. No. It was supposed to be a larger door.

And what they're referring to is the fact that the door that is there is smaller than was intended.

Q. Okay. And he says, "See highlighted in yellow on the attached report." And so, if you flip over to the attached report, the first page of the attached report, Los Cerritos site visit 11/28/12, attending" -- and that's Bob Cardin LEG, for Lewis Energy Group; Tom Pittman, that's you; right?

A. Right.

Q. And for the Glacier Capital Construction, Jack Green, and Kyle, superintendant at SBS, Victor de Anda, who is the structural engineer; right?

A. Right.

Q. John Grable and Matt Martinez; right?

A. Right.

Q. Okay. Now, if you would, turn the page to the second page of that and look under the section called, "Rigid Frame Erection." Do you see that?

A. Uh-huh. Yes, sir.

Q. And there's a highlighted part -- in some it's highlighted, some of it comes out a little bit fuzzy. Yours is highlighted, isn't it?

A. Yes, sir.

Q. Okay. And that's the way it was in the original -- the way Mr. Grable had it. And it says,

"When originally designed, former GCC Don Wilson directed that hangar door to open 80 clear. The PEMB has configured the door to open at 75 feet. SBS stated they would provide hangar door pocket extensions of 2 feet 6 inches at each end per the structural -- per Synergy Structural Engineering supplemental drawings. Hangar door was raised from 22 feet to 26 feet when the building height was raised 4 feet in height to house the newly purchased 2000LXS with a wingspan of 70 feet. 2 and a half feet cleared at each wing end is satisfactory per BC" -- that's Bob Cardin -- "and sees no need to change 75-foot wide opening to 80 feet." Did I read that correctly?

A. Yes, sir. Can I ask you, what is SSEI supplemental drawing?

Q. This is SSEI, but I don't have a supplemental drawing.

A. Well, SSEI stands for what?

Q. That's the -- the Synergy Structure Engineering Incorporated.

A. Oh, okay.

Q. That's --

A. I'm sorry.

Q. That's okay. And then the very last paragraph down there is not highlighted and it says,

"The hangar will not accommodate the Falcon 7X, as the wingspan is above 83 feet in length and the tail is 26'1. The hangar door as roughed-in is 75 and 26 feet tall. So, adjusting the functional width dimension serves no function." Did I read that correctly?

A. Yes.

Q. Okay. And this was sent to Mr. Lewis on December 3rd; correct?

A. Correct.

Q. And you were copied on that as well, weren't you?

A. Yes.

Q. And the way I'm reading that, it says leave it at 75 feet. Am I reading it wrong?

A. Well, no. I don't think you're reading that particular thing wrong. But the bottom line is that Rod Lewis wanted an 80 foot opening. He's parking a $40 million plane in there. And we didn't want to be compromised by a few inches on either side of the wings.

Q. Okay. A month and a half later, January 23rd, the issue of the 80-foot door came up again. This is seven weeks later. For seven weeks the door has sat there in construction being built at 75 feet; correct?

A.   No.  It wasn't until weeks after that we found out that it wasn't 80 feet.

Q.   That just says it was at 75 feet on December 3rd.

A.   No.  Okay.  It's not saying that it's 75 -- let me read this again because -- yeah, it says that the change should be from 75-foot wide opening to 80-foot.  It's the last sentence in that paragraph.

Q.   No.  It says -- it says that the wing span is satisfactory per BC and sees no need to change 75 wide opening to 80 feet.

A.   Well, that's right.  Bob Cardin said, well, you know what, let's make -- let's just go ahead and keep it at 75 feet.

Q.   Right.  And that's what I said.

A.   But Rod Lewis didn't say that.  Rod Lewis wanted his 80-foot opening.

Q.   Were you the owner's rep out there?

A.   At that time.

Q.   Did you agree with this?

A.   No.

Q.   Did you --

A.   In fact, there's another e-mail out there that I sent to Rod where it says that we're going to make it 80-foot.  They agreed to make it 80-foot.  And

we'll make the modifications necessary.

Q. The next day?

A. No.

Q. The next week?

A. I don't know. But I know it's out there.

Q. All right. Let's get to it. That would be Exhibit 59. So, the first e-mail was December 3rd that you got that said, we're leaving it at 75 feet.

A. Right.

Q. This is January 23rd, eight weeks later; eight weeks of construction later. And your e-mail is down at the bottom, and it says, "After further review on the hangar door, I have found the following: On December 3rd a site report was prepared -- a site report by JGA highlighted the fact that the opening was 75 feet when the original intent was to have an 80-foot opening." Okay. How come you didn't mention in there that the pilot said there's no need to move the thing back out to 80 feet?

A. Because Rod Lewis didn't -- I mean, Bob Cardin didn't buy that $40 million plane. Rod Lewis bought it.

Q. Why didn't you feel it necessary to inform Mr. Lewis --

A. We gave -- we exhausted every option to keep

that door at 76 feet.

Q. These are the only two e-mails I got. They were eight weeks apart. One of them says keep it at 75 feet and the other one says --

A. We went through almost a month of trying to say, can we justify this; can we justify this.

Q. This is your report to Mr. Lewis; right?

A. Correct.

Q. January 23rd. And you neglect to mention what the pilot said about the 75-foot opening; right?

A. No. He -- he knew what Bob Cardin said about that. He told me.

Q. You were there?

A. Yeah -- well, I know it because Rod talked to me about it. And he goes, "I want my 80 feet." And we went through every option and the bottom line was --

Q. So, Rod knew it was 75 feet on December 3rd and he waited until January 23rd before he told you he wanted 80 feet?

A. I -- I don't know what --

Q. That's his --

A. -- I don't know what the actual dates are. But you know, we exhausted every -- every option to try to justify keeping it at a 76-foot 2-inch opening

versus an 80-foot.

Q. Well, just the -- part of what you've been talking about is there were just delays and delays and delays. Well, this is one where the door is done December 3rd and you wait -- the owner waited eight weeks before they said, no, I don't want 75; go back and redo the whole thing and change it to 80.

A. I don't --

Q. That could have been much sooner, couldn't it?

A. Yes, it could have been.

Q. Now, in this particular e-mail, you then go back and say, "SBS said they could modify to give us the 80-foot opening." Right?

A. Right.

Q. And then you -- the last sentence says, "Regardless, you were told you would have an 80-foot opening and you will." Okay. Now, SBS actually did agree to put in that 80-foot opening, didn't they?

A. I believe they did.

Q. All right. If you want to look at Exhibit 60.

A. (Witness complying.)

Q. That's actually where Kyle Kieke pitches the proposal to say, we're going to pour two slabs that

extend further out into those door pockets for the door track extensions; right?

A. Uh-huh.

Q. Install two additional heavy steel columns for the end walls. And it goes through and describes how they're going to take off the roof at that point, the 13 sheet panels that cover that little wing wall area, and redo those door panels; right?

A. Right.

Q. Okay. So, this was -- SBS poured the foundation it was supposed to pour.

A. You think that?

Q. Yeah. And Synergy poured the foundation that Synergy drew. Schulte made the building that Grable told them to build manufactured out of metal. Right?

A. Right.

Q. The two didn't match; right?

A. Oh, how did they not match?

Q. The doors didn't match.

A. What was wrong with the doors?

Q. The door openings didn't match. One was 75 feet and one was laid out for 80.

A. I'm -- now I don't understand you. What was -- so, you're telling me that the building was fabricated with 80-foot doors?

Q.   The building was fabricated with 75-foot doors.  The foundation -- no -- yeah, the other way around.

A.   Yeah.  The building was fabricated with 80-foot doors.  So, when the building was delivered, SBS cut the structure down and made those 80-foot doors 75-foot doors.  Isn't that correct?

Q.   Yes.

A.   Okay.

Q.   Right.

A.   But they didn't --

Q.   But Schulte built what they were told to build; right?

A.   And SBS modified on-site to accommodate a different building --

Q.   To accommodate --

A.   -- without even telling us.  Without telling us.  We found that after the fact.

Q.   And in any case, you -- SBS agreed to fix that, didn't they?

A.   Yes.

Q.   Okay.  And if you would, turn the page to Exhibit 61.  From January 30th, this is from John Grable, but it references you.  It says, "Tom Pittman and I had a conference call with Kyle regarding the

steps required to make right the original spec for an 80-foot wide door." And then below in the next paragraph it says, "This will not result in any additional cost to you. SBS will pay for this out of their own pocket since this was the original specification." Did I read that correctly?

A. Yes.

Q. Okay. So, at this point in time, you've identified a problem. Whose fault it was is, I guess, debatable. But SBS is saying, not only will we fix it, but we'll pay for it; correct?

A. Yes.

Q. They never got the chance to do that, did they?

A. No.

Q. In fact, they -- the next paragraph, it says, "Kyle Kieke stated he estimates it will take three weeks to complete these adjustments, but is waiting for metal building supplier to confirm delivery of the additional steel columns that are located at the back interior of the hangar pocket doors." Those steel columns were delivered on Friday after the termination; correct?

A. Oh, I don't remember that.

Q. Okay. You don't remember that coming up in

your meeting?

A.  No.  But I'm sure if you have it, it's there.

Q.  It's in the meeting notes.

A.  Okay.

Q.  Jack says, "The steel" -- you asked about when the steel columns will be there, and he says, "The steel columns for the door will be here on Friday."

A.  Okay.

Q.  We don't have to go back and look at it. That's what it says; right?

A.  Okay.  I believe you.

Q.  Okay.  But they never got a chance to install those, did they?

A.  No.

Q.  Okay.  So, let's talk about Schulte for a second.  After the termination, we saw where there was communications with Erick Key of Schulte about the tolerances for the building; right?

A.  Okay.

Q.  And there was also a complete redo of the interior mezzanine structure on the inside of the building; right?

A.  All of the interior framing was redone.

Q.  Okay.  And you asked Schulte to bid that,

didn't you?

A. No.

Q. What did you ask Schulte to bid?

A. We asked for pricing on additional members that we were going to need.

Q. And it was, what, about $8500.00 worth of stuff?

A. I don't remember.

Q. Okay. And then you knew that Schulte had supplied these big columns as well that were going to go towards this repair of the doors; right?

A. Right.

Q. And you knew Schulte hadn't been paid for those because they were just now being delivered; right?

A. I'm assuming. Yeah.

Q. Okay. And so, when you asked Schulte to bid those, did Erick Key send you back a proposal?

A. I don't know. Did he?

Q. Exhibit 93, if you look at it.

A. (Witness complying.)

Q. Okay. It says that, "Attached is the proposal for the replacement material for the hangar in Uvalde. Please have the erector verify quantities and materials. He says he can have this material

delivered the week of the 22nd," which this is in April. "To be able to do this, we have to get all the outstanding balances that are owed to Schulte Building Systems for this job paid for. We need to get this resolved before any fabrication can take place." Did I read that correctly?

A. Correct.

Q. And what was your response to Mr. Key at Schulte Building Systems? Did you get him paid?

A. I don't remember what my response is.

Q. You never got him paid, did you?

A. No, I don't think so.

Q. Instead, you ordered the material from somebody else; right?

A. I probably did.

Q. Did you ever tell Mr. Key that you weren't going to use his services and why?

A. No.

Q. Now, you mentioned that there was this material that was out there. Do you know what happened to it?

A. Yeah. The material that was originally delivered was -- was cut down in the field to modify the dimension that wasn't right. But we weren't told --

Q.   What happened to it?

A.   I don't know.  The -- once you take a rafter and cut it, it's not much good to anybody.

Q.   What about the -- the stuff that Schulte had sent that hadn't been used yet?

A.   I don't know.

Q.   Okay.  If you would, turn the page to Exhibit 94.

A.   (Witness complying.)

Q.   April 15th, this is right after Erick Key says, yeah, we've got part of our order, but we're not -- in fact, there's the orders down there at the bottom of Exhibit 94.  It's orders 79497 through 80608.  But the e-mail at the top is from Daniel Boddie to you and it says, "We are probably going to use 80323 since it is already on-site.  But we still lack the final pieces for doors.  The other stuff is all laying in a giant pile of metal next to the hangar.  Rod instructed Lingo to put it somewhere safe on the ranch to use at some point in the future." Does that refresh your recollection about what happened to all that --

A.   It was -- it was -- most of it was scrap.

Q.   Then why would Rod instruct that it be put somewhere safe on the ranch so that it could be used

at some point in the future?

A.  Because Rod saves everything.  I mean, from leftover rock to --

Q.  And he didn't -- and he didn't pay for it, did he?

A.  I don't know if he did or not.

Q.  You know that Schulte didn't get paid.

A.  Well, then --

Q.  Did they?

A.  No -- I don't know.  Did SBS pay them?

Q.  Do you know if anybody got paid for the materials that Schulte left?

A.  I don't -- I'm assuming not.

Q.  Did you or anybody that you know of reject any of the material that was delivered?

A.  No.

Q.  Was any of it sent back --

A.  No.

Q.  -- to the person that supplied it?

A.  No.

Q.  The inventory that Mr. Robertson had dropped off, did you send it back?

A.  No.

Q.  And apparently, it was kept by Mr. Lewis.

MR. CLARK:  Your Honor, at this time I'll

pass the witness.

THE COURT: Mr. Slates?

MR. SLATES: Your Honor, would this be an opportune point for a quick break, or should I go ahead?

THE COURT: How long -- okay. We'll take a 15-minute break now. Okay. Then we'll work until 5:00 after that. You can step down, Mr. Pittman.

THE WITNESS: Yes, sir.

THE COURT: Almost through.

(Recess taken.)

THE COURT: Y'all have a seat. Go ahead, Mr. Slates.

MR. SLATES: Thank you, Your Honor.

## CROSS-EXAMINATION

### BY MR. SLATES:

Q. I don't know if you still have your exhibit book open to SBS 94. It's the document you were looking at with Mr. Clark right before we broke.

A. Yes, sir.

Q. What does your e-mail to Mr. Boddie say on April 15th, 2013, the second e-mail in the sequence from the top?

A. I asked him, "Do we need any of this?" And then I said, "It's out of spec anyway."

Q.   What does that mean, it's out of spec anyway?

A.   That there was no way to reuse any of it.  It had been cut; it had been compromised.

Q.   Okay.  I just wanted to cover that while we were on the topic.  I want to change topics now, actually, and go back to the questions that were presented to you this morning from Mr. Brown about the circumstances surrounding your decision that you needed to make a change in the electrical subcontractor.  Okay?

A.   Okay.

Q.   Mr. Brown asked a number of questions about whether or not you ever communicated with Robertson, either with Jerrod Robertson or anyone else.  Do you recall those questions?

A.   Yes, sir.

Q.   Is it appropriate in your experience for an owner to have direct communications with a subcontractor?

A.   No.

Q.   Who should your communications be with?

A.   The general contractor.

Q.   Do you know whether the contract between you and SBS actually requires that?

A.   Yes.

Q.   Let's take a look at it.  If you look at Robertson's Exhibit Number 17, I want to direct your attention to section 4.2.4, which is on page 18.

A.   17?

Q.   18.  "Communications facilitating contract administration."

A.   Okay.

Q.   You can see it on the TV there.

A.   Yes.

Q.   Take a moment to read that and just tell me if this is a provision that, in fact, requires you contractually to communicate with SBS and not Robertson, as you understand it.

A.   (Witness complying.)

Q.   If I could expedite things along, I'm focused on the last sentence of that paragraph.

A.   Communication by and with separate contractors shall be through the owner.

Q.   "Shall be through the contractor"; correct? "Communications by and with subcontractors and material suppliers shall be through the contractor."

A.   Yes, sir.  I'm sorry.

Q.   So, in your mind, were you complying with the contract by communicating with SBS rather than Robertson specifically?

A.   Yes, sir.

Q.   Did you convey concerns about Robertson's manpower on the job to SBS?

A.   Many times.

Q.   Do you know whether they passed those along to Robertson or not?

A.   No.

Q.   If they didn't, would that have been a failure on their part in your mind?

A.   Yes.

Q.   In your experience in the industry, do general contractors not like it when you communicate directly with their subcontractors?

A.   Yes, they do not.

Q.   When you've been in that role of the general contractor, how would you react if an owner communicated directly with your subs?

A.   Negatively.

Q.   I want to look at specifically manpower on this job for Robertson based on the daily reports Robertson introduced into the record in this case.  If you'll turn with me to 19 of Robertson's exhibits. That's the thinner set.

A.   (Witness complying.)

Q.   Are you with me?

A.   Yes, sir.

Q.   Okay.  I want you to tell me if my notes are correct.  19-A is 12/18; is that correct?

A.   Yes, sir.

Q.   Zero people on site; correct?

A.   Correct.

Q.   19-B is 12/19, two people on-site; correct?

A.   Correct.

Q.   19-C is 12/20, two people on-site; correct?

A.   Correct.

Q.   "D" is 1/2, one person on-site; correct?

A.   Correct.

Q.   "E" is 1/3, one person on-site; is that correct?

A.   Yes, sir.

Q.   "F," 1/4, one person on-site; correct?

A.   Correct.

Q.   "G," 1/7, one person on-site?

A.   Yes, sir.

Q.   "H," 1/8, one person on site; correct?

A.   Correct.

Q.   "I," 1/15, zero for Robertson; correct?

A.   Correct.

Q.   "J," 1/21, zero for Robertson; correct?

A.   Correct.

Q. "K," 1/22, zero for Robertson; correct?

A. Correct.

Q. And "L," 1/23, the day they were terminated, zero for Robertson; correct?

A. Correct.

Q. Does that look like the appropriate staffing given the scope of the electrical work on this project based on your experience in the construction industry?

A. No.

MR. CLARK: Your Honor, I'm going to object to -- he's not been designated to testify as an expert.

THE COURT: Overruled.

Q. (BY MR. SLATES) Were you personally satisfied as the owner's representative on this project with that level of manpower for this project?

A. No.

Q. Let's talk about the bids that you got from Robertson and from C&S. Take a moment to look back at Tri-Bar 25, which is in the big black binder. Do you recall looking at that with Mr. Clark this morning?

A. 25?

Q. Yes, sir.

A. Yes.

Q. It's the inquiry about potential notice of a

lien -- now, is that a lien or is that a notice of a lien?

A.   That's a notice for an intent to file.

Q.   Does that happen pretty regularly on a construction job, in your experience?

A.   Yes.

Q.   The implication was made -- or let me ask you, did you feel like the implication was being made that there was some correlation between you getting this notification that there might be a lien notice and your e-mail, which is SBS Exhibit 26, in which you say you want to make a change?

A.   Yes.

Q.   Do you recall that?

A.   Yes, sir.

Q.   All right.  I wanted -- let's look at the timing here, if we can.  Exhibit Number 25 is an e-mail dated Monday, January 14th at 1:28 p.m.; correct?

A.   Correct.

Q.   And the next one, Exhibit 26 of SBS, is an e-mail dated 3:52 p.m.

A.   Yes.

Q.   Do you remember what happened in between those two time frames?  Let me help you out.  Let's

look at Tri-Bar Exhibit Number 44. Are you in the -- should be the white book.

A. Okay.

Q. And can you see on the TV?

A. Oh, yes.

Q. Same day; right?

A. Yes, sir.

Q. January 14th at 2:39 p.m. in between those two e-mails; correct?

A. Correct.

Q. What did you get from C&S at 2:39 p.m.?

A. I got a price for the scope of work for the change order.

Q. And you had already received, we saw this morning in Robertson's Exhibit 4-A, a bid for $60,000.00 roughly; correct?

A. Correct.

Q. Let's get some timing down here as well. I believe, if I remember correctly, Exhibit 4-A, you got the initial number in December -- I want to say it was the 14th, perhaps; let's double-check; yes -- December 14th, you get the 60,000; right?

A. Correct.

Q. And then 4-B was the revised number of 56,000. That was January 8th. Do you recall that?

A. Yes, sir.

Q. Then you get a bid from C&S that's $21,119.00?

A. Yes, sir.

Q. So, as of January 14th, you have two bids from Robertson; one for 60, one for 56, and one bid from C&S for 21,000. Is that the state of events at that time?

A. Yes, sir. Yes, sir.

Q. So, you got a bid from Robertson roughly three times -- at least two and a half times, even after revised -- the bid you got from C&S. Did it seem to you like Robertson's bid was the right bid to go with, if you're reporting the best interest of the owner?

A. Absolutely not.

Q. And just to go back -- we talked about this this morning. The $72,000.00 number, what does that represent? I think you said it was the base contract work; is that right?

A. Yeah. Actually, this is base contract with the change order.

Q. Well --

A. No. Pardon me. It doesn't have the change order. This is just the base contract amount that --

from the original set of documents.

Q. All right. Just so we're all together and I'm not confused, I think the base is the 26,000 in labor, the 46,000 in material. That gets you to 72; right?

A. Correct.

Q. And then the 21 is a separate number?

A. Is an add. Yeah.

Q. So, we talked about apples and oranges this morning. If we're going to compare apples to apples, the apples are this. Robertson's base contract was $128,000.00; right?

A. Right.

MR. BROWN: Your Honor, I'm going to object at this point. I've given him a little leeway, but he's clearly leading his witness at this time.

THE COURT: Don't lead your witness, Counsel.

MR. SLATES: Fair enough.

Q. (BY MR. SLATES) What was the amount of Robertson's subcontract; do you recall?

A. It was 120 and change.

Q. And how does that compare to the --

A. Significant -- significantly higher than the 76,000 that we got from C&S.

Q.   And to compare the other apple to the apple, what was the amount of the change order?

A.   The change order was -- from Robertson initially was over -- a little over 60,000.  We asked for them to go back because I felt it was extremely too high for the amount of work they were doing.  But keep in mind, that was almost half of their contract amount for a bit of changes.  And then -- then they came back with another number, and I still didn't feel good about it.  And that's when I asked C&S, price the original contract and price the change order.

Q.   And let me ask you a general question.  Is it important for you, as the owner's representative, to try to manage the cost on a project?

A.   Yes, sir.

Q.   Did you develop some understanding, based on your dealings with Rod Lewis, as to whether or not he expected that of you?

A.   Yes, sir, he did.

Q.   Did you want to try to minimize the cost of the project to the extent that it wouldn't compromise quality?

A.   Without a doubt.

Q.   Had you worked with C&S before?

A.   Many years; over 20.

Q.   Had you found them to be a quality contractor -- electrical contractor?

A.   They are.

Q.   And had you had a positive or negative experience with Robertson at that point?

A.   Very negative.

Q.   Because of the manpower issues or because of other issues?

A.   No.  The -- the initial issue that I had with them was they didn't man the job properly.  There was -- they were never there with enough staff to get things done.

Q.   All right. Did you believe that you had the right, under your contract with SBS, to require them to make a change in the electrical subcontractor?

A.   I did.

Q.   Have you worked with the AIA form contracts before?

A.   Many years.

Q.   I want to take a look at another provision. We looked at 4.2.4 earlier.  Let's go back to Robinson -- Robertson 17.  Have you got it?

A.   Yes, sir.

Q.   I want to direct your attention to paragraph 5.3 of that document, which is on page 19.

A. Yes, sir.

Q. It says, "By appropriate agreement, written where legally required for validity, the contractor shall require each subcontractor to the extent of the work to be performed by the subcontractor to be bound to the contractor by terms of the contract documents and to assume toward the contractor all the obligations and responsibilities including the responsibility for safety of the subcontractor's work which the contractor, by these documents, assumes towards the owner and architect."

Is it your understanding, based on your experience, that that provision flows down, so to speak, the obligations of the general conditions to the subcontractor; or at least requires the general contractor to include the provision that accomplishes that?

A. Yes.

Q. Okay. And was it your understanding that SBS had complied with that provision?

A. Yes, it was.

Q. Did you have any reason to believe they had not?

A. No.

Q. Are the -- and just to be clear, if we look

at section 1.1.1 of the general conditions, the contract documents definition; does it include the AIA general conditions?  Look here.

A.  Yes.  The general and supplemented.

Q.  I think you said earlier you haven't seen the SBS subcontract before.  Do I recall your testimony correctly?

A.  Yes, sir.

Q.  Okay.  I'll wait to ask Mr. Robertson about that.  Given these provisions, did you believe that you had the legal right to require SBS to make a change in the electrical subcontracting?

MR. BROWN:  I'm going to object at least as to the legal conclusion.  I'll object on that basis.  I don't think he has --

THE COURT:  As the general on the project, did he believe he had a right under the contract to terminate?

THE WITNESS:  Yes.

THE COURT:  Okay.

Q.  (BY MR. SLATES)  And did you believe that by asking SBS to do so, you were putting SBS in a position where they would be in breach of their subcontract with Robertson?

A.  Yes.

Q. Let me ask you the question again. It might not have been clear. The question is that --

MR. BROWN: No, it was clear.

Q. *(BY MR. SLATES)* The question is this. Did you believe that asking SBS to make a change from Robertson would mean that SBS would be in breach of its subcontract with Robertson?

A. Oh, no. No. Not a breach.

Q. Did -- when you went to SBS and asked them to make a change, did they say, well, wait a minute, we can't do that?

A. No. They had no objection whatsoever.

Q. Did they tell you that it was going to be a breach of their subcontract to do that?

A. No, they did not.

Q. Did you have any basis to believe that asking them to make a change, given the lack of manpower and the gross difference between pricing for the work, was in any way inappropriate?

A. I didn't think it was inappropriate at all.

Q. Did you have any malice towards Robertson or was it just a matter of getting the project built?

A. I -- I don't know Robertson.

Q. Did you have -- setting aside the contract for a moment, let's ignore what your rights legally

may have been. Did you at least have a good faith belief that you had the right to ask SBS to make a change in the electrical subcontractor?

A. Yes, I did.

Q. All right. I want to change gears now and talk about schedule issues on the project in general. If we can go to Robertson Exhibit Number 15. I want to direct your attention to section 4.3, which is on page 3. The contract we -- just to give some context here, look at the first page. It was dated the 17th of May 2012; correct? I'm looking at the top of the first page.

A. Yeah. Yes, sir.

Q. If we look in 4.3, what does it say is the scheduled final completion date?

A. 7th of December 2012.

Q. Did that schedule get met?

A. No.

Q. Let's look at Tri-Bar Exhibit Number 33. That's in the bigger binder. What is that? Okay. This is a schedule for the project; correct?

A. Yes, sir.

Q. And if we looked at line item number 14, what is that line item?

A. Detail, fabricate, and deliver steel.

Q.   And can we see what the scheduled delivery date is for that?  August 7th, 2012?

A.   August 7th, 2012.

Q.   Was the metal building delivered on August 7th, 2012?

A.   No.

Q.   Let's go to Tri-Bar Exhibit Number 35.  This is a revised schedule for the project.  And who do these schedules come from, just to be clear?

A.   From SBS.

Q.   Did you make this schedule?

A.   No.

Q.   Was it your understanding that when they provided this to you that they were committing to meet this schedule?

A.   Yes, sir.

Q.   If you look at line item number 19, it's the same line item.  Detail, fabricate, and deliver steel. And what date do we see?

A.   October 18th.

Q.   Okay.  Did they meet that schedule?

A.   No.

Q.   What were they telling you and Mr. Grable, if you were present for those conversations, about their ability to make those delivery dates?

A. Well, originally, they told us when we made the hangar modification that it was not going to impact the schedule. And then as it went, there was always another excuse or another reason why they had to extend that number. And it kept being extended and extended. As you can see, that's a three month -- or two and a half month extension right there.

Q. If we look at Tri-Bar Exhibit Number 36, what is -- it looks like you got a copy of this report; is that correct?

A. Yes, sir.

Q. And that you were present?

A. Yes, sir.

Q. What was SBS representing at this time, as far as their ability to make those delivery dates, if you look at item number 3?

A. They were still on target with the main steel frame delivery on-site October 15th. This matches current updated schedule. Erection will begin the same week of delivery.

Q. Let's look at SBS Exhibit Number 63, one of the documents Mr. Clark asked you about this morning, back into the black binder.

A. Which number?

Q. 63.

A.   Yes, sir.

Q.   All right.  I want to call your attention to the third page of that exhibit -- actually, the bottom of the second page, top of the third page.  There's an e-mail from Mr. Grable to Mr. Lewis with a copy to you.  And he makes reference to, "An effort to ascertain the real schedule of building delivery; not inconsistent and incorrect delivery dates provided by SBS."  Do you see that?

A.   Yes, sir.

Q.   If you look at the top of the next page -- first at the bottom of that page, he said he made contact with Schulte.  And then at the top of the second page, what did he find out from -- from Schulte?  Starting with, "Building supplier stated." Can you see that?

A.   Yeah.  It said, "Builder supplier stated overcommitment on their part has exceeded their capacity to provide a timely delivery of the building product.  Their response was honest and straightforward, leaving us befuddled by SBS's responses to their specific delivery dates."

Q.   Let's look at Robertson now; Exhibit Number 32.  This morning Mr. Brown asked you -- had you focus in on one sentence in this exhibit.  It's over on the

third page.

A. I'm sorry, John. I can't get this --

Q. It's in -- I think it's in -- I think that's SBS you got. It's going to be this one.

A. Okay.

THE COURT: It's easier to read off there, Mr. Pittman.

THE WITNESS: Oh, yes sir.

THE COURT: For me, it is.

THE WITNESS: Yeah. Much easier.

Q. *(BY MR. SLATES)* All right. So, I'm on the e-mail -- the 28th e-mail -- here we go. So, do you recall this morning that Mr. Brown asked you to focus in on this sentence that says, "The hangar building is beautiful and fits well with the land"? Do you remember that?

A. Yes, sir.

Q. You didn't get a chance to read the rest of this e-mail string this morning. But if you take some time to look at it, I think you'll see that everything is not all wonderful in hangar land at this time, is it?

A. No, not at all.

Q. In that same e-mail, he makes reference to you having stated that, "Under no circumstances will

we allow only two workers on-site.  Only full staff is acceptable."

A.  Correct.

Q.  Is this consistent with your other testimony about the ongoing problems with manpower and staffing?

A.  Yes, sir.

Q.  Were you conveying that to SBS at that time?

A.  Yes, I was.  That's why I followed up.

Q.  And then even in the following sentence, Mr. Grable says, "Not the way it has progressed thus far with the PEMB building delay."  Do you see that?

A.  Yes.

Q.  Was that a major issue for you and Mr. Grable?

A.  Well, yeah.  It affected the overall schedule.

Q.  And was --

A.  The critical path was all PEMB.

Q.  Was Mr. -- was Mr. Lewis happy at the time?

A.  Not at all.

Q.  Let's look at the first page of that e-mail. This is from Mr. Lewis on November 25th to Tony.  It says he was visiting the project last week and noticed that it is really still in slow motion.  Only three guys working on erecting the building and going very

slow.  Do you see that?

    A.  Yes, sir.

    Q.  Is that consistent with your understanding of conditions at the time?

    A.  Yes, sir.

    Q.  If you look down at the -- the bottom paragraph, "To me, what I witnessed over a couple of days last week, it's still a shoddy operation.  They did not have the proper lifting equipment or cranes to make the job go smoothly and they were basically shimming the metal runners foot by foot along the trusses to place them, wasting a lot of time."  Is that also consistent with what you were seeing on the project?

    A.  Yes, sir.

    Q.  Were you concerned at this point in time about SBS's ability to complete this project?

    A.  I was very concerned about it.

    Q.  Did you begin considering options for what to do if they continued to fail to meet your expectations?

    A.  I had to.  I did.

    Q.  Did you feel like you had a responsibility to consider those options?

    A.  Yes, sir.

Q. What options did you consider?

A. Well, we considered every option in the sense of whether we were going to bring in another contractor, whether we were going to bring in another general contractor, or we were going to finish it ourselves. And I felt that it would have been more cost effective to finish it ourselves and try to use what was -- if anything, we could.

Q. At that time did you believe the termination was appropriate?

A. Yes, sir.

Q. Did you communicate that to Rod Lewis?

A. I did.

Q. Did he agree with you?

A. No. He wanted to try to -- initially, he wanted -- when I wanted to terminate at first, Rod didn't want to. He wanted to try to work something out. It wasn't until later on that he agreed that it was time to -- because he was very unhappy.

Q. We saw earlier this morning -- I won't go back to it, but just to reference it -- the solicitation of bids in SBS Exhibit Number 65 on October 31st where you were out there looking to get people to give you prices to finish. Do you recall that?

A.   Yes, sir.

Q.   Was that part of that process of considering your options?

A.   Yes, sir.  I didn't want to have to get forced into the position of terminating and not having a game plan.

Q.   What would that have done to the schedule?

A.   It was already catastrophic what we had to deal with.  It was so grossly behind schedule.  And then had we not had a game plan, we would have been further behind.

Q.   Would it be prudent for an owner or an owner's representative to consider terminating a general contractor without exploring other options for how to complete the project if, in fact, it came to that?

A.   Not in my -- not in my opinion.  I'm the expert that works for Rod Lewis.  And if I'm going to terminate somebody, I'm going to have a game plan in place or an idea of where we're going to go forward.

Q.   Let's look back at -- we saw this one this morning, too, but I do want to revisit it -- Tri-Bar 46 in the white binder.  Just go off the TV.

A.   I'm going to have to look at this one.

Q.   This is where you've asked John Grable to put

them on notice of, again, inadequate manpower.  Do you recall looking at that this morning?

A.  Yes, sir.

Q.  Is this -- was this a problem that had been going on for months at this point?

A.  Yes.

Q.  Was there ever a point in the project where you believed they were meeting your expectations, as far as staffing?

A.  No.

Q.  Let's go to the meeting minutes, Exhibit Number 48.  That's Tri-Bar 48.  Do you recall looking at this this morning?

A.  Yes, sir.

Q.  Mr. Clark focused your attention on a few select sentences, but you all didn't read every sentence, did you?

A.  No, sir.

Q.  And do you recall Mr. Clark saying there was nothing in this document that indicated any reason for terminating SBS, other than the first sentence that said, "Met with Rod.  He wants to terminate the contract"?

A.  Yes, sir.

Q.  What do you say on this line right here?

A. "I felt that we gave every chance and a lot of delays."

Q. And were those delays, in your mind, a result of failure to adequately man the job?

A. Yes. Part of it.

Q. So, to represent that there is nothing in here that indicates a justification for delay, do you still believe that that testimony is accurate?

A. Oh, yeah. In fact, Steve Schiffman says, "Okay. We're disappointed, but we understand part of it."

Q. Did you believe that there was any question, based on your interaction with SBS, about their appreciating the fact that they were being terminated because of failure to hit the schedule and failure to adequately man the job?

A. Yes. In fact, they go on to say that, you know, this wasn't their finest hour.

Q. Let's see. Did you believe at that point that you had justification to terminate SBS for cause?

A. Yes, I did.

Q. And you understand the difference between a termination for cause and a termination for convenience?

A. Yes, sir.

Q. Let's look at the contract. Back to Robertson Exhibit Number 17. All right. So, 14.2 is termination by the owner for cause. And if you look specifically at 14.2.3 and 14.2.4, what does that say about whether or not you have to pay the general contractor when you terminate for cause?

A. "When the owner terminates the contract for one of the reasons stated in section 14.2.1, the contractor shall not be entitled to receive further payment until the work is finished."

Q. Let's look at 14.4.1. And actually, specifically, 14.4.3. What does it say with respect to payment to the contractor in the event of a termination for convenience?

A. 14.4.3?

Q. Yes, sir.

A. "In cases such as termination for the owner's convenience, the contractor should be entitled to receive payment for work executed and cost incurred by reason of such termination along with reasonable overhead and profit on work not executed."

Q. So, it's your understanding that payment is required at the time of termination if you terminate for cause?

A. For convenience. Yes.

Q. All right. Let's go back to Exhibit Number 48. And I want to call your attention to the second page of that. You looked at this this morning with Mr. Clark. You said -- the question was, can you sign releases? You said, absolutely. Contractually, we don't have to pay you until the project is finished. Is that a termination for cause or a termination for convenience, in your mind?

A. Cause.

Q. And did you intend this to be a termination for cause?

A. Yes, I did.

Q. Why did you tell them you were going to pay them if you knew that the contract didn't require you to do that until the project was finished if this was a termination for cause?

A. Well, you know, we didn't want to make this painful -- or as less painful as possible. I mean, we had every intention of paying them any money due. And I made it plain that that's what we were going to do.

Q. Did you know about the defects at the time you made those statements?

A. No, sir.

Q. Had you known about the defects, would you

have told them that you were going to get them paid?

A. No.

Q. What would you have told them if you had known about the defects at that point?

A. We would have said there was several items that need to be done; need to be fixed; need to be repaired. It's not in the best interest to get SBS back on the project because they were nonperforming from the get-go. And we felt that a clean break would have been necessary.

Q. All right. We're not going to pull this back up. But do you recall this morning that Mr. Brown showed you the justifications for a termination for cause; and the first one on that list under 14.2.1 of Robertson Exhibit Number 17 was, "Repeatedly fails or refuses to supply enough properly skilled workers or proper material." Do you remember that?

A. Yes, sir.

Q. Did you believe that SBS had repeatedly failed or refused to supply enough properly skilled workers or proper material on this project?

A. Yes.

Q. At any time did Mr. Grable indicate that he did not believe that a termination was justified?

A. No.

Q.   You -- you were asked questions this morning about a certification.  You don't have a certification -- don't have a formal certification, do you?

A.   No.

Q.   Did you have conversations with Mr. Grable about whether termination was justified?

A.   They --

MR. CLARK:  Your Honor, I'm going to object.  This is going to be hearsay.

THE COURT:  Overruled.

Q.   (BY MR. SLATES)  Let's look at -- there is a requirement, if we look down a little further in 14.2.3 -- oh, I'm sorry -- 14.2.2.  It says you're supposed to give written notice.  See that?

A.   Yes, sir.

Q.   We spent a bunch of time this morning talking about that.  Do you recall that?

A.   Yes, I did.

Q.   Do you see anywhere in there where it says that notice gives the contractor an opportunity to cure?

A.   No.

Q.   Is there anything, once an owner has made the decision to terminate for cause, that a contractor can

do to stop that?

A. No.

Q. Does the notice, in your mind, have any substantive effect other than to let them know what's coming?

A. No, not really. I mean, we -- we spoke often about this.

Q. And let's get back to Exhibit Number 48. I want to point out a couple of those comments. But I want to just focus on -- on the first page, this is Steve. Who is Steve?

A. Schiffman.

Q. It says, "Okay. We're disappointed. We understand part of it." If we look down, Steve again says, "Not seeing the best side of SBS Construction for many reasons." Do you see that?

A. Yes, sir.

Q. If we go down to -- I believe it's on the second page. Said -- this is Mr. Schiffman again talking. It says, "I visited the job yesterday and I understand we're up front and forthright people. We had some problems. We are truly sorry about it." Do you see that?

A. Yes, sir.

Q. Does that sound like someone that is

surprised that they're being terminated?

A. Not at all.

Q. Does it sound like someone that is protesting that the termination isn't justified?

A. No.

Q. Does it sound like someone -- and in fact, do you see anywhere in there where anyone complains about having not received a written notice seven days prior to this meeting?

A. No.

Q. Had you been telling SBS for months that schedule and manpower were a problem?

A. Yes, I had.

Q. And had they taken adequate steps, in your mind, to address your concerns?

A. No.

Q. Let's look at SBS Exhibit Number 12. This is an e-mail -- or excuse me -- a letter from -- I believe from Mr. Schiffman to you dated February 15th. Do you see that?

A. Yes, sir.

Q. It says, "While we accepted the challenge to deal with the various parties involved and to manage the ongoing design changes, we at SBS obviously did not meet your expectations or the expectations of Mr.

Lewis." Do you see that?

A. Yes, sir.

Q. Does that sound like someone that's angry or someone that's contrite?

A. Contrite.

Q. Does it sound like someone that's acknowledging responsibility -- or culpability?

A. Culpability.

Q. And do you see anywhere in that letter where Mr. Schiffman complains about having not received the written notice seven days prior to the meeting?

A. No, he did not.

Q. In fact, when did the notice issue get raised relative to you and your team discovering the defects and withholding payment based on those defects?

A. Actually, I just heard about it for the first time today.

Q. So, until today, no one had ever told you that SBS had any issue with having not received notice?

A. Yes, sir.

Q. Is that correct?

A. That's correct.

Q. All right. So, what did you do at that point in order to try to get the project back on track?

A. Well, the first thing I did was kind of damage control. I wanted to make sure that before we released any funds to SBS, that we do a full forensic discovery. That's why we brought in independent third party contractors to help us evaluate what we had. We knew we had some issues, but we didn't know they were going to be as extensive as they were.

Q. Who did you hire? You mentioned Speedway earlier.

A. We hired Speedway. We hired -- well, we had BoDen contractor -- Daniel and I had worked when he was with Turner Construction. And so, we brought in -- they bought in a concrete contractor. They brought in another mason. They brought in an HVAC guy. You know, a bunch of different independent contractors.

Q. And what did you begin to find out based on that investigation?

A. Well, the list is pretty extensive. You know, we found out what we felt were --

MR. CLARK: Your Honor, I'm going to object on hearsay. He's not even identifying who these are coming from.

THE COURT: Just tell us what you have personal knowledge of, sir.

THE WITNESS: Okay. Well, we had

personal knowledge of --

THE COURT: You have personal knowledge of.

THE WITNESS: Sir?

THE COURT: You have personal knowledge.

THE WITNESS: Yeah. Well, I had personal knowledge of the inspections that were made, the discovery that was made, and the report that was -- that was formulated and given. And so, those -- those were -- we hired Speedway. We brought in C&S. We brought in a brick mason, a concrete contractor. There were several other people that we brought in to do this inspection.

Q. (BY MR. SLATES) Let's look at --

MR. BROWN: Your Honor, I'm not clear. I don't know where he's going with this and what he's trying to establish. But still, I don't know that an adequate foundation was laid to testify as to what he's doing there. I'm aware of a report, but the culmination of individuals into that report and his role and given the fact that he earlier testified this morning about a report that he did that somehow was not in existence; I'm not clear on how we're able to establish what part is his, what part is theirs, and what part is hearsay. So, I'm going to object; one of

spoliation, but two, of the fact that I still think there's some hearsay issues.  So, I've got to object.

Q.   *(BY MR. SLATES)*  All right.  I'm going to ask you --

THE COURT:  Wait a minute.  I didn't hear -- I mean, I heard a speech; not really an objection.

MR. BROWN:  Okay.  I said I object, Your Honor, as to the testimony.

THE COURT:  Give me a three-word legal objection.

MR. BROWN:  One, hearsay; two, spoliation on both.

THE COURT:  Because you're testifying as to the contents of the written report that you don't know where it is?

MR. SLATES:  And let me address that --

THE COURT:  Wait.  Let me ask him that. What's the answer to that?

THE WITNESS:  Well, I know that the report was done.

THE COURT:  But they haven't given it to the other side, from what I understand.  Is that correct?

MR. SLATES:  No.  The --

THE COURT:  Okay.  But what you're

testifying from is the contents of a written report; correct?

THE WITNESS: Yes, sir.

THE COURT: Okay. Then the objection is sustained. You haven't given them the written report?

MR. SLATES: No, we have. There's confusion here and I'm trying to clarify it.

THE COURT: Can you pull up the written report and let's see.

MR. SLATES: It's Exhibits 19, 20, and 21 which they objected to on the basis of hearsay.

MR. BROWN: There are -- there are two issues that he's trying to get to. One, Your Honor, is of the contents of the -- whatever it is -- Spellway --

THE COURT: Speedway.

MR. BROWN: -- Speedway. That is their -- that report we objected because, one, report not designated, et cetera. But there's another issue --

THE COURT: No, no. Wait a minute. The focus of everybody's concentration was, you've never seen, didn't know of this written report.

MR. BROWN: There are two --

THE COURT: Which report is the one you don't know about?

MR. BROWN: We don't know about the one he talked about this morning.

MR. CLARK: Let me help you out with that one. That's one of the reports they're talking about, Your Honor. You see it's written there on the front cover as identified as belonging to Jennifer Swisher, October 18th of 2013. It's not tied to Mr. Pittman. That's the report that we received. She's not an expert. He's not designated as an expert. That's the report we've got. I don't know how we're supposed to recognize that as being something he did back in February.

MR. SLATES: I'm just trying to eliminate the confusion, Your Honor. I think if I can ask him a handful of questions, it will solve the problem.

THE COURT: Well, you tell me. You know the answer.

MR. SLATES: Yeah. So, the point is, Jennifer Swisher is the person that compiled this. She had input from Daniel Boddie. She had input from Tom Pittman. And they compiled this document that records photographically the conditions --

THE COURT: Ms. Swisher did; right?

MR. SLATES: Well, she created the document. But the photographs and the -- and notes

that you'll see in the document were primarily from Daniel Boddie, perhaps some input from Mr. Pittman. I'd have to ask him to confirm. But it was Daniel and Jennifer that did most of the -- the actual legwork to create this document. But this is -- I believe that he can confirm when he talked about the investigation report this morning, it culminated in this.

THE COURT: Well, that's -- but they -- he did not make this report.

THE WITNESS: Well, I gave --

THE COURT: Wait a minute.

THE WITNESS: I'm sorry, sir.

THE COURT: So, the objection is sustained.

Q. *(BY MR. SLATES)* Did you provide input into this report, Mr. Pittman?

A. I did.

Q. What type of input did you provide?

A. Well, we oversaw all of the -- the forensic discovery. Okay. We oversaw all the work that Speedway did. We saw, as we uncovered things, you know, discrepancies that are in that report. We took pictures of it. We documented every discrepancy and deficiency that we -- that we found and put it in this written report. I left after that and then Jennifer

and Daniel put this report together. I was instrumental in getting all of this done.

Q. And just to be clear, when you referred to a report this morning, was it Exhibit 20 and 21 that you were referring to?

A. I'm assuming.

Q. You can look at it. It's --

MR. BROWN: Your Honor --

THE COURT: The objection is still sustained, Counsel.

MR. SLATES: I understand, but --

MR. BROWN: He didn't prepare --

MR. SLATES: -- we're not allowed to talk about the report, Your Honor.

THE COURT: Well, you're talking about the report.

MR. SLATES: I just wanted to clear up the record as to the implication that there's some document out there that we haven't --

THE COURT: What you've made clear to me is this Los Cerritos Hangar Deficiencies is the report that everyone was talking about.

MR. SLATES: Okay.

THE COURT: Mr. Pittman did not prepare the report, so we're not going into the report.

Q.   (BY MR. SLATES)  Based on your personal observations and your dealings with Speedway/BoDen and the completion of the project, did you become aware of some defects on the project?

A.   Yes, sir.

Q.   What defects did you become aware of?

MR. BROWN:  Now, at this point I'm going to renew the objection and --

THE COURT:  Give me a legal objection, Counsel; not a speech.

MR. BROWN:  Hearsay and; two, Judge, attempting to comment on evidence not in the record and --

THE COURT:  But once your client left, he took over as the manager of the construction; correct?  So, he, as manager of construction, can denote the defects, if any, that existed; correct?  Not the report.

MR. SLATES:  Yes.  I mean, he --

THE COURT:  Well, I'm asking Mr. Brown.

MR. SLATES:  I'm sorry.

THE COURT:  Sorry.  Right?  He's the one that took over after your client left; correct, for Lewis Energy?  So, your objection is overruled.

Q.   (BY MR. SLATES)  What defects did you

personally observe?

A. Well, there was defects with -- there were several defects with the roof that we took pictures of, that I had Speedway take pictures of in detail. The fact that the building -- you can look at the roof line, and it goes like this. And then right over at the hangar section, it drops off and the rafters slope out like this. It's -- a picture is worth a thousand words. And we dug out around the perimeter and found out that sometime -- sometime after our inspection was done that the exterior forms were shifted out over the pad. And it shows concrete after we dug out that was sitting -- was 10 inches -- or 8 inches thick. And that it goes to dirt, rather than that grade beam being fully executed and dug out 36 inches. That was around the full perimeter of the building. And that -- and those pictures show that and --

MR. SLATES: I don't know -- is 27 admitted?

THE COURT: Your 27?

MR. SLATES: Yes, Your Honor.

THE COURT: No, not preadmitted.

MR. SLATES: It's structural drawings dated --

THE COURT: All I have is numbers.

MR. SLATES: -- June 26th, 2012. Do y'all have an objection?

MR. CLARK: To him testifying about it? Yes. He's not an expert.

MR. SLATES: I just want to show him the plans.

MR. CLARK: To do what? He's not an expert.

MR. SLATES: To have him identify the condition he's describing.

MR. CLARK: He's not been designated as an expert to testify about what the plans mean.

MR. SLATES: I'm asking him what defects he observed in conjunction with performing his responsibility as the project representative.

THE COURT: But, Counsel, you're offering a report or something of Speedway.

MR. SLATES: No. It's -- it's not Speedway. It's John Grable's plans for the project.

THE COURT: And that's the plans which he used in order to pour the --

MR. SLATES: Actually --

THE COURT: -- slab or --

MR. SLATES: -- these are structural, so it's --

THE COURT:  Okay.

MR. SLATES:  -- Victor de Anda's plans of the project.

THE COURT:  Okay.  You can offer those.

MR. SLATES:  At this time we would offer Tri-Bar 27.

THE COURT:  Formal objections?

MR. BROWN:  I have no objection.

MR. CLARK:  No objection, Your Honor.

THE COURT:  27 is admitted.

Q.  *(BY MR. SLATES)*  All right.  If we can go to the last page of that, what is a brick lug?

A.  It's just an extension of the exterior beam that the brick or the stone is going to sit on.

Q.  Is it this area here?

A.  Yes, sir.

Q.  And is it -- is it supposed to be sitting -- what's all that?

A.  That's all concrete.  It's all the way down to the bottom.

Q.  All right.  Let me ask you to draw what you actually physically observed relative to what that calls for.

A.  What we observed after we dug it open?

Q.  Yes.

MR. CLARK: Your Honor, Mr. Pittman has not been designated as an expert. They do have an expert, Daniel Boddie. If we're going to hear this twice, I'd just as soon hear it from the expert. So, I'm objecting on the grounds that he's not an expert. What he's about to draw --

THE COURT: What is his expertise in structural engineering?

MR. SLATES: I'm not asking him an opinion. I'm asking what he physically --

THE COURT: Well, you asked him to draw the structural design for a purpose; right?

MR. SLATES: I'm asking him to draw what he physically observed in the field.

MR. CLARK: Okay. I don't have an objection to that, Your Honor.

THE COURT: Okay. Draw what you saw in the field. Draw the trees around it, too.

A. Okay. Basically, when we went around the perimeter of the building -- and those pictures detail -- they accurately depict this. We dug this out and we found out that this -- this form that should have been here was shifted out to here, you know, approximately several inches, to where when we dug this out, that brick lug was sitting on -- that

consisted of about 8 inches of concrete. It wasn't bearing down so -- through supplemental structural instructions, SSI from Victor de Anda, he -- we came back in and added into this -- doweled into the existing grade beam and gave a structural brick lug.

Q. (BY MR. SLATES) Prior to that having been done, what was underneath the brick lug?

A. Dirt.

Q. What do the plans show is supposed to be underneath the brick lug?

A. Concrete.

Q. Okay. Let's look at SBS Exhibit Number 16. Actually, before we go there, let me ask you a question. You were asked this morning about your physical observation. When you observed the forms, were they in the same plane as the grade beam or were they shifted out like you just described?

A. No. They were in the same plane.

Q. When you saw the pour after it was done, could you tell whether or not the edge of the foundation was over the grade beam?

A. No. I mean, we didn't -- no. You can't -- there would have been no way to determine, unless we would have x-rayed those grade beams.

Q. The suggestion that you knew that the brick

lug wasn't sitting over the grade beam, which I think was implied this morning, is that true?

A. No. We had no knowledge of that. That grade beam wouldn't have been integral with the -- or the brick lug wouldn't have been integral with the grade beam.

Q. All right. Let's -- specifically in Exhibit Number 16, it's a March 15th letter from John Grable to Jack Green with a copy to you. "I'm writing this letter to alert you to recent discoveries concerning the structural foundation. It appears that the perimeter masonry lug that's required to support the 20-foot high tall stone here is only 10 inches deep and not the specified 3-foot depth." Is that a reference to --

A. Yes, sir.

Q. -- the brick lug that --

A. Yeah.

Q. He goes on to say, "In view of the fact that we continued to discover deficiencies in the construction work, it might be best for you to contact your insurance company and inform them about the unfolding catastrophic condition." And in your mind, was the brick lug a safe condition?

A. Not at all. I mean, there was a reason they

designed it to be 36 inches deep in that part of that grade beam.

Q. You talked this morning about the building being out of plumb. Do you recall that?

A. Yes, sir.

Q. Do you recall what efforts were undertaken to make that determination and who made them, other than just the visual observations you referenced this morning?

A. Well, there was more than one thing. The building was so far racked that you could see -- either a CMU wall was out of plumb or the building was racked. And when SBS -- or when United Erectors and Speedway came out there, they determined that the building was racked a little over 2 inches.

Q. Do you recall Mr. Clark asking you questions about the hangar doors before lunch?

A. Yes, sir.

Q. And do you recall him indicating -- or acknowledging, at least -- that those -- that the building was field modified to accommodate the foundation?

A. Yes. It was shipped with 80-foot doors and field modified.

Q. And just to put it in very basic terms, does

that mean that the building that SBS delivered was bigger than the foundation upon which it was supposed to sit?

A.   Yes, sir.

Q.   Did anyone from SBS tell you that they were field modifying the door section to fit the foundation?

A.   No.

Q.   When did you find that out?

A.   After we asked for an actual measurement. And they said, "Well, the doors open up to 76 foot, 2 inches."  And I said, "What happened to the 80 feet?"  And that's when -- and it wasn't until afterwards that we determined -- or we found out that field modification had been done when Schulte -- after we contacted Schulte, Schulte said, yes, we shipped 80-foot door sections out there.  They had the right steel.  They cut the steel down to fit the foundation.

Q.   Did you ever actually go on the roof of the building?

A.   No.

Q.   Were you able to observe pictures that were taken of the roof?

A.   Yes, sir.

Q.   Were the conditions of the roof consistent

with the quality of construction you would expect on a project like this?

A. No.

Q. Were they acceptable to you, as the owner's representative?

A. No, they were not.

Q. I want to put some context here. There were questions raised this morning about why you didn't bring them back out to address some of these issues. Did you feel like SBS was honest with you about the issues with the schedule for the delivery of the metal building?

A. No. That changed, I want to say, three or four times. And then the last time that they said that it was going to be delivered and we got word from Schulte that it hadn't even been put into production yet, that we felt that SBS was not telling us the truth.

Q. Did you feel deceived by SBS in relation to the brick lug issues?

A. Oh, yes.

Q. Go ahead.

A. No. I just -- that was a potential catastrophic failure they could have had there.

Q. Did you feel deceived by SBS in conjunction

with the field modifications of the hangar doors?

A. I did.

Q. Did you feel deceived by SBS in the context of the quality of the construction on the roof that you couldn't see from the ground?

A. Oh, yes.

Q. In light of these issues, what was your level of trust and confidence with SBS at the time you began to discover these defects and you got that letter from Mr. Schiffman we looked at this morning saying, I want to come meet with you and fix this thing?

A. We felt we had exhausted every option with SBS.

Q. Did you have any interest in getting them back out there, given the lack of trust and confidence?

A. No.

Q. All right. I want to -- I'm going to be jumping around a little bit. I want to address some of the other questions and issues that were raised this morning. The -- the bid -- the initial bid, at least; what was the SBS subcontract amount again, if you could remind me?

A. SBS --

Q. I'm sorry. The Robinson subcontract amount.

A.   It was 120 and change.

Q.   And the -- the bid, if I recall correctly, initially was 60?

A.   The --

Q.   60,000?

A.   The change order?

Q.   Yes.

A.   Yes, sir.

Q.   You said a quarter of the contract amount. Would you agree with me that that amount --

A.   It was more like a third.

Q.   -- is closer to half?

A.   Yeah.  Closer to half.  Yeah.

Q.   Did it seem like there was a 50 percent increase in the scope, based on the changes that you knew existed in the plans?

A.   Not at all.  That's why I questioned it.  In fact, Tony Weigand questioned it as well.  That's when we determined that we've got to get additional pricing on this.

Q.   I believe Mr. Clark referenced the final contract cost being roughly 2 million.  Do you recall that earlier?

A.   Yes.

Q.   But you don't know what happened between the

time you left and when the project got finished?

A.  No.

Q.  What I want to focus on is Exhibit 22-A of Robertson where it talks about the C&S contract value. If the project went from 1.2 million to 2 million, does that suggest to you the scope of work may have increased?

A.  Oh, without a doubt.

Q.  And are you confident that what is being referenced here is a different scope of work than what you solicited from them in Tri-Bar Exhibit --

A.  Absolutely.  It had to have been.

Q.  They were suggesting that you weren't on the job in December of 2012 this morning.  Do you recall that?

A.  Yes, sir.

Q.  If I can direct your attention to Tri-Bar Exhibit Number 69.  Mr. Clark showed you a number of daily reports from December this morning.  Those are the ones that he marked.  Did you understand that's the case?

A.  Yes.

Q.  You may have mentioned, in fact, I think that it didn't look like all of them were there.

A.  Correct.

Q.   If we look at the December 10th report, which is -- it's in the white book, 69.  Are you with me?

A.   Yes, sir.

Q.   Do you see on December 10th that SBS's daily report under Inspections, Testing, and Visitors shows Tom Pittman was there to do a site visit?

A.   Yes, sir.

Q.   So, even if you set aside everything you told us this morning about you being out there sometimes when SBS people weren't, this document at least suggests you were there at least one time in December; right?

A.   Correct.

Q.   All right.  I want to talk now about the payment issues.  If you can direct your attention to Tri-Bar Exhibit Number 1.  That's their first pay application, isn't it?

A.   Yes.

Q.   And what is the amount of that pay application?

A.   $88,290.50.

Q.   What is it after retainage?

A.   $79,461.45.

Q.   And the date?

A.   July 29th of '12.

Q.   It looks like maybe 27.  I know you're farther away than --

A.   27th.  Sorry.

Q.   Okay.  And if we go to Exhibit Number 2 of Tri-Bar, the date?

A.   9/7/12.

Q.   The amount after retainage?

A.   $108,505.64.

Q.   Let's go to Number 3, which for some reason is missing the first page.  But if we look down at -- come back up to completed this period.  We use that column to come up with our amount.  Oh, first of all, we don't have the date exactly, but it's somewhere after September 30th; correct?

A.   Yes, sir.

Q.   Scroll down; what's the amount?

A.   Yes.  $31,429.01.

Q.   Okay.  And after retainage -- let's come back down because there's another document that will help us get to the bottom of that.  Exhibit Number 4, this is pay app number 4; correct?

A.   Yes, sir.

Q.   And it's dated 10/30/12?

A.   Yes, sir.

Q.   How much is it for after retainage?

A.   $3,541.68.

Q.   Number 5, date?

A.   December 3rd, 2012 -- or is that an 8?

Q.   It's a 3, it looks like.

A.   Okay.

Q.   And the amount?

A.   $271,597.01.

Q.   Looks like 03 maybe.  Okay.  Let's look at SBS Number 7.  This looks to be a draw summary prepared by SBS, and it shows 79,461 which was paid on September 6th.  Do you see that?

A.   Yes.

Q.   It shows the 108,505 was paid on 10/22; correct?

A.   Correct.

Q.   And then for the amount for Number 3 -- there is where I was talking about getting some help -- it's $28,286.11; correct?

A.   Correct.

Q.   And that would have been sometime -- I don't see the date it was submitted, but it must have been sometime after 9/30.  We saw that it was the September draw; right?

A.   Right.

Q.   Okay.  So, those all three, if we scroll back

down, should have been paid on 1/17. How many -- if you did 30 days from July 27th, where would you fall?

A. August 27th.

Q. Paid on 9/6. It was late; right?

A. Right.

Q. How many days late?

A. Seven.

Q. If we go to 9/7, that would have been due when?

A. 10/7.

Q. It was paid when?

A. 10/22.

Q. How many days late?

A. 18.

Q. All right. So, there was reference made -- 15; right -- 7 minus 22?

A. Yeah.

Q. There was reference made this morning about payment being withheld for three months. Do you recall that?

A. Yes, sir.

Q. That must have been a reference to these. Would you agree?

A. Yes.

Q. $28,786.00. As a percentage of the work, how

much is that?

A. Not even 4 percent.

Q. I did the math. It's 2.5.

A. Okay.

Q. And 3,541, doing the math, it's 0.3 percent. Is that satisfactory progress on this job?

A. No. In fact, I'm surprised that you would submit a pay application for $3,000.00 or even for $28,000.00, for that matter.

Q. And if we look at -- and I'm going to ask you to use your book this time. Tab 4 in Tri-Bar's exhibits; that's going to be that pay application.

A. I'm sorry, but which tab?

Q. Tab 4.

A. 4?

Q. Yeah.

A. Okay.

Q. Okay. So, let's look at what they're actually billing for in this pay application. I want you to go to the schedule of values. There's $1300.00 for project management. Did it seem like they were managing a lot of work that month?

A. No.

Q. $357.00 for rental, $188.00 for builder's risk, and $1800.00 for plumbing. So, of that, which

is actual work?

A. $1800.00 in plumbing.

Q. So, in an entire month, did they get anything done besides $1800.00 worth of plumbing?

A. Not according to this pay application.

Q. And in the preceding month, what got done? Let's look at tab 3. Again, we've got project management, we've got other general conditions cost, we got travel, we got builder's risk, we got $9800.00 for site utilities, and $16,000.00 for concrete. Do you see that?

A. Yes.

Q. Was that satisfactory progress for an entire month?

A. No.

Q. So, in a two-month period they have made progress on less than 3 percent of the work. Is that satisfactory?

A. No, it's not.

Q. And with respect to these amounts which weren't paid until January 17th, this one would have been due when? Let's assume it was October 1st that it was turned in. Give them the benefit of the doubt.

A. November 1st.

Q. All right. So, it was two and a half months

late; right?

A. Right.

Q. $28,000.00 of the -- how big was the total contract?

A. It was --

Q. It says on that pay application; right?

A. -- 1.2 -- 1,226,000.

Q. Okay. Roughly 2 percent of the contract amount; right?

A. Right.

Q. And then this one would have been due -- submitted --

A. December -- January 1st.

Q. It was a month and a half late, wasn't it?

A. Well, no. That's only --

Q. It was --

A. Oh, yeah. It was a month and a half late.

Q. The big one, the 271; it was submitted when?

A. December 8th.

Q. That's a 3.

A. Okay. 3.

Q. That's my bad handwriting. So, when was it due?

A. November 3rd -- or January 3rd.

Q. Paid January 17th?

A.   Yes, sir.

Q.   It was late two weeks, but not the three months that was suggested this morning, was it?

A.   Right.  Correct.

Q.   This morning you were talking about the mockup and you were waiting on the mockup.  Who does the mockup?

A.   Well, the general contractor does the mockup.

Q.   And were they waiting on you or were you waiting on them?

A.   We were waiting on them.

Q.   Getting back to the brick lug, there were representations made that it was poured exactly the way it was drawn.  Is that true based on what we went through here?

A.   I'm sorry.  Repeat that question.

Q.   I changed gears on you and I apologize for doing so without telling you I was going to.  Going back to the brick lug, there were representations made in prior examination that it was poured exactly the way it was drawn.  Is that true, based on what you observed in the field?

A.   No, sir.

Q.   With respect to the conditions depicted on the roof that you saw in the paragraphs, what did

those conditions look like?

A.   Well, towards the --

MR. CLARK:  Your Honor, I'm going to object.  He said he hadn't been up on the roof, so unless there's a picture sitting there which we can all see, I think it's going to be hearsay what somebody else told him was up on the roof.

THE COURT:  He's the general contractor.  I presume he reviewed the pictures of whatever to make a personal statement of what the roof looked like to him.  Can you?

THE WITNESS:  Yes, sir.

THE COURT:  Well, do it then.

A.   Well, there was several splices along the cupola area, the roof -- where -- there was three different roof clips used, through discovery.  There was specifically only supposed to be one.  I mean, you can't arbitrarily use different thickness roof clips on a roof and expect it to be correct.  Towards the end of the area where the doors were, where they spliced on sections of rafters and columns, you can literally see in the pictures where the -- the rafter does this.  And I'm exaggerating, but it flows down like this.  You can see it from the ground.  You can look up and see that the roof line is altered.

Q. (BY MR. SLATES) Is that in the location where you understand them to have field modified the hangar doors?

A. Yes, sir.

Q. Can you associate anything -- any correlation between those two events?

A. Well, they tried to field modify it. And because of the field modification, it didn't match the original slope. You can look at the pictures. And it's -- you've got a straight roof cutting across, and then when you hit that roof line, it dips off. It's just -- it's like this.

Q. Any other conditions that stand out in your mind from the photographs you reviewed?

A. Well, the grade beams. There was -- there were bolts that were missing, there was bolts that were not torqued properly, there was really pathetic welds. The list is lengthy; ad infinitum. There's -- it's a very detailed list.

Q. Well, we'll get into that in more detail with Mr. Boddie. But let me ask you this. Knowing what you know now, would you have made the representations about making payments to SBS in light of the fact that you viewed it as a termination for cause?

A. No, I would not have.

Q. Did you think that -- do you think it's unreasonable for an owner to withhold payment until they quantify the scope of the defects on a project?

A. Not at all.

Q. Do you think an owner should have to pay for defective work?

A. No.

Q. Do you think that it's reasonable for Tri-Bar to offset the cost of repairing the defective work against the amounts that are owed under the contract?

A. Yes.

MR. SLATES: That's all my questions.

THE COURT: Mr. Brown, as to matters brought up on cross?

MR. BROWN: Yes, sir.

### REDIRECT EXAMINATION

**BY MR. BROWN:**

Q. Mr. Pittman, when you were speaking with Mr. Slates, you indicated that -- as you did this morning, that you took and made additional inquiries for subcontractors; correct?

A. Correct.

Q. I know that at least for electrical, you only have one proposal?

A. Correct.

Q. That's the only one you made?

A. The only one I made.

Q. Thank you. Now, with regard to the timelines, you would agree with me that you don't have the need or a problem until the problem exists; right?

A. I'm not sure I follow you.

Q. There's not a problem until the problem exists.

A. Okay.

Q. Correct?

A. I think I follow you.

Q. Okay. So, as it relates to Mr. Robertson or Robertson Electric, prior to the point where he is submitting bids or he makes this inquiry regarding the additional work that was identified in the plans that he had, you're already soliciting subcontractors for him?

A. Because he never managed -- he never managed the job with enough people.

Q. Now, the reality is, he doesn't get to the site and is not going to work until the December. Did you know that?

A. Why is that?

Q. Because -- well, the first question is, did you know that?

A. Well, I'd have to go back and look at the daily reports, but --

Q. So, when you're seeking to replace him, you're doing it because you just don't want him on the site. You're just trying to take over the job?

A. No. That's not true.

Q. Okay.

A. He's not managing -- he's not manning the project.

Q. The reality here is that if your people are blocking and not doing the work that allows them to go forward and do the work, then they've got to man it in such a way that they can get things done in relation to what is there; correct?

A. I think that's probably safe.

Q. Okay. And the next part is also true; that if you're not paying them, then they're not going to send, perhaps, as much as they can if you're not paying them; right?

A. Right.

Q. So, it appears to me what you're really saying is, we want you to work; we're not going to pay you, but we want you to get it done. Right?

A. No, no. That's not the case. I mean --

Q. Well, the testimony -- and it's at this point

uncontroverted that there's an e-mail from Rod Lewis that says October, early November, don't pay these people. And that is, in fact, what's going on. They're not getting paid; right?

A. No. We just proved that they did get paid.

Q. No. What you proved was that there are payments that had been made. You did not prove that they got paid.

A. Well, I disagree. We just proved that they got paid.

Q. Now, on the 26th of November is when there is this -- and that's in Exhibit 32. And that's when Mr. John Grable is saying that you're already pricing the completion of the hangar with other qualified subs and suppliers. Now, that's -- you're doing that on November 26th.

A. Yes, sir.

Q. Okay. So, you would agree -- and again, as it relates to Robertson Electric, that if he's not there, then you're attempting to price him and replace him when he's not even there yet. Right?

A. Well, it goes back to the -- the original problem that we had, is we had a change order. They gave us a price for the change order that was almost half of their total contract amount for a section of

work that we felt wasn't half again as much work.

Q. Well --

A. And we proved that.

Q. -- I understand that -- well, no. What you said is -- you said some things. I don't know that you've proven it. That would be for the judge to decide. But the reality here is that, as it relates to what you're talking about, what you're saying is that we identified a problem before it was a problem, and so we're going to replace the problem before it materializes --

A. We didn't identify the problem before it was a problem. The problem identified itself. And it tracked -- if you can look through the daily reports, those numbers don't lie. Assuming they did lie --

Q. Have you ever heard -- at least, you know, Texas Rangers when they talk about one ride, one ranger?

A. Yeah.

Q. Okay. Well, here the need only realized for one person.

A. Okay.

Q. And you don't get to sit up here and tell someone else how to do their job; right?

A. They didn't do their job. If they had done

their job, we wouldn't be sitting here.

Q.   Well, that presumes that what you're saying is true; correct?

A.   Are you -- are you implying I'm lying?

Q.   I'll let the facts decide that.  What I'm saying is, the -- it presumes that what you're saying is true.

A.   Uh-huh.

Q.   Now, as relates to the decisions to terminate, you have decisions to terminate that you're making on November 3rd, November 2nd, November the 26th, November 4th, the latter part of October.  These are all times when you're deciding you're going to terminate the entire --

A.   If they had just showed up to work, we wouldn't have even talked about terminating.

Q.   Okay.  I thank you for volunteering.  But the bottom line is, you're saying that these individuals don't show up to work.  And from what I can tell, as you went through with your attorney, that your time of going to the site is sporadic at best; correct?

A.   Well, I don't -- I wouldn't say sporadic.

Q.   Well --

A.   We've already -- we'd already determined that there's -- they said that I was only there -- I didn't

show up in December when their reports clearly say that I was there in December. And I maintain that I was there several times when there was nobody working. There was nobody from Robertson Electric, there was nobody from SBS there.

Q. And again -- and the issue is if you're believed -- if someone believes you; right?

A. Yeah.

Q. Okay. Now, you made it a point when you were speaking with Mr. Slates to indicate how concerned you were; correct?

A. Correct.

Q. You were so concerned you don't document it; right? Right?

A. Correct.

Q. You have this adverse working relationship with SBS at this point; right?

A. No. It wasn't adverse until the very end.

Q. In your --

A. Even at the time of termination, I said, "I want to try to get you guys paid."

Q. Sir, in your e-mails, you're using profanity that talk about them.

A. Well, I mean, that kind of -- in the construction industry, every once in awhile somebody

drops an F-bomb.

Q. You're talking that you're going to screw over them.

A. I didn't say I was going to screw over them. I said I was going to crush them.

Q. Okay.

A. And as a college football player, that's a euphemism. Okay. That's -- you know, Rod Lewis is my running back. He's behind me. You're a linebacker. These guys are a linebacker that -- I'm going to hit them as hard as I can. I'm going to pull Rod Lewis to the finish line. That's my job is to protect the owner.

Q. Now, when you're talking about the euphemism of football and you're going to crush somebody, it was usually quite literal; right?

A. In football it was.

Q. Yeah. I was a halfback. I know it was.

A. Yeah.

Q. So, the bottom line is, what we're talking about here is, the relationship between the two of you had deteriorated.

A. Towards the end, yes, it had.

Q. And had deteriorated to such an extent that you didn't document it?

A. Well, you know, there was documentation, but I didn't personally document anything about Robertson Electric.

Q. When we talk about, again, 14.2.2 where we're addressing the need for certification, you go to 14.2.3 and 14.2.4 and you address what else needed to be done, but you totally miss and omit the fact that you never complied with 14.2.2, which you already admitted you didn't do. Right?

A. I didn't send out notice.

Q. Not just you, but Mr. Grable; correct?

A. Correct.

Q. So, what you're really saying is, Your Honor, don't hold us accountable to the contract, but hold them accountable. Right? Right?

A. No. No. But --

Q. Then you want to be held accountable to the contract?

A. Well, as we stated before, we had talked about all these issues. There wasn't any reference to any written notice not being done until just I showed up to here. The first time I heard that.

Q. Now, you've not been party to at least coming to court often; correct?

A. No.

Q.   This is the first time I think I've seen you in court; right?

A.   I've been in court before.

Q.   Here?

A.   Here.

Q.   Okay.  And the record will reflect that in numerous instances, the issue has been noticed on the part of Tri-Bar to put people on notice as to whatever misconduct or failures there have been.  So, you're saying that today is the first instance they made you aware of it; correct?

A.   No.  I -- aware of what?

Q.   The fact that notice was an issue.

A.   Yes, sir.

Q.   So, I guess the issue here is whether and to what extent you've been communicating with the attorneys for Tri-Bar.  Thank you.  I have no further questions.

THE COURT:  Mr. Clark?

MR. CLARK:  Oh, I didn't realize I got to go again.

THE COURT:  You don't have to.  Anything that's subject to cross.

MR. CLARK:  Right.  I'm sorry.  I just didn't realize I had another shot at it.

THE COURT: Direct, cross, redirect. If y'all read the Rules of Civil Procedure, you'd understand basically what I'm doing.

MR. CLARK: I did. I just wasn't --

THE COURT: You have a right to examine on anything Counsel brought up on cross.

MR. CLARK: Can I take two minutes to visit with my co-counsel? Because I really didn't realize I had that. I'm sorry, Your Honor, or I would have been prepared.

THE COURT: Okay. Take two minutes.

MR. CLARK: We don't need a break. I just want to --

THE COURT: Two minutes.

(Discussion off the record.)

MR. CLARK: I have no further questions, Your Honor.

THE COURT: Okay. You can step down, Mr. Pittman.

THE WITNESS: Thank you.

THE COURT: Yes, sir. Let me ask y'all, how many witnesses more do you have, Mr. Brown?

MR. BROWN: We have my client, we have Mr. Kieke, and then myself.

THE COURT: And yourself. Okay. How

many do you have, sir?

MR. SLATES:  Well, it depends on what happened with some more of these exhibits.  For sure we will have John Grable -- Mr. Clark may call him adversely -- who is the architect.  Matt Martinez, who works with John Grable.  Dan Boddie.  Steve Mower on the payment of costs associated.  And then it looks like we're probably going to have to call Jennifer Swisher and Bob Carnwath, but those will be brief.  That will just be to prove up documents that have been objected to.

THE COURT:  Okay.  So, we're talking about nine more witnesses?

MR. SLATES:  In my case, you're talking about four substantive witnesses and three prove-up witnesses, and then Mr. Clark is going to have some.

THE COURT:  That was three.  That's ten now.  Okay.  You gave me a three day --

MR. SLATES:  Oh, did you say you were --

MR. CLARK:  He didn't ask me yet.

THE COURT:  Okay.  How many do you have?

MR. CLARK:  Dave Morgan, who will not be long.  Kyle Kieke, who will be longer.  Erick Key with Schulte.  And Steve Schiffman and myself and John Maywald.

MR. SLATES: Would it -- and I'm just throwing this out as a suggestion. Would it be helpful to do attorney's fees on submission? It would save us --

THE COURT: Y'all have three days. You said three days and I'm not seeing three days.

MR. SLATES: I'm worried about that, too, Your Honor, frankly, given how long today has taken.

THE COURT: Yeah. Since you have one witness for one day.

MR. SLATES: No. I -- I will say that I think Tom will be the longest witness of the trial.

THE COURT: Well, you have to focus because I've got three days, and then you have a mistrial and we do it again. So, focus. We'll see how it goes tomorrow. Okay. We might be working late tomorrow. So, have all your witnesses ready to go. See y'all in the morning at 9:00.

MR. BROWN: Yes, sir.

THE COURT: Thank y'all.

THE STATE OF TEXAS  *

COUNTY OF KENDALL   *

I, TAMI L. WOLFF, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing or orally by counsel for the parties to be included in this volume of the reporter's record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this reporter's record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

I further certify that the total cost of the preparation of this reporter's record is $_____ and was paid/will be paid by _____.

WITNESS MY OFFICIAL HAND on this, the _____ day of _____, 2015.

_____
/s/
TAMI L. WOLFF
Texas CSR 5833
Expiration: 12/31/15
Kendall County Courthouse
201 E. San Antonio, Suite 212
Boerne, Texas  78006
(830) 331-8286